**Hearing Date: January 22, 2018 at 11:00 a.m. (Eastern Time)**
**Objection Deadline: January 16, 2018 at 5:00 p.m. (Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
P. Bradley O'Neill
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for RWNIH-DL 122nd Street 1 LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
HANS FUTTERMAN,                                                  :    Case No. 17-12899 (MEW)
                                                                 :
                              Debtor.                            :
                                                                 :
----------------------------------------------------------------- X

**MOTION TO APPOINT A CHAPTER 11 TRUSTEE OR, IN THE**
**ALTERNATIVE, CONVERT CHAPTER 11 CASE TO CHAPTER 7**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

JURISDICTION ............................................................................................................. 2

BACKGROUND ............................................................................................................. 2

    A.    The Debtor ........................................................................................... 2

    B.    The Debtor's Assets ............................................................................ 3

        i.    RGS Holdings ............................................................................ 3

        ii.    JenCo ......................................................................................... 5

            a.    Offer to Purchase the Lot 24 Property ............................ 7

        iii.    Other Properties ........................................................................ 8

    C.    The Debtor's Postpetition Disclosures ............................................... 8

    D.    The Ladera Chapter 11 Cases ............................................................. 9

        i.    Mr. Futterman's Failure to Communicate with Creditors ......... 9

        ii.    Mr. Futterman's Unilateral Withdrawal of the Bankruptcy Auction ........ 10

ARGUMENT .................................................................................................................. 12

I.    The Court Should Appoint a Chapter 11 Trustee ........................................... 13

    A.    Cause Exists to Appoint a Chapter 11 Trustee Under Section 1104(a)(1) ........... 14

        i.    Mr. Futterman's Prepetition Actions Demonstrate Cause to Appoint a
            Chapter 11 Trustee ................................................................... 16

        ii.    Mr. Futterman's Postpetition Actions Establish Cause to Appoint a
            Trustee ...................................................................................... 18

    B.    The Appointment of a Chapter 11 Trustee is in the Best Interests of Creditors ... 19

i

II.    In the Alternative, the Court Should Convert the Chapter 11 Case to a Case Under
       Chapter 7 of the Bankruptcy Code....................................................................................... 22

       A.    Diminution of the Estate and the Absence of a Reasonable Likelihood of
             Rehabilitation ............................................................................................................. 22

       B.    Mr. Futterman's Gross Mismanagement of the Estate ......................................... 25

CONCLUSION.......................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*,
336 B.R. 610 (Bankr. S.D.N.Y. 2006) ......................................................................13

*In re Ancona,* No. 14-10532 (MKV),
2016 WL 7868696 (Bankr. S.D.N.Y. Nov. 30, 2016) ...........................................14, 15, 18, 20

*In re Ashley River Consulting, LLC*, Nos. 14-13406 (MG) & 14-13407 (MG),
2016 WL 1540941 (Bankr. S.D.N.Y. Mar. 31, 2015) ...........................................15

*In re BH S&B Holdings, LLC*,
439 B.R. 342 (Bankr. S.D.N.Y. 2010) ......................................................................22

*In re Biolitec, Inc.*, No. 13-11157 (DHS),
2013 WL 1352302 (Bankr. D.N.J. Apr. 3, 2013) ...................................................15

*In re Cardinal Indus.*,
109 B.R. 755 (Bankr. E.D. Ohio 1990) ....................................................................15

*In re Deena Packaging Indus., Inc.*,
29 B.R. 705 (Bankr. S.D.N.Y. 1983) ...................................................................13, 14

*In re Eurospark Indus., Inc.*,
424 B.R. 621 (Bankr. E.D.N.Y. 2010) ......................................................................20

*In re Halal 4 U LLC,* No. 08-15216 (MG),
2010 WL 3810860 (Bankr. S.D.N.Y. Sep. 24, 2010) ........................................13, 25

*In re Ionosphere Clubs, Inc.*,
113 B.R. 164 (Bankr. S.D.N.Y. 1990) ......................................................................14

*In re Kanterman,*
88 B.R. 26 (S.D.N.Y. 1988) .......................................................................................23

*In re Marvel Entm't Grp., Inc.*,
140 F.3d 463 (3d Cir. 1998) .......................................................................................20

*Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat
Sales, Inc.)*,
4 B.R. 635 (Bankr. E.D.N.Y. 1980) ..........................................................................14

*In re Ridgemour Meyer Props., LLC*,
413 B.R. 101 (Bankr. S.D.N.Y. 2008) ..................................................................14, 20

*In re Rundlett,*
    136 B.R. 376 (Bankr. S.D.N.Y. 1992) .............................................................23, 24

*In re Soundview Elite*, *Ltd.,*
    503 B.R. 571 (Bankr. S.D.N.Y. 2014) .............................................................19, 20

*In re Strawbridge,* No. 09-17208 (MG),
    2010 WL 779267 (Bankr. S.D.N.Y. Mar. 5, 2010) .........................................25, 26

*Taub v. Taub (In re Taub),*
    427 B.R. 208 (Bankr. E.D.N.Y. 2010) ...................................................................20

*In re V. Savino Oil & Heating Co.,*
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ..............................................................13, 14

## STATUTES

11 U.S.C. § 105(a) ........................................................................................................2

11 U.S.C. § 341 ...........................................................................................................19

11 U.S.C. § 541(a)(6) ...................................................................................................3

11 U.S.C. § 1104(a) ..............................................................................................1, 2, 13

11 U.S.C. § 1104(a)(1) ..............................................................................13, 14, 15, 19

11 U.S.C. § 1104(a)(2) ..............................................................................14, 19, 20, 21

11 U.S.C. § 1112(b) ..................................................................................1, 2, 22, 23, 24

11 U.S.C. § 1112(b)(1) ...............................................................................................22

11 U.S.C. § 1112(b)(4) ...............................................................................................22

11 U.S.C. § 1112(b)(4)(A) ....................................................................................23, 25

11 U.S.C. § 1112(b)(4)(B) ....................................................................................25, 26

28 U.S.C. § 157 .............................................................................................................2

28 U.S.C. § 1134 ...........................................................................................................2

28 U.S.C. § 157(b)(2)(A) ..............................................................................................2

## OTHER AUTHORITIES

Fed. R. Bankr. P. 2015.3(a) ....................................................................................18, 19

iv

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

RWNIH-DL 122nd Street 1 LLC ("**RWN**") requests that this Court enter an Order (i) appointing a chapter 11 trustee in the above-captioned chapter 11 case (the "**Chapter 11 Case**") of Hans Futterman (the "**Debtor**") under section 1104(a) of title 11, United States Code (the "**Bankruptcy Code**") or, in the alternative, (ii) converting the Chapter 11 Case under section 1112(b) to a case under chapter 7 of the Bankruptcy Code.  In support of this motion (the "**Motion**"), RWN respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Chapter 11 debtors-in-possession are fiduciaries for their creditors.  Mr. Futterman has proven, both through his prepetition and postpetition actions, that he will not properly fulfill this role.

2.      The Debtor has no cash and no income.  His assets consist of equity interests in two entities that own real property in Manhattan and several apartments in which he is a joint owner.  He acknowledges that he plans to pay his creditors in this Chapter 11 Case through a sale of some or all of these assets.  He is, however, ill-suited to perform this function for several reasons:

- He has been removed from management of a non-debtor affiliate – which he now asserts will provide the greatest value to the estate – by an arbitrator who concluded that he had engaged  in "self-dealing";

- He has admitted that, while managing another non-debtor affiliate, he diverted  payments due to that affiliate to another entity and largely spent them, a transfer that violated an assignment of leases and rents that had been granted to RWN; and

- As demonstrated in the Ladera cases, he does not communicate with his creditors or act in their interest, and cannot be relied upon to identify or close appropriate sale transactions.

1

3.      An independent fiduciary should be appointed to manage what appear to be relatively straightforward asset sale processes and ensure that the proceeds of the sales are properly preserved and used to satisfy the claims of creditors.  RWN requests that this Court appoint a chapter 11 trustee to oversee the sale of the Debtor's assets, or, alternatively, this Chapter 11 Case should be converted to a case under chapter 7 of the Bankruptcy Code, so a chapter 7 trustee will manage this process.  Either way, Mr. Futterman should be removed from control of this Chapter 11 estate for the best interests of his creditors.

## JURISDICTION

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1134.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

6.      The statutory predicate for the relief requested herein includes Bankruptcy Code §§ 105(a), 1104(a), 1112(b).

## BACKGROUND

### A.      The Debtor

7.      The Debtor, Hans Futterman, is an individual.  He has no income, and has not had one for nearly two years.  *See Declaration of Alana R. Katz* (the "**Katz Declaration**") Ex. A (12/4/17 Transcript of 341 Meeting (the "**341 Transcript**")) at 11:6-15.  No one else in his household has one either.  *See id.* at 14:10-12.  The Debtor's monthly operating reports in this Chapter 11 Case reflect that he began the Chapter 11 Case with $800 in cash.  *See* Katz Decl. Ex. B (Debtor's October, 2017 Operating Report).  Within a month, that money had been spent on personal expenses.  *See* Katz Decl. Ex. C (Debtor's November, 2017 Operating Report).

8.      The Debtor has scheduled secured claims of $2,685,540 and unsecured claims of $3,739,413.  *See* Katz Decl. Ex. D and E (Debtor's Schedules and amended

2

Schedules). These totals do not include RWN's claim, which is based on a personal guaranty given by the Debtor on a loan (the "**Ladera Loan**") that RWN made to one of Mr. Futterman's entities, Ladera, LLC ("**Ladera**"). That claim, asserted in the amount of $10,729,240 (and continuing to accrue default interest, fees and other charges), is secured by assets of Mr. Futterman's estate or assets in which he owns an indirect interest. *See* Katz Decl. Ex. F (RWN's Proof of Claim).

9.      While he has not formally articulated an approach to this Chapter 11 Case, Mr. Futterman acknowledged at the 341 Meeting that he intends to sell assets to pay creditor claims and living expenses. *See* Katz Decl. Ex. A (341 Transcript) at 15:9-17.

**B.      The Debtor's Assets**

10.      Mr. Futterman has three principal assets: a 100% interest in RGS Holdings LLC ("**RGS**"), a 100% interest in JenCo 121 LLC ("**JenCo**"), and a group of properties he owns together with his wife.

*i.      RGS Holdings*

11.      RGS is a holding company that indirectly owns a majority ownership interest in 2280 FDB LLC ("**2280 FDB**") and, until recently, managed that entity through a subsidiary. A chart reflecting the relationship between these entities is below:



2280 FDB owns seven unsold condominium units in a mixed use development located at 2280 Frederick Douglass Boulevard in Harlem (the "**2280 Building**").

12.     The Debtor's Schedules of Assets and Liabilities (the "**Schedules**") value Mr. Futterman's interest in RGS at $10,000,000.  *See* Katz Decl. Ex. D (Schedules) at 5.  This valuation is premised on Mr. Futterman's understanding of the value of the unsold units in the 2280 Building.  *See* Katz Decl. Ex. A (341 Transcript) at 16:15-18.  Mr. Futterman has not filed an independent appraisal to support this valuation or any others contained in the Schedules.

13.     Mr. Futterman is the manager of RGS and SoHa Terrace Manager Corp., which in turn are the managers of SoHa Terrace LLC ("**SoHa Terrace**") and 2280 FDB.  RGS owns an 80% economic interest in SoHa Terrace.  Two other entities, USHA SoHa Terrace LLC ("**USHA**") and Ventures 76 LLC ("**Ventures**" and, together with USHA and SoHa Terrace, the "**2280 Parties**") own the remaining 20% interest in SoHa Terrace.  *See id.* at 16:3-17:3.

14.     On April 9, 2013, USHA filed claims against RGS, Mr. Futterman, SoHa Terrace, 2280 FDB, and the corporate predecessor-in-interest to Ventures, alleging that Mr. Futterman had mismanaged 2280 FDB.  The claims were later fully tried to an arbitrator.  On July 12, 2017, the Arbitrator issued an award (the "**Arbitration Award**") finding, among other things, that Mr. Futterman had intentionally refrained from leasing units in the 2280 Building to depress 2280 FDB's income and reduce the distributions paid to the 2280 Parties.  *See* Katz Decl. Ex. G (Arbitration Award) at 22-23.  He had done so, the arbitrator held, to pressure the minority members to sell him their interests in 2280 FDB at a discount.  *Id.*  Based on this "self-dealing," the arbitrator ordered Mr. Futterman removed from management of SoHa Terrace and 2280 FDB.

15.    The day after entry of the Arbitration Award, 2280 FDB and SoHa Terrace filed a state court action to confirm the Arbitration Award, remove Mr. Futterman from management of 2280 FDB, and appoint an independent manager to replace Mr. Futterman in that role.   That action was stayed by the filing of this Chapter 11 Case, but was subsequently removed to this Court.  *See* Adv. Pro. Nos. 17-01220, 17-01221, 17-01222 (Bankr. S.D.N.Y.).

16.    Prior to commencing the Chapter 11 Case, Mr. Futterman continued marketing and selling units in the 2280 Building in direct contrast to the directive in the Arbitration Award.   These actions also violated certain pledges and guaranties given by Mr. Futterman under the Ladera Loan.  Shortly after the filing of the Chapter 11 Case, RWN learned that Mr. Futterman caused a unit in the 2280 Building to be sold, but did not inform RWN.

17.    RWN sent a letter to Mr. Futterman, in his capacity as authorized representative of RGS, on November 2, 2017, requesting an accounting of all amounts received from the sale of this unit, as well as all other amounts received by Mr. Futterman or his related entities from the rental of the remaining empty units in the 2280 Building.  Additionally, RWN noted that it received a marketing flyer to sell the commercial unit in the 2280 Building, and reserved all rights with respect thereto.   RWN's counsel also sent a corresponding letter to Debtor's counsel, informing him of the letter from RWN, and requesting that the Debtor commence chapter 11 proceedings for 2280 FDB and RGS, so that the sale of these units and RWN's collateral can be overseen by this Court and creditors can have transparency with respect to the funds received therefrom.  *See* Katz Decl. Ex. H.  RWN received no response to these letters.

ii.    *JenCo*

18.    JenCo is a New York Limited Liability Company solely owned and managed by Mr. Futterman.  JenCo owns a vacant lot located at 311 West 121st Street in

5

Manhattan, known as Lot 24 (the "**Lot 24 Property**").  Mr. Futterman has scheduled his interest

in JenCo at $3,700,000.  *See* Katz Decl. Ex. D (Schedules) at 5.

19.     Like the Debtor, JenCo also guaranteed the Ladera Loan.  That guarantee

was secured by a mortgage on the Lot 24 Property and security interests in certain personal

property related thereto (the "**JenCo Mortgage**").  *See* Katz Decl. Ex. I (JenCo Mortgage).

Under Part I, paragraph 2(a) of the JenCo Mortgage, JenCo absolutely and unconditionally

assigned to RWN all of JenCo's current and future "Leases and Rents."  The JenCo Mortgage

defines "Leases" to include:

> [A]ll leases and other agreements or arrangements heretofore or hereafter
> entered into affecting the use, enjoyment, or occupancy of, or the conduct
> of any activity upon or in, the [Lot 24 Property], including any extensions,
> renewals, modifications or amendments thereof.

*See id.* at 3 ¶ (d).  That same paragraph also defines "Rents" to include:

> [R]ents, rent equivalents, moneys payable as damages . . . royalties . . .
> income, fees, receivables, receipts, revenues, deposits . . . accounts, cash,
> issues, profits, charges for services rendered, and other consideration *of
> whatever form or nature received by or paid to or for the account of or
> benefit of [JenCo]*.

*Id.* (emphasis added).  The JenCo Mortgage granted JenCo a revocable license to operate and

manage the Lot 24 Property and collect the Rents.  Upon an event of default under the Ladera

Loan, which occurred in September 2016, that license was automatically terminated.  *Id.* at

¶¶ 2(a), 27.  After termination, RWN is entitled to possession of all Rents, including Rents that

were past due, whether or not RWN enters or takes control of the Lot 24 Property.  *Id.*

20.     Sometime thereafter, Bestrow Realty ("**Bestrow**"), the owner of the

property adjacent to the Lot 24 Property sought access to the Lot 24 Property to build on its lot.

JenCo entered into an access agreement with Bestrow, which required Bestrow to pay JenCo

$20,000 per month.  Katz Decl. Ex. A (341 Transcript) at 47:8-12.  Mr. Futterman, however,

6

directed these amounts to be paid not to JenCo, the owner of the Lot 24 Property, but rather to RGS.  *Id.* at 47:15-24.   RGS is using the money to "pay bills" of RGS and Next City Development, LLC ("**Next City**"), two entities owned 100% by Mr. Futterman.  *Id.*  However, Mr. Futterman was unable to name what types of bills were paid, other than insurance bills that amount to a few thousand dollars.  *Id.* at 48:13-17.   Only $6,000 of the $60,000 remains in the RGS bank account.  *See id.* at 48:23-49:6.   Mr. Futterman claimed he "did not know" what happened to the remaining money.  *Id.* at 48:18-22.

21.    On December 7, 2017, RWN wrote to Mr. Futterman, as the authorized representative of JenCo, informing him that his diversion of payments under the access agreement violates the JenCo Mortgage and demanding an accounting.  RWN's counsel sent a corresponding letter to the Debtor's counsel, demanding that all funds paid by Bestrow under the access agreement be immediately turned over to RWN.  The Debtor did not timely reply to the letter, but ultimately, through his new counsel, replied by summarily arguing that RWN has no guarantee claim under the Ladera Loan and therefore the Debtor had no obligation to account for the diverted funds.  *See* Katz Decl. Ex. J.

  a.  *Offer to Purchase the Lot 24 Property*

22.    On October 26, 2017, after the commencement of the Chapter 11 Case, RWN learned that Mr. Futterman received an offer that day from Level Investments ("**Level**") to purchase the Lot 24 Property for $3,000,000.  Mr. Futterman did not communicate this offer to RWN.  Rather, RWN received a copy of the offer from Level.

23.    The same day, RWN sent a letter to Mr. Futterman's counsel, asking the Debtor's intentions with respect to Level's offer, as a fiduciary of the Debtor's estates and creditors.  See Katz Decl. Ex. K.  RWN has received no response to this inquiry.

7

      *iii.*    *Other Properties*

24.    The Schedules and the amended Schedules also reflect that Mr. Futterman owns interests in four additional pieces of real property, which he values at $3,525,000 in the aggregate. *See* Katz Decl. Ex. D (Schedules) at 3. These properties are jointly owned with Mr. Futterman's wife. There are three mortgages on two of these properties, each held by separate banks in a total amount of $2,438,812. *See id.* at Schedule D.

### C.    The Debtor's Postpetition Disclosures

25.    The Debtor filed his Schedules on November 13, 2017. Three weeks later, at the 341 Meeting, Mr. Futterman admitted that the Schedules did not include all of the entities in which the Debtor holds a majority or controlling interest. *See* Katz Decl. Ex. A (341 Transcript) at 17:22-25; 19:13-18; 21:12-16. In particular, the Debtor had failed to disclose his interests in (i) SoHa Terrace Manager Corp. and SoHa Manager Owner LLC, two entities reflected in the above chart of the entities related to 2280 FDB, (ii) Next City, which is the Debtor's general contracting entity, and (iii) Urban Hyena Productions, LLC, an entity the Debtor established with a friend to work on movie, film, and media projects (together, the "**Additional Interests**"). The Debtor thereafter filed amended Schedules on December 19, 2017. *See* Katz Decl. Ex. E (amended Schedules). However, the amended Schedules largely parallel the original Schedules and reflect *none* of the Additional Interests.

26.    The Debtor's Schedules also reveal that both the Debtor's father, Lewis Futterman, and his mother, Pamela Frost, are creditors of the Debtor's estate. *See* Katz Decl. Ex. D (Schedules) at Schedule E/F. The Debtor has also filed two applications to employ counsel, which reveal that his father is paying his legal expenses. *See* Katz Decl. Ex. L (Certification filed by Lewis Futterman stating that he provided an attorney retainer of $7,500 along with a

8

filing fee of $1,717); Katz Decl. Ex. M (stating that Lew Futterman provided the Debtor's wife

with $35,000 to pay Debtor's attorneys).

     **D.**     **The Ladera Chapter 11 Cases**

     27.     Ladera and Ladera Parent LLC ("**Ladera Parent**" and, together with

Ladera, the "**Ladera Entities**") are debtors in separate cases pending before the Court.  *See* Case

No. 16-13382 (MEW) (Bankr. S.D.N.Y. Dec. 4, 2016).  Ladera owned a real estate development

project located at 300 West 122nd Street in Manhattan (the "**Ladera Property**").   It was

controlled by Ladera Parent which, in turn was 100% owned and controlled by Mr. Futterman

through an intermediate entity.   An organizational chart reflecting Mr. Futterman's original

ownership interests in the Ladera Entities is below:



RWN was the principal secured creditor in the Ladera cases, which were filed on the eve of a

UCC foreclosure sale after Ladera failed to repay the Ladera Loan at maturity.

     i.     *Mr. Futterman's Failure to Communicate with Creditors*

     28.     From the outset of the Ladera cases, Mr. Futterman sought to negotiate

privately with various potential financiers while withholding information from Ladera's

creditors.  In the first two months of the case, Mr. Futterman sought to negotiate construction

financing, but did not inform RWN about these negotiations. *See* Katz Decl. Ex. N (1/11/2017

Hr'g Tr.) at 15:1-3.  This proposed financing also included terms that were not shared with

creditors or approved by this Court, such as exclusivity periods and financial penalties.  The Court noted that these types of terms require Court approval, and Mr. Futterman's negotiations of these were thus not effective.  *See* Katz Decl. Ex. O (2/15/2017 Hr'g Tr.) at 12:15-16 ("If there are financial penalties that I haven't approved, they're meaningless.").  This led the Court to admonish Mr. Futterman to share information with Ladera's creditors.  *See id.* at 15:7-17 ("[I]t's a Chapter 11 process and I expect there to be information sharing.  That's one of the things that happens in Chapter 11; it's one of the expenses, burdens, however you want to characterize it for the benefit of your client, that comes with being part of the bankruptcy process . . . So the fact that you're in control, for purposes of a case, doesn't mean that you're in control of information or that you get to do things at your own whim.").

29.    Thereafter, Mr. Futterman abandoned the construction financing and signed a term sheet for a private sale of the Ladera Property.  He failed to inform RWN before signing this term sheet and failed to provide the term sheet or related documents.  *See* Katz Decl. Ex. P (3/1/2017 Hr'g Tr.) at 7:1-7 ("This is the first time we're getting this news.  Notwithstanding your admonition last week, we're being kept in the dark.  We asked twice for these documents and didn't get them . . . And we need transparency, and I think Your Honor's on board that we should be getting transparency.").  Once again, this Court directed Mr. Futterman to share information with his creditors, specifically with RWN.  *Id.* at 9:21-10:1 ("I told you to share information . . . The more that you spring something on them, the more time I'm going to give them to respond.").

ii.    *Mr. Futterman's Unilateral Withdrawal of the Bankruptcy Auction*

30.    Mr. Futterman ultimately abandoned this transaction as well and thereafter negotiated a consensual plan of reorganization with RWN providing for the marketing and auction sale of the Ladera Property.  After approval of the bidding procedures by this Court, Mr.

10

Futterman retained Cushman & Wakefield, as broker, to market the Ladera Property.    Four

parties submitted initial bids for the Ladera Property (the "**Original Bidders**").    None of these

initial bids exceeded the amount of RWN's debt.

31.    Shortly before the scheduled auction, Mr. Futterman asked the Court –

over strenuous creditor opposition – to defer the auction to allow him to pursue a new potential

financing, which he asserted was fully agreed to by all parties and would pay creditors in full.

Mr. Futterman had apparently signed a new term sheet without ever disclosing it or this new

potential financing to creditors.    *See* Katz Decl. Ex. Q (6/20/2017 Hr'g Tr.) at 15:5-12 ("Q:

When did you sign the term sheet? A: Last night Q: And did you tell [RWN] about any of these

discussions? A: No, Your Honor Q: Why not? A: Because all the parties didn't want to do that at

this point . . . .").    After a brief adjournment, the Debtor unilaterally cancelled the auction (in

violation of the Court-approved bidding procedures) by purporting to "withdraw" Ladera's

previously granted motion to approve the auction and related bidding procedures.    *See* Katz Decl.

Ex. R.

32.    RWN promptly filed a competing chapter 11 plan, providing for the

auction sale of the Ladera Property (the "**RWN Plan**").    The Ladera Entities filed an amended

chapter 11 plan based on their proposed financing (the "**Ladera Plan**").    After an expensive

competing plan process, the Ladera Entities and their creditors reached a settlement.    The Ladera

Plan was conditionally confirmed, subject to the closing of Mr. Futterman's proposed financing

within three weeks, as Mr. Futterman previously represented that the parties were committed and

only needed to work on the documentation.    *See* Katz Decl. Ex. S. (6/22/2017 Hr'g Tr.) at 18:4-

12.    If the financing did not close timely, the confirmation of the Ladera Plan would be vacated

and the RWN Plan would be confirmed.    Mr. Futterman ultimately did not come to terms and the

11

financing did not close in the required time, *see* Katz Decl. Ex. T (8/31/2017 Hr'g Tr.) at 10:23-11:19, so the RWN Plan was confirmed by this Court, and a public auction was scheduled for the Ladera Property.

33.    Two plus months after Mr. Futterman's unilateral cancellation of the auction, none of the four Original Bidders returned.  Despite another round of marketing by Cushman & Wakefield, only two new parties submitted bids for the Ladera Property.  RWN also submitted a credit bid based on its secured claim.

34.    The RWN Plan provided for the appointment of a wind-down officer (the "**Wind-Down Officer**") to, among other things, auction and sell the Ladera Property.  The Wind-Down Officer conducted an auction on September 14, 2017 and spent a significant amount of time and effort to qualify the two new bidders for the auction, as their original bids were not deemed qualified under the Court-approved bid procedures.  *See* Katz Decl. Ex. U (9/21/2017 Hr'g Tr.) at 7:3-10.  Ultimately, only one other bidder aside from RWN was qualified.  The other potential bidder was not qualified because, among other things, it refused to participate in the auction if any other bidders were qualified.  *Id.* at 6:23-7:3.  After numerous rounds of bidding, RWN prevailed with a credit bid of $48,600,000.  *See* Katz Decl. Ex. V, ¶ 6.  The sale of the Ladera Property to RWN closed on November 14, 2017.  *See* Katz Decl. Ex. W, ¶ 8.

## ARGUMENT

35.    As a chapter 11 debtor in possession, Mr. Futterman owes fiduciary duties to the creditors of his estate.  *See In re Halal 4 U LLC*, No. 08-15216 (MG), 2010 WL 3810860, at *4 (Bankr. S.D.N.Y. Sep. 24, 2010); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 669-70 (Bankr. S.D.N.Y. 2006).  Based on his prepetition conduct, as well as his actions during this Chapter 11 Case, Mr. Futterman has demonstrated that he cannot fulfill his duties to maximize

12

the value of his assets for the benefit of creditors or keep his creditors informed about his

ongoing business operations.  The best interests of all creditors in this Chapter 11 Case demands

an independent fiduciary appointed to administer the Debtor's assets.  Therefore, RWN requests

that this Court appoint a chapter 11 trustee or, in the alternative, convert this case to one under

chapter 7 of the Bankruptcy Code.

## I.    The Court Should Appoint a Chapter 11 Trustee

36.    Section 1104(a) of the Bankruptcy Code provides for the appointment of a

trustee in a chapter 11 case in two circumstances:

> At any time after the commencement of the case but before confirmation
> of a plan, on request of a party in interest or the United States trustee, and
> after notice and a hearing, the court shall order the appointment of a
> trustee—
>
> (1)    for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of
> the case, or similar cause, but not including the number of
> holders of securities of the debtor or the amount of assets or
> liabilities of the debtor; or
>
> (2)    if such appointment is in the interests of creditors, any
> equity security holders, and other interests of the estate,
> without regard to the number of holders of securities of the
> debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).  This section is phrased in the disjunctive, meaning that there are two

distinct predicates for the appointment of a chapter 11 trustee.  Such appointment is "authorized

upon a showing of cause . . . or demonstration that the appointment is in the interests of the

parties."  *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

37.    Appointing a chapter 11 trustee under section 1104(a)(1) is "not a

discretionary function" and requires a showing of fraud, dishonesty, incompetence, or gross

mismanagement by the debtor, either before or after the commencement of the case.  *See In re*

13

*Deena Packaging Indus., Inc.*, 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983); *Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980) ("Under subsection (a)(1), the Court's discretionary powers are more circumscribed . . . the Court's discretion is limited to a determination of whether 'cause' exists for such appointment . . . ."). Under section 1104(a)(2), however, the decision "entails equitable considerations through which the court may exercise its discretionary powers." *Deena Packaging*, 29 B.R. at 706; *see also In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) (noting that a court has broad discretion under section 1104(a)(2)).

38.    While the appointment of a trustee in chapter 11 is an "extraordinary remedy," *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990), section 1104 "represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *V. Savino Oil & Heating*, 99 B.R. at 525.

## A.    <u>Cause Exists to Appoint a Chapter 11 Trustee Under Section 1104(a)(1)</u>

39.    While trustees must be appointed under section 1104(a)(1) in cases of fraud, dishonesty, incompetence, and gross mismanagement, mandatory appointment of a trustee is not limited to such situations. *See In re Ancona*, No. 14-10532 (MKV), 2016 WL 7868696, at *9 (Bankr. S.D.N.Y. Nov. 30, 2016) ("[T]he word 'including' and here, the words 'or similar cause,' before and after the enumerated listed examples of 'cause' reflect that the grounds for appointing a chapter 11 trustee are not limited to those specifically set forth in the statute."); *see also V. Savino Oil & Heating*, 99 B.R. at 525 ("[T]he grounds for appointing a reorganization trustee are not even limited to the derelictions specifically enumerated.").

40.    Other factors warranting the appointment for a trustee under section 1104(a)(1) are "conflicts of interest, inappropriate relations between corporate parents and

14

subsidiaries, misuse of assets and funds, inadequate record keeping and reporting, failure to disclose relevant and material information, lack of credibility and creditor confidence, and various other similar instances of conduct." *Ancona*, 2016 WL 7868696, at *9 (citing *In re Ashley River Consulting, LLC*, Nos. 14-13406 (MG) & 14-13407 (MG), 2016 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015)); *see also In re Biolitec, Inc.*, No. 13-11157 (DHS), 2013 WL 1352302, at *12 (Bankr. D.N.J. Apr. 3, 2013) (finding cause to appoint a trustee under section 1104(a)(1) because current management was "unable to act as a disinterested fiduciary for the estate [or] maintain the confidence of creditors"); *In re Cardinal Indus., Inc.*, 109 B.R. 755, 765-66 (Bankr. S.D. Ohio 1990) (finding that sufficient cause existed to appoint a trustee under section 1104(a)(1) due to the creditors' "serious and general loss of confidence in the Debtors' management," despite no finding of any of the enumerated 1104(a)(1) factors). A court may consider both "pre- and post-petition misconduct . . . when making the determination that 'cause' exists for the appointment of a trustee." *Ashley River Consulting*, 2015 WL 1540941, at *10.

41.    In *Ashley River Consulting*, the court found cause to appoint a trustee under section 1104(a)(1) where the debtor's principal had previously been found guilty of fraud and gross misconduct and had also been found accountable for "diverting and commingling funds" during his time in control. *Id.* The court found that although this conduct had taken place years prior to the bankruptcy, the "misconduct and wrongdoing has carried forward," as the manager had also acted in bad faith with respect to the bankruptcy of another entity he controlled. *Id.*

15

i.  *Mr. Futterman's Prepetition Actions Demonstrate Cause to Appoint a Chapter 11 Trustee*

42.     Mr. Futterman has repeatedly demonstrated that he cannot be trusted to act as a chapter 11 fiduciary.  First, he has already been found to have engaged in "self-dealing" by an arbitrator.  In particular, the arbitrator found that Mr. Futterman, as manager of 2280 FDB and related entities, had refrained from renting condominium units to deprive minority investors of distributions and thereby squeeze them until they sold to him at a discount.  On this basis, the arbitrator ordered him removed from management of these entities.  2280 FDB owns the condominium units that Mr. Futterman concedes generate the value in the estate's principal asset, his interest in RGS.  A manager who uses his authority to pressure creditors to extract benefits for himself is simply unacceptable as a chapter 11 fiduciary.

43.     Second, Mr. Futterman has also behaved improperly concerning the second major asset of the estate, JenCo.  In particular, JenCo was entitled to at least $60,000 in payments under an access agreement with Bestrow Realty.  These payments had been assigned to RWN under an Assignment of Leases and Rents contained in the JenCo Mortgage.  Mr. Futterman acknowledged, under oath, that he had nevertheless caused these payments to be delivered to RGS, where he spent them on various expenses that he could not name.  RWN promptly wrote to him, explaining how his actions violated JenCo's agreements and demanding an accounting of the diverted funds.  More than one month has passed, but Mr. Futterman has never explained the basis for this clear diversion of funds subject to RWN's lien (and whether or not Mr. Futterman disputes the claim, the lien still exists), provided an accounting, or provided a copy of the access agreement between JenCo and Bestrow.

44.     Furthermore, the Debtor has received an offer to buy the Lot 24 Property for $3 million.  Although this offer approximates his own (unsupported) $3.7 million valuation

16

of the Lot 24 Property, Mr. Futterman did not inform his creditors of the offer;  RWN learned of

the offer only from the potential buyer.  Similarly, despite RWN's written demand and Mr.

Futterman's fiduciary obligation to maximize the value of the estate for creditors, he does not

appear to have engaged in any negotiation with the interested party and, to the extent that he has

done so, there has been zero transparency.

45.    Finally, Mr. Futterman's conduct as controlling insider and principal of

the debtors in the Ladera chapter 11 cases also reflects his unsuitability as an estate fiduciary.

During those cases, Mr. Futterman repeatedly acted unilaterally, without informing creditors of

estate opportunities or negotiations and without taking creditor interests into account.  This was

not only inappropriate as a matter of process, it produced bad results for creditors.  He pinballed

among various alternative options, rejecting viable transactions without creditor consultation,

and ultimately failed to close any transaction at all.  He later unilaterally cancelled a scheduled

auction at which  four  bidders were expected to participate – again, without creditor consultation

and over the strenuous objection of RWN – to pursue a financing he had never disclosed to

creditors.  More than two months later, after Mr. Futterman had failed to close that financing, the

Ladera Property was sold at auction.  Undoubtedly exasperated with Mr. Futterman's earlier

conduct, the four Original Bidders did not return.

46.    Throughout the Ladera cases, Mr. Futterman's excessive combativeness,

poor negotiating skills, and apparent pursuit of his own interests over those of creditors led to

unnecessary conflict and greatly increased legal fees for all parties.  RWN has no confidence that

Mr. Futterman will not repeat this behavior in this Chapter 11 Case if he is allowed to conduct

sales of his assets.  Indeed, his apparent refusal (i) to inform creditors of the offer for the Lot 24

Property or engage with the offeror and (ii) to provide an accounting of his diversion of $60,000

17

from JenCo suggests that, if allowed to control this case, he will behave in precisely the same manner.

       ii.     *Mr. Futterman's Postpetition Actions Establish Cause to Appoint a Trustee*

47.     Aside from the more obvious displays of misconduct and mismanagement, courts have also found cause to appoint a trustee where a debtor's case suffers from conflicts of interest or where a debtor fails to follow basic bankruptcy procedural rules.  For example, in the *Ancona* case, this court granted a landlord's request for the appointment of a chapter 11 trustee because the individual debtor had failed to fulfill his fiduciary duties, including to investigate and object to any claim other than the claim of the landlord, and the debtor's failure to timely file his 2015.3 reports.  2016 WL 7868696, at *10.  The *Ancona* court further found appointment of a chapter 11 trustee warranted because the debtor's father, who also held insider claims against the debtor, had sought to pay the debtor's professional fees.  *See id.* at *11-12 ("The Court finds that the third-party fee payment applications are further evidence of the conflicts of interest that plague this case.").

48.     First, the Chapter 11 Case is rife with conflicts of interest.  As reflected on the Schedules, both Mr. Futterman's father and mother are creditors of the estate.  As in *Ancona*, Mr. Futterman's father, Lewis Futterman, is currently paying his legal fees associates with the Chapter 11 Case.

49.     Additionally, Mr. Futterman has violated the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  Under Bankruptcy Rule 2015.3, chapter 11 debtors are required to file periodic financial reports of the "value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest."  Fed. R. Bankr. P. 2015.3(a).  As reflected in the Schedules and discussed at the 341 Meeting, Mr. Futterman holds a substantial or controlling

18

interest in numerous entities, including RGS and JenCo, in addition to several others.  Under the rule, the first 2015.3 report must be filed "no later than seven days before the first date set for the meeting of creditors under § 341 of the Code."  Fed. R. Bankr. P. at 2015.3(b).  The original date scheduled for the 341 Meeting was November 27, 2017, and the 341 Meeting was initially held on December 4, 2017.  As of the date of this Motion, the Debtor has not filed a single 2015.3 report on behalf of any of his other entities.

50.    Mr. Futterman's behavior, both before and after the filing of this Chapter 11 Case, does not meet the standards of a fiduciary under chapter 11 of the Bankruptcy Code and thus establishes cause to appoint a trustee under section 1104(a)(1).

**B.    The Appointment of a Chapter 11 Trustee is in the Best Interests of Creditors**

51.    In addition to finding 'cause' to appoint a chapter 11 trustee under section 1104(a)(1), the Court should also appoint a trustee under section 1104(a)(2) because it is in the "best interests of creditors."  *In re Soundview Elite*, *Ltd.*, 503 B.R. 571, 582-83 (Bankr. S.D.N.Y. 2014) ("Subsection (a)(2) envisions a flexible standard.  It has been repeatedly held that in determining whether the appointment of a trustee is in the best interests of creditors, a bankruptcy court must . . . eschew rigid absolutes and look to the practical realities and necessities.") (internal citations omitted).

52.    In determining whether a trustee should be appointed under section 1104(a)(2) of the Bankruptcy Code, courts consider such factors as:

> (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

19

*Id.* at 583; *see also Ancona*, 2016 WL 7868696, at *12 (same).

53.    Also relevant under section 1104(a)(2) is whether the debtor "suffer[s] from material conflicts of interest, and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved." *Ridgemour Meyer Props.*, 413 B.R. at 113; *accord In re Eurospark Indus., Inc.*, 424 B.R. 621, 629 (Bankr. E.D.N.Y. 2010).    Likewise, "acrimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2)." *Taub v. Taub (In re Taub)*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (internal citation omitted); *see also In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (deep conflict and animosity between debtor and lenders led to "intense and high-stakes bickering," which caused lack of confidence in debtor and appointment of chapter 11 trustee).[1]

54.    In *Taub*, the Bankruptcy Court for the Eastern District of New York appointed a trustee in an individual chapter 11 case under section 1104(a)(2) where it found that the debtor's relationships with her creditors and other parties in interest was acrimonious and unproductive, which led to "costly, protracted, and burdensome litigation in this Court and in state court."    *Id.* at 229.    Appointment of a trustee was in the best interests of creditors because it would "fulfill the [d]ebtor's fiduciary obligations to the estate and its creditors without any prospect of favoritism or animus."    *Id.* at 230.

55.    Here, these principles militate in favor of the appointment of a chapter 11 trustee.    Creditors properly lack confidence in Mr. Futterman's ability to honor his fiduciary

---

[1] The *Ancona* court also found that a debtor's "unjustified refusal to evaluate his own pre-petition actions and to investigate claims that are held by insiders evidences the unhealthy conflict of interest in this case, and highlights the need to appoint a neutral trustee to carry out, in an unbiased manner, the [d]ebtor's fiduciary duties."    2016 WL 7868696, at *10.    An independent fiduciary is needed to investigate Mr. Futterman's actions and potentially bring litigation to recover funds for the benefit of creditors.

duties and pursue the interests of creditors rather than his own.   As explained above, Mr.

Futterman has:

- Diverted RWN's collateral from JenCo to RGS to avoid paying RWN and likely using this money for his personal benefit;

- Been found guilty of self-dealing by an arbitrator for intentionally depressing income to 2280 FDB in the hopes of squeezing out his partners' interests; and

- Consistently failed to communicate with creditors during Ladera's cases and unilaterally cancelled auctions and withdrew from negotiations that could have provided creditors with higher recoveries.

An independent trustee will eliminate these concerns.

56.      Additionally, Mr. Futterman's personal combativeness, failure to

communicate with creditors or respect their views or interests severely impaired his relationship

with RWN – the largest creditor of the estate – over the Ladera cases.  Mr. Futterman has also

pursued years of litigation with the 2280 Parties who, other than RWN, have been the most

active creditors in this Chapter 11 Case.  These contentious relationships alone are enough to

warrant the appointment of a chapter 11 trustee under section 1104(a)(2).

57.      In addition, appointment of a trustee will not in any way interfere with the

progress of the case.  The estate has no operating assets or business that requires Mr. Futterman's

continued involvement.  He has no aptitude in selling assets that a trustee lacks.  Indeed, his

performance in the Ladera cases suggests that a trustee would be far more effective in identifying

and closing transactions that are advantageous to the estate.

58.      Based on Mr. Futterman's behavior and the creditors' need for a

successful sale process to receive recovery, it would be in the best interests of all Mr.

Futterman's creditors for a trustee to be appointed under section 1104(a)(2).

21

II.    **In the Alternative, the Court Should Convert the Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code**

59.    There is also ample basis to convert the Chapter 11 Case to chapter 7 under section 1112(b) of the Bankruptcy Code. That section provides,

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  Section 1112(b)(4) lists several examples of "cause" for the conversion to chapter 7, including "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation [or] (B) gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4).  However, this list of factors is not exhaustive and "courts are free to consider other factors."  *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (citing *In re Ameribuild Const. Mgmt., Inc.*, 339 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009)) ("Bankruptcy judges have wide discretion to determine whether cause exists to dismiss or convert a case under section 1112(b).").  Courts use several factors to determine whether conversion to chapter 7 is appropriate, including whether a debtor "has engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests."  *Id.* at 346 (citing 7 Collier on Bankruptcy ¶ 1112.04[6]).  Mr. Futterman's acts and omissions both before and during this Chapter 11 Case provide cause to convert this case.

A.    **Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation**

60.    To establish cause under section 1112(b), there must be both (i) a diminution to the estate and (ii) no reasonable likelihood of rehabilitation.  Under the first factor, continuing loss to the estate can occur at any dollar amount, and need not be a substantial or

22

large volume.  For example, in *In re Kanterman*, this Court found that a housewife who filed for individual chapter 11 with $7,500 in her bank account, and who had spent $5,000 by the time the court considered a motion to convert, had caused a diminution to the estate.  *See* 88 B.R. 26, 29 (S.D.N.Y. 1988) ("All that need be found is that the estate is suffering some diminution in value.").  The *Kanterman* court also noted that the "more important question is the absence of a likelihood of rehabilitation . . . ." *Id.* at 28.

61.    The term "rehabilitation" as used in section 1112(b) is not synonymous with "reorganization" and does not include liquidation.

> 'Rehabilitate' has been defined to mean 'to put back in good condition; re-
> establish on a firm, sound basis.'  Rehabilitation, as used in section
> 1112(b)(1), does not mean the same thing as reorganization, as such term
> is used in chapter 11.  Since a debtor can be liquidated in chapter 11, the
> ability to confirm a plan of reorganization is considerably different than
> reaching a firm, sound financial basis.

*Id.* at 29 (citing Collier on Bankruptcy, ¶ 1112.03[i], p. 1112-15).  Therefore, this term "necessarily involves establishing a cash flow from which current obligations can be met." *Id.* at 29.  The *Kanterman* debtor was a housewife with no source of income.  Her  husband was a judgment debtor with at best an "erratic income stream." *Id.* at 28.  Because the debtor would not be able to meet current obligations on her real property, the court found, that there was no possibility for rehabilitation under section 1112(b)(4)(A). *Id.*

62.    Similarly, in *In re Rundlett*, the court converted an individual chapter 11 case to chapter 7 under section 1112(b)(4)(A).[2]  136 B.R. 376 (Bankr. S.D.N.Y. 1992).  The Debtor had "no visible independent cash flow to support the debtor's living expenses other than

---

[2] The debtor in this case was a widow with no source of income other than life insurance proceeds from her husband's death that she was using for living expenses. *Id.* at 379-80.  The court first noted that the insurance proceeds were assets of the estate, and that every dollar spent by the debtor caused a diminution to the estate. *See id.* ("The insurance funds are property of the estate for distribution to creditors.  The debtor is unemployed and has no source of income other than from the insurance proceeds.  This is not a case where post-petition income, which is excluded from property of the estate pursuant to 11 U.S.C. § 541(a)(6), will offset a diminution in property of the estate.").

23

from the interests earned on the invested insurance proceeds." *Id.* at 380. These proceeds, however, belonged to creditors as property of the estate. *Id.* at 380-81 ("The phrase independent sources is intended to mean assets or income not regarded as property of the estate claimed by creditors. Although a debtor who is not engaged in business is eligible to file a chapter 11 petition, the debtor . . . [must] fund the plan with income that does not already constitute property of the estate."). Because the debtor "relie[d] on property of the estate to satisfy . . . normal living expenses and to fund her Chapter 11 plan," there was no possibility of rehabilitation and the case was converted. *Id.* at 381.

63.     These cases compel conversion of this case to chapter 7. First, there has been diminution to the Debtor's estate. The Debtor began the Chapter 11 Case with $800 in cash, all of which was spent during the first month of the case on the Debtor's personal expenses. This constituted 100% of the Debtor's cash available to pay creditor claims.

64.     Furthermore, the Debtor has no reasonable likelihood of rehabilitation as defined in section 1112(b). The Debtor has not had income for the past two years, and his wife is not currently working. He has acknowledged that he plans to use the proceeds from a sale of the real property held directly or indirectly by RGS and JenCo to fund his personal expenses, such as tuition and medical costs.

65.     The sole means by which Mr. Futterman plans to pay creditor claims is selling estate assets. That is not rehabilitation; that is liquidation. Not only does Mr. Futterman's apparent plan for the Chapter 11 Case fall within the particular expertise of a chapter 7 trustee, but Mr. Futterman has demonstrated that he has little competence in that area, as he has repeatedly failed to negotiate or close multiple transactions. Any proceeds from a sale of Mr. Futterman's assets will become property of the estate, and should be used to pay creditors,

24

not the Debtor's personal expenses. Therefore, cause exists to convert the Chapter 11 Case to a case under chapter 7 under section 1112(b)(4)(A).

## B.    Mr. Futterman's Gross Mismanagement of the Estate

66.    Section 1112(b)(4)(B) provides a related but independent basis for a conversion where the debtor has caused "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B). Courts in this district have taken a somewhat expansive view of this language, and have converted individual chapter 11 cases under this section if it appears that the debtor filed its chapter 11 petition in bad faith. *See, e.g.*, *Halal 4 U*, 2010 WL 3810860, at *5 (converting an individual chapter 11 case under this section because although there was no conclusive proof the debtor filed its petition in bath faith, the circumstances surrounding the filing and the accompanying disclosure were suspicious, as the debtor had to file amended schedules for failure to list properties that were not initially disclosed); *In re Strawbridge*, No. 09-17208 (MG), 2010 WL 779267, at *4 (Bankr. S.D.N.Y. Mar. 5, 2010) (cause existed under section 1112(b)(4)(A) and (B) to convert the individual chapter 11 case because the debtor did not file her petition in good faith where she had filed previous bankruptcies and various state court actions in an effort to frustrate secured creditor's efforts to enforce their security interests).

67.    The *Halal 4 U* court also found that failure to make accurate and complete postposition disclosures qualified as gross mismanagement of the estate warranting conversion to chapter 7. For example, the debtor in that case had failed to accurately represent its interests in its properties and failed to submit monthly operating reports that satisfactorily depicted the debtor's income and expenses by property. *Halal 4 U*, 2010 WL 3810860, at *4.

68.    Mr. Futterman has demonstrated repeatedly that he cannot be trusted with control over the assets of his creditors. Not only was he removed from management of 2280 FDB and SoHa Terrace due to "self-dealing," but, more recently, in connection with the Lot 24

25

Property, Mr. Futterman diverted RWN's collateral from JenCo to RGS so he could use the funds for personal benefit. The fact that Mr. Futterman "did not know" what happened to approximately $54,000 does not indicate that he is a fiduciary who is capable of proper management of his estate.

69.     Mr. Futterman has also failed to accurately disclose interests in various entities.  As discovered at the 341 Meeting, the Schedules failed to disclose the Additional Interests, which are all entities in which Mr. Futterman has a controlling or majority interest. Although Mr. Futterman's counsel assured the United States Trustee he would amend the Schedules to include these Additional Interests, the amended Schedules failed to include them as well.

70.     Further, as the *Strawbridge* court noted, an independent fiduciary appointed to control the estate is particularly important where a debtor's valuation of its property is "exaggerated and divorced from economic reality."  *Strawbridge*, 2010 WL 779267, at *4. Both the Schedules and the amended Schedules reflect that Mr. Futterman's interest in RGS is worth $10,000,000, and his interest in JenCo is worth $3,700,000.  However, these valuations are not based on any legitimate appraisal or expert analyses.  They are simply numbers that Mr. Futterman hopes these assets will realize so he can receive a return.  Additionally, during the 341 Meeting, Mr. Futterman stated that his interest in RGS is worth more in the ballpark of $8,000,000 to $10,000,000, which estimates are not reflected in the amended Schedules.

71.     Based on this mismanagement and dishonesty, cause exists to convert the Chapter 11 Case under section 1112(B)(4)(B).  The creditors need an independent fiduciary, not Mr. Futterman, to examine and liquidate his assets and distribute the proceeds in accordance with the Bankruptcy Code.

26

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, RWN respectfully requests that

the Court enter an order either (i) appointing a chapter 11 trustee or (ii) converting the Chapter

11 Case to a case under chapter 7 of the Bankruptcy Code and granting such other, further, and

additional relief as the Court deems just and proper.

Dated: New York, New York
        January 9, 2018

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ *P. Bradley O'Neill*
        Adam C. Rogoff, Esq.
        P. Bradley O'Neill, Esq.
        1177 Avenue of the Americas
        New York, New York 10036
        Phone: (212) 715-9100

*Attorneys for RWNIH-DL 122nd Street 1 LLC*

27