**TARTER KRINSKY & DROGIN LLP**
*Counsel to the Debtor in Possession*
1350 Broadway, 11th Floor
New York, New York 10018
Tel (212) 216-8000
Fax (212) 216-8001
Scott S. Markowitz, Esq.
Robert A. Wolf, Esq.
Jill Makower, Esq.
smarkowitz@tarterkrinsky.com
rwolf@tarterkrinsky.com
jmakower@tarterkrinsky.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:

HANS FUTTERMAN,                                Chapter 11

                                               Case No.: 17-12899 (MEW)

                              Debtor.
-------------------------------------------------------------x

**DEBTOR'S DISCLOSURE STATEMENT TO**
**ACCOMPANY HIS PLAN OF REORGANIZATION**

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

## TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................................................. 1

I. INTRODUCTION ................................................................................................................... 1

CAUTIONARY STATEMENT ................................................................................................. 5

    A.   SUMMARY OF CLASSIFICATION AND TREATMENT ........................................ 6

II. VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN ..................................... 8

    A.   MANNER OF VOTING ON PLAN .......................................................................... 8
    B.   CLAIM HOLDERS ENTITLED TO VOTE .......................................................... 8
    C.   CLASSES IMPAIRED UNDER THE PLAN .......................................................... 9
    D.   VOTE REQUIRED FOR CLASS ACCEPTANCE ............................................... 10

III. THE DEBTOR, HIS BUSINESS AND HIS ASSETS ...................................................... 10

    A.   GENERAL BACKGROUND .................................................................................. 10
        1.  Pre-Petition ............................................................................................ 10
    B   THE DEBTOR'S PRIMARY ASSETS. ................................................................ 14
        1.  RGS Holdings LLC. ............................................................................... 14
        2.  JenCo 121LLC ....................................................................................... 15
        3.  265 West 122nd Street, Unit D ......................................................... 15
        4.  254 West 123rd Street, Garden Apartment ................................... 16
        5.  1 Burlingham Road, Pine Bush, NY .................................................... 16
        6.  317 Shawangunk Lake Road, Pine Bush, NY .................................... 16
        7.  Miscellaneous Assets ............................................................................ 16

IV. THE CHAPTER 11 CASE .................................................................................................. 16

        1.  The Chapter 11 Filing ........................................................................... 16
        2.  Retention of Counsel ............................................................................. 17
        3.  Removal of State Court Litigation ....................................................... 17
        4.  December 20, 2017 Scheduling Order .................................................. 18
        5.  RWN's Motion to Convert and the Debtor's Claim Objection Motion ........... 18
        6.  Settlement of RWN Claim Objection and the Debtor's Purchase of Certain Development Rights and the Debtor's Motion to Dismiss his Chapter 11 Case ................................................................................ 18
        7.  Bar Date and Objections to Claim ....................................................... 19
        8.  April 4, 2018 Scheduling Order ............................................................ 21
        9.  Post-Petition Operations ....................................................................... 21

V. SUMMARY OF THE PLAN ................................................................................................ 21

    A.   GENERAL .............................................................................................................. 22
        1.  Brief Explanation of Chapter 11 ......................................................... 22
        2.  Acceptance of the Plan ......................................................................... 23
        3.  Classification of Claims Generally ....................................................... 23
    B.   CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN ........ 24
        1.  Unclassified Claims ............................................................................... 25
        (a)   United States Trustee Fees ........................................................... 25
        (b)   Administrative Claims .................................................................. 25
        (c)   Priority Tax Claims ...................................................................... 27
        2.  Class 1 – TD Bank's Secured Claim .................................................... 28
        3.  Class 2 – U.S. Bank National Association as Trustee's Secured Claim ........ 28
        4.  Class 3 – People's United Bank, N.A.'s Secured Claim ..................... 29
        5.  Class 4 – Harlem Mann LLC's Secured Claim ................................... 30
        6.  Class 5 – All General Unsecured Claims ............................................ 31

C.    CONDITIONS TO AND MEANS FOR CONSUMMATION OF THE PLAN.............................................31
    1.  Condition to Occurrence of the Effective Date ............................................... 31
    2.  Funding of the Plan............................................................................... 32
D.    OBJECTIONS TO CLAIMS ........................................................................................32
E.    RESOLUTION OF DISPUTED CLAIMS .......................................................................32
F.    ESTIMATION ........................................................................................................33
G.    ALLOWANCE OF DISPUTED CLAIMS .......................................................................33
H.    CERTAIN OTHER PROVISIONS OF THE PLAN ...........................................................33
    1.  Causes of Action/Avoidance Actions .................................................... 33
    2.  Disbursing Agent.................................................................................. 34
    3.  Payments by Cash ................................................................................ 34
    4.  Unclaimed Distributions....................................................................... 34
    5.  Executory Contracts and Unexpired Leases .......................................... 35
      (a)    Assumption and Rejection Generally............................................35
      (b)    Rejection of Executory Contracts and Unexpired Leases..................35
    6.  Professional Fees and Expenses............................................................ 36
    7.  Retention of Jurisdiction ...................................................................... 36

VI.  CONFIRMATION PROCEDURES ................................................................................38
    A.    SOLICITATION OF VOTES; ACCEPTANCE ................................................................38
    B.    CONFIRMATION HEARING......................................................................................38
    C.    BEST INTERESTS TEST .........................................................................................41
    D.    CRAM DOWN ......................................................................................................41
    E.    RISK FACTORS ...................................................................................................43

VII.  CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ...................................................43

VIII.  VOTING INSTRUCTIONS..........................................................................................46

IX.  CONCLUSION.......................................................................................................47

## DISCLOSURE STATEMENT

On October 17, 2017 (the "Petition Date"), Hans Futterman ("Futterman" or "Debtor") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York.  Since the Petition Date, the Debtor has remained in possession of his assets and has continued to own, operate and manage his business affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (the "Bankruptcy Code").

Pursuant to § 1125 of the Bankruptcy Code, the Debtor now submits this disclosure statement (the "Disclosure Statement") relating to his proposed plan of reorganization dated April 16, 2018 (the "Plan").

## I.

## INTRODUCTION

The Debtor provides this Disclosure Statement to all of the Debtor's known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan.  All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan (a copy of which accompanies this Disclosure Statement as **Exhibit "A").**[1]

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings assigned to them in the Plan.

By order of the Bankruptcy Court dated May ___, 2018, this Disclosure Statement has been approved as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to make an informed judgment about the Plan.

However, the Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan.  No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement.  All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for **June ___, 2018 at 10:00 A.M**. at the United States Bankruptcy Court located at One Bowling Green, New York, New York 10004.  This hearing may be adjourned from time to time without further notice other than by announcement in Court on the scheduled date of such hearing.  At that hearing, the Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Court will then also receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

**No representations concerning the Debtor, the estimated value of the Debtor's property and/or the estimated assets to be generated from the liquidation of the Debtor's assets, are authorized by the Debtor other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance which are other than as contained in this Disclosure Statement, should not be relied upon by you in casting your vote with respect to the proposed Plan.**

***THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO ALL CREDITORS UNDER THE***

*CIRCUMSTANCES. THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EACH AND EVERY CLASS OF CREDITORS AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.*

THE BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECT ACT OF 2005 ADDED BANKRUPTCY CODE SECTION 1129(a)(15) WHICH CREATED ADDITIONAL REQUIREMENTS WITH RESPECT TO THE CONFIRMATION OF A CHAPTER 11 PLAN IN THE CASE OF AN INDIVIDUAL DEBTOR. BANKRUPTCY CODE SECTION 1129(a)(15) READS IN PERTINENT PART:

[I]N THE CASE IN WHICH THE DEBTOR IS AN INDIVIDUAL AND IN WHICH THE HOLDER OF AN ALLOWED UNSECURED CLAIM OBJECTS TO CONFIRMATION OF THE PLAN -

(A) THE VALUE, AS OF THE EFFECTIVE DATE OF THE PLAN, OF THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN ON ACCOUNT OF SUCH CLAIM IS NOT LESS THAN THE AMOUNT OF SUCH CLAIM; OR

(B) THE VALUE OF THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN IS NOT LESS THAN THE PROJECTED DISPOSABLE INCOME OF THE DEBTOR (AS DEFINED IN SECTION 1325 (b) (2)) TO BE RECEIVED DURING THE 5-YEAR PERIOD BEGINNING ON THE DATE THAT THE FIRST PAYMENT IS DUE UNDER THE PLAN, OR

DURING THE PERIOD FOR WHICH THE PLAN PROVIDES PAYMENT WHICHEVER IS LONGER.

ALL UNSECURED CREDITORS HAVE A RIGHT TO OBJECT TO THE DEBTOR'S PLAN OF REORGANIZATION.  SHOULD AN UNSECURED CREDITOR OBJECT TO CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION, AN INDIVIDUAL'S CHAPTER 11 PLAN MAY ONLY BE CONFIRMED IF THE PLAN PAYS UNSECURED CREDITORS 100 PERCENT OF THEIR CLAIMS, OR DEVOTES FIVE YEARS OF THE DEBTOR'S PROJECTED DISPOSABLE INCOME TO THE PAYMENT OF UNSECURED CREDITORS. THE DEBTOR BELIEVES THE PLAN SATISFIES THIS REQUIREMENT.

**THE FAILURE BY AN UNSECURED CREDITOR TO OBJECT TO THE CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION MAY RESULT IN THE COURT CONFIRMING THE PLAN WITHOUT SATISFYING THE REQUIREMENTS OF SECTION 1129(a)(15). ALL UNSECURED CREDITORS SHOULD DISCUSS THEIR RIGHTS WITH THEIR RESPECTIVE ATTORNEY.**

This Disclosure Statement is based upon information available to the Debtor as of April 13, 2018 and does not reflect events that may occur subsequent to that date, which may have a material impact on the information contained in this Disclosure Statement.  The Debtor will not make any effort to supplement or amend this Disclosure Statement to reflect changes subsequent to the date hereof.

**THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER,**

**THE DEBTOR AND ITS ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.**

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER STATUTE OR RULE OF SIMILAR IMPORT.

ALTHOUGH THE DEBTOR'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE DEBTOR'S PROFESSIONAL ADVISORS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION.  SUCH PROFESSIONAL ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.

## <u>CAUTIONARY STATEMENT</u>

CERTAIN INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AND THE PRIVATE SECURITIES LITIGATION REFORM ACT OF

1995, AS AMENDED.    SUCH FORWARD-LOOKING INFORMATION IS BASED ON INFORMATION AVAILABLE WHEN SUCH STATEMENTS ARE MADE AND IS SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN THIS DISCLOSURE STATEMENT.

### A.    Summary of Classification and Treatment

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims, the relative allocations of property to holders of such Claims, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan.    However, the Debtor believes that a broad overview of what, in the opinion of the Debtor, Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan and the proposed treatment of each such Class under the Plan.

| CLASS | DESCRIPTION | KIND OF PROPERTY DISTRIBUTED TO CLASS | PROJECTED ULTIMATE DISTRIBUTION AS PERCENTAGE OF ALLOWED CLAIM |
|---|---|---|---|
| Administrative (unclassified) | a. Professional Fees and Expenses | Cash | 100% as allowed by Court or as agreed between the holder of such claim and the Reorganized Debtor. |
| | b. Accounts payable and other obligations which arose post-petition | Cash | 100% on the Effective Date[2] or as may be paid in the ordinary course of business. |
| Priority Tax Claims (unclassified) | Tax Claims | Cash | 100% of Allowed Claim paid in equal quarterly installments over a four (4) year period from the Effective Date. |
| Class 1 | TD Bank's Secured Claim against the property located at 265 West 122nd Street, New York, NY, Unit D (Approximately $1,020,000) | Cash | TD Bank's mortgage shall be reinstated as permitted by section 1123(a)(5)(G) of the Bankruptcy Code and the Reorganized Debtor shall cure any payment defaults under TD Bank's mortgage and reinstate the loan in accordance with its terms. TD Bank shall retain all liens as existed as of the Petition Date. |
| Class 2 | U.S. Bank National Association's Secured Claim against the property located at 254 West 123rd Street, New York, NY (Approximately $837,000) | Cash | U.S. Bank National Association's mortgage shall be reinstated as permitted by section 1123(a)(5)(G) of the Bankruptcy Code and the Reorganized Debtor shall cure any payment defaults under U.S. Bank National Association's mortgage and reinstate the loan in accordance with its terms. U.S. Bank National Association shall retain all liens as existed as of the Petition Date. |
| Class 3 | People's United Bank, N.A.'s Secured Claim against the property located at 1 Burlingham Road, Pine Bush, New York 12566 (Approximately $586,000) | Cash | People's United Bank's secured claim shall be modified by extending the maturity date and the payment terms. The Plan provides for full payment over time of People's United Bank's mortgage by making payments of $3,000 per month for approximately three years from the Effective Date and paying any outstanding amounts by the 40th month from the Effective Date either through a refinance or sale. People's United Bank shall retain all liens as existed as of the Petition Date. |
| Class 4 | Harlem Mann, LLC's Secured Claim | Cash | Harlem Mann LLC's Allowed Secured Claim ($1 million) shall be paid by the Reorganized Debtor over a period of time. The Debtor shall pay $100,000 to Harlem Mann on the Effective Date and the balance of $900,000 over time from the Debtor's distribution received from the liquidation of 2280's remaining assets. |
| Class 5 | Claims of All Unsecured Creditors (Approximately $3 million or up to $14 million if the RWN is ultimately allowed) | Cash | Allowed Class 5 Claimholders shall be paid in full plus post-petition interest at 3% per year over a period of three (3) years from the Effective Date assuming the RWN Claim is expunged. In the event the RWN Claim is allowed at an amount of $5 million or more, holders of Class 5 Claims shall be paid in full plus post-petition interest at 3% per year over a period of five (5) years |

---

[2] Effective Date is a term defined in the Plan.

| CLASS | DESCRIPTION | KIND OF PROPERTY DISTRIBUTED TO CLASS | PROJECTED ULTIMATE DISTRIBUTION AS PERCENTAGE OF ALLOWED CLAIM |
|-------|-------------|------------------------------------------|--------------------------------------------------------------|
|       |             |                                          | from the Effective Date. |

## II.

## VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN

### A.    Manner of Voting On Plan

Before voting, this Disclosure Statement as well as the Plan should be read in its entirety. You should only use the ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.

**If you hold a Claim in Classes 3, 4 or 5, included in the package of materials forwarded to you along with the Disclosure Statement and Plan is the enclosed ballot for your acceptance or rejection of the Plan.  You should complete, date and sign your ballot and return it to Tarter Krinsky & Drogin LLP, Attention: Scott S. Markowitz, Esq., 1350 Broadway, New York, New York 10018, attorneys for Debtor.  All ballots must be received by 5:00 P.M. on June __, 2018.  Any ballot which is properly executed but does not indicate acceptance or rejection of the Plan shall be deemed to be an acceptance of the Plan.**

### B.    Claim Holders Entitled To Vote

Under the Bankruptcy Code, any holders of Claims in Classes that are "impaired" under the Plan are entitled to vote to accept or reject the Plan, unless such Class of Claims neither receives nor retains any property under the Plan (in which case such Class is deemed to have rejected the Plan).  Bankruptcy Code §1124 provides generally that a Class is impaired if the legal, equitable or contractual rights of the Claims or interests in that Class are altered.

Subject to the exceptions provided below, any holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim holder has filed a proof of Claim with respect to a Disputed Claim.

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Debtor or by an order of the Bankruptcy Court in an estimated amount which it deems proper for the purpose of voting to accept or reject the Plan. In other words, only holders of Allowed Claims may vote to accept or reject the Plan. A Claim to which an objection has been filed by the Debtor or any other party-in-interest not later than May__, 2018, or a Claim (i) which is listed on the Debtor's schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding proof of claim has not been filed is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the court allows the Claim (in whole or in part) by Final Order. Upon request of a party-in-interest, the court may temporarily allow or estimate a Disputed Claim for purpose of voting on the Plan. Ballots cast in respect of Claims other than Allowed Claims will not be counted. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the creditor is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

C.      **Classes Impaired Under the Plan**

Claimholders in Classes 3, 4 and 5 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan. Any controversy as to whether any Claim or Class of Claims is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

**D.**     <u>**Vote Required For Class Acceptance**</u>

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of Allowed Claims in that Class who cast ballots.

**III.**

<u>**THE DEBTOR, HIS BUSINESS AND HIS ASSETS**</u>

**A.**     <u>**General Background**</u>

    **1.**     <u>**Pre-Petition**</u>

The Debtor is an individual who resides with his wife Ellen R. Barnaby ("Ellen") at their residence located at 265 West 122nd Street, Apt. D, New York, New York. The Debtor and Ellen own this apartment as tenants by the entirety. Ellen has not filed a bankruptcy petition. The Debtor believes his residence has a fair market value of approximately $3,400,000 and is subject to a first mortgage in favor of TD Bank in the amount of approximately $1,020,000. The Debtor is primarily engaged in a business of developing real estate in upper Manhattan. Since 2001, the Debtor has successfully developed several mixed used condominium projects including the development located at 265 West 122nd Street and 254 West 123rd Street.

In or about 2004, the Debtor through entities known as Ladera LLC and Ladera Parent, LLC (collectively, "Ladera") began the lengthy process of assembling a development site (the "Project") in upper Manhattan comprised of (a) two primary development lots -- the parcel located at 223/229 St. Nicholas Avenue a/k/a 305 West 121st Street, New York, New York which contained an operating garage ("Lot 30" or the "Garage Parcel") and the parcel located at 231/237 St. Nicholas Avenue a/k/a 300 West 122nd Street, New York, New York which contained an operating gas and service station ("Lot 35" and, together with the Garage Parcel,

the "Real Property"), (b) air rights and easements from five (5) other adjacent lots, and (c) a variance allowing for 16,191 additional FA and 15 feet of additional height beyond the contextual zoning limitation. The assemblage was for the development of the Project as a mixed-use property featuring new residential condominiums, a FRESH qualifying supermarket, and other amenities that are commonly found and expected in such a development. Ladera entered into its first contracts in 2006. Closings began in 2008 on air rights and then continued through 2011 for Lot 35, the adjacent gas station site. A closing was to occur on the Garage Parcel in April 2014 with full funding for the Project of $136 million. Unfortunately, the final closing on the Garage Parcel was delayed to August 2015. Originally, funding was to be provided by a construction loan from iStar Financial and Goldman Sachs ("iStar/GS"). Unfortunately, the Garage Parcel owners refused to close in the time frame required, forcing the Ladera to commence litigation seeking specific performance. The existence of such litigation caused Ladera to lose the construction financing that was to be provided by iStar/GS. Ladera then decided to refinance with a lender known as RWN Real Estate Partners ("RWN") which the Debtor later found out was the private equity arm of Marc Rowan, one of the founders of Apollo Global Management, LLC, in order to take out its existing financing. The Debtor had explored multiple other options, but decided on RWN premised upon the assertion of RWN's principal Jon Singer that RWN was a good faith secondary lender that would provide a loan of one year plus a one year extension and that RWN only wanted a reasonable rate of interest of 9% and no risk to their principal. Further, Mr. Singer assured the Debtor that RWN would provide funding on substantially similar terms for the acquisition of the Garage Parcel if settled or if the seller thereof was ordered by a court to close.

RWN's original loan to Ladera was made in or about May 2014 in the principal amount of $12,000,000. The Debtor had previously contributed in approximately $10,000,000 of his own funds to the Project. In or about May 2015, Ladera and/or RWN modified the original loan agreement to provide for up to $22,000,000 in additional funding to close on the Garage Parcel and to fund timely requests for disbursements relating to the commencement of demolition, construction, and other necessary work on the Project. In exchange for such additional funding and other significant commitments, RWN received an interest rate increase from 9% to 14%, substantial increases in fees, and a newly coined "Capital Availability Fee" and "Additional Capital Availability Fee," whereby RWN received an additional $880,000 in fees. RWN then loaned Ladera the principal amount of approximately $16 million (which increased the total principal amount loaned by RWN to Ladera to approximately $28 million), and charged Ladera approximately $3 million in prepaid interest, fees and costs on that $16 million loan. The approximately $16 million was paid to the seller of the Garage Parcel when Ladera closed on its purchase of same in August 2015.

The $16 million paid to the Garage Parcel owner and the $3 million in prepaid interest, fees and costs that went to RWN totaled $19 million, leaving $3 million in funding available for Ladera. However, when Ladera sought to draw down that $3 million, RWN refused. On August 28, 2015, Ladera entered into two subsequent loan agreements with RWN as part of an integrated transaction: (i) an acquisition loan agreement (the "Acquisition Loan Agreement") providing for an acquisition loan (the "Acquisition Loan"); and (ii) a building loan agreement (the "Building Loan Agreement" and, together with the Acquisition Loan Agreement, the "August 2015 Loan Agreements") providing for a building loan (the "Building Loan" and,

together with the Acquisition Loan, the "August 2015 Loans").    RWN asserted that in total, these loans increased the principal amount outstanding to approximately $36,000,000.

RWN's loans were secured by the Project as well as personally guaranteed by the Debtor and the Debtor also provided pledges of his ownership interest in various limited liability companies, one of which owned a 2500 ft. vacant development site located at 311 West 121 Street, New York, New York.

RWN's loans were originally scheduled to mature on March 1, 2016. On February 29, 2016, RWN and Ladera entered into a loan amendment which extended the maturity date to June 1, 2016 and increased the interest rate of the loans to 15% and imposed an addition 2% exit fee. In April 2016, the Debtor attempted to obtain financing with Goldman Sachs but was unsuccessful. Ladera was unable to refinance the loans as of June 1, 2016 and on or about June 2, 2016, Ladera and RWN entered into a forbearance agreement. The forbearance agreement extended the maturity date to September 1, 2016. RWN insisted on an increase of its interest rate to 19.5%. In September 2016, RWN gave official notice of a default and notified the Debtor that RWN intended to auction RWN's security interest in the LLC interest. RWN published a UCC auction sale notice and retained a broker. This made it nearly impossible for the Debtor to obtain refinancing for the Project. In an effort to retain the Project, the Debtor caused Ladera to file chapter 11 with this Court on December 4, 2016.

In Ladera's chapter 11 case, this Court confirmed of a plan of liquidation submitted by RWN which provided for an auction sale of the Project. RWN's plan was confirmed in late August 2017 and an auction was conducted by a wind down officer appointed under the plan on September 14, 2017. Despite the fact that several interested purchasers indicated an interest in bidding at the auction, only one bidder was ultimately qualified, an entity known as Happy

Living Group. However, RWN submitted the highest bid in the form of a credit bid in the amount of $48,600,000. Despite bid procedures which required bidders to close within two weeks, RWN or its designee did not close until November 14, 2017. That auction and RWNs actions thereafter remain under a cloud to this date and Debtor is exploring all options related thereto.

Because of the automatic stay imposed by Ladera's chapter 11 filing, RWN could not enforce its rights under its loan documents against Ladera. As a result, RWN filed a lawsuit in New York State Supreme Court seeking summary judgment in lieu of complaint against the Debtor based upon the Debtor's guaranty of RWN's loans. Rather than litigating the summary judgment in lieu of complaint action in state court, the Debtor was advised to file a chapter 11 petition with the clerk of this Court. The Debtor filed his chapter 11 case on October 17, 2017.

B.      **The Debtor's Primary Assets**

The following is a description of the Debtor's assets.

1.      **RGS Holdings LLC**

The Debtor is 100% owner of RGS Holdings LLC ("RGS"). RGS is a holding company that indirectly owns a majority ownership in an entity known as 2280 FDB LLC ("2280 FDB") through its ownership interest in SoHa Terrace LLC. 2280 FDB owns seven (7) unsold condominium units in a mixed use development located at 2280 Frederick Douglas Boulevard, New York, NY. Five (5) of these units are residential apartments, one (1) is a community facility and one (1) is a commercial retail unit. The Debtor estimates the net market value of these condominium units to be approximately $20,500,000.00.   As such, the Debtor estimates his interest in RGS to be approximately $10,000,000.00 which is based upon the Debtor's estimate of the fair market value of the various condominium units ($20,500,000.00) less the first mortgage ($4,600,000.00) debt and less

the minority partners' share of the equity. As of December 31, 2017, there was approximately $430,000 in cash reserves for 2280 FDB. Approximately $330,000 was held at the mortgagee bank, BCB. $100,000 was held at Chase bank in the 2280 FDB operating account. BCB was fully aware of the arbitration and the Debtor's bankruptcy filing and did not assert a default. Rather, BCB simply stated that if the loan was performing, it wished for sales of the units to continue. BCB sold the mortgage on December 27, 2017 to a distressed debt buyer Maverick Real Estate Partners ("Maverick"). Maverick is attempting to assert retroactive default interest under the loan based upon (1) the arbitration decision, and (2) the Debtor's chapter 11 filing. Maverick asserts the Debtor's personal guaranty provides that the arbitration decision and the Debtor's individual bankruptcy filing constitutes a default under the loan allowing them as the subsequent purchaser of the loan to seek such retroactive default interest. 2280 FDB is in the process of refinancing the mortgage in order to pay off Maverick.

## 2.  JenCo 121 LLC

The Debtor owns 100% membership interest in JenCo 121 LLC ("JenCo"). The JenCo's sole asset is its ownership interest of certain real property located and known as 311 West 121st Street, New York, New York (aka Block 1948 Lot 24) (the "JenCo Property").

As of the Petition Date, the Debtor believed the value of the JenCo Property was in the range of approximately $3,700,000.00. Premised upon a recent decision by the Bankruptcy Court, the Debtor is assessing the value of the JenCo Property.

## 3.  265 West 122nd Street, Unit D

The Debtor owns this condominium unit with Ellen. The Debtor believes the fair market value of the apartment is approximately $3.4 million. The apartment is subject to the first mortgage held by TD Bank in the approximate amount of $1million.

4.    **254 West 123rd Street, Garden Apartment**

The Debtor owns this condominium unit with Ellen. The Debtor believes the fair market value of the apartment is approximately $2.2 million. The apartment is subject to the first mortgage held by U.S. Bank National Association in the approximate amount of $837,000.

5.    **1 Burlingham Road, Pine Bush, NY**

The Debtor owns this upstate single family house with Ellen. The Debtor believes the fair market value of the house is $1.5 million. The house is subject to the first mortgage held by People's United Bank, N.A. in the approximate amount of $586,000.

6.    **317 Shawangunk Lake Road, Pine Bush, NY**

The Debtor owns this property with Ellen. The Debtor believes the fair market value of this property is $250,000. There is no mortgage encumbering the property.

7.    **Miscellaneous Assets**

The Debtor has various other assets such as household furnishings and the like. The Debtor also may have various causes of action related to the auction sale of the Real Property.

**IV.**

**THE CHAPTER 11 CASE**

1.    **The Chapter 11 Filing**

The Debtor's Chapter 11 Case was originally assigned to the Honorable Sean H. Lane but subsequently transferred to the Honorable Michael E. Wiles because Judge Wiles had presided over the Ladera bankruptcy case. The Bankruptcy Court has entered several orders in the Chapter 11 Case, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the bankruptcy court's worldwide website: **www.nysb.uscourts.gov.**  A pacer password is required to view the documents.

2.      **Retention of Counsel**

Subsequent to the Petition Date, the Debtor remained in possession of his assets and property and continued to operate his business as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  By order of the Court dated December 20, 2017, Schafferman & Feldman LLP was authorized to act as bankruptcy counsel for the Debtor during the course of its Chapter 11 Case.   By order of the Court dated December 28, 2017, the Debtor was authorized to retain Tarter Krinsky & Drogin LLP to substitute as his general bankruptcy counsel in place of Schafferman & Feldman LLP.

3.      **Removal of State Court Litigation**

Prior to the Petition Date, aside from the summary judgment in lieu of complaint lawsuit filed by RWN, the Debtor was also a party to a litigation commenced by USHA SOHA Terrace LLC ("USHA"), a minority member of 2280 FDB. 2280 FDB is a limited liability company which owns certain real property located at 2280 Frederick Douglas Boulevard, New York, NY. The Debtor through entities he owns controls 80% of the equity of 2280 FDB.  In August 2017, an arbitrator issued a decision which for the most part determined the Debtor had provided an accurate financial accounting of 2280 FDB's operations through 2014, but nonetheless determined the Debtor should be removed as managing member. Both the Debtor and USHA sought partial confirmation and/or modification of the arbitrator's award.  The Debtor removed all of the pending litigation with respect to confirmation of the arbitrator's award as well as RWN's summary judgment in lieu of complaint litigation (the "Removed Adversary Proceedings") to this bankruptcy case.

4.      **December 20, 2017 Scheduling Order**

At a status conference held on December 13, 2017, the Debtor and RWN agreed to a tight time schedule for the Debtor to file any objections to RWN's proof of claim. On or about November 30, 2017, RWN had filed a proof of claim against the Debtor in the amount of $10,729,240 based upon the difference RWN asserts it was owed on the various loans including a 24% default rate and the amount of its $48,600,000 credit bid at the auction in the Ladera chapter 11 case (the "RWN Claim"). On December 20, 2017, the Bankruptcy Court issued a scheduling order requiring the Debtor, *inter alia*, to file any objections to RWN's proof of claim by January 16, 2018 (the "December 20th 2018 Scheduling Order"). The December 20th 2018 Scheduling Order also required the Debtor to file various pleadings with respect to the Removed Adversary Proceedings and the Court scheduled a further status conference for January 22, 2018. The December 20th 2018 Scheduling Order also required RWN to file any motion to convert the Debtor's chapter 11 case to a chapter 7 by January 9, 2018.

5.      **RWN's Motion to Convert and the Debtor's Claim Objection Motion**

As required by the December 20th Scheduling Order, on January 9, 2018, RWN filed a motion to convert the Debtor's chapter 11 case to a chapter 7 case and/or to appoint a chapter 11 trustee. The Debtor timely filed his objection to the RWN Claim asserting, *inter alia*, that RWN was not entitled to a deficiency judgment based upon, among other things, (1) the value of the assets it acquired via the credit bid at the auction in the Ladera case (the "RWN Claim Objection") and (2) RWNs interference with the Ladera sale process and tainting of the auction process.

6.      **Settlement of RWN Claim Objection and the Debtor's Purchase of Certain Development Rights and the Debtor's Motion to Dismiss his Chapter 11 Case**

Rather than incurring the expense and the uncertainty of litigating the RWN Claim Objection and the conversion motion, the Debtor and RWN agreed to resolve all disputes between

the parties by entering into a settlement agreement and related development rights purchase agreement (the "Agreements"). The Agreements which were heavily negotiated provided, *inter alia*, that RWN would withdraw the RWN Claim and the Debtor through JenCo would purchase for a price of $600,000 certain floor area development rights from RWN so that the Debtor could develop the vacant lot owned by JenCo. The Debtor and RWN executed the Agreements and the Debtor filed a motion to approve the Agreements.

Prior to the initial hearing on the motion to approve the Agreements, a dispute arose as to the scope and meaning of the defined term Floor Area Development Rights which the Debtor had agreed to purchase from RWN. After two hearings, the Bankruptcy Court denied the Debtor's motion to approve the Agreements. As such, the RWN Claim is still outstanding against the Debtor. In connection with the dispute surrounding the Agreements, RWN disclosed for the first time that it had entered into a contract in early January 2018 to sell the same assets which it acquired at the auction in the Ladera Chapter 11 Case for a price in excess of its credit bid to Happy Living Group, the only other bidder which the Wind Down Officer qualified.

7.    **Bar Date and Objections to Claims**

By order dated November 21, 2017 (the "Bar Order"), the Bankruptcy Court established December 27, 2017 as the last date for creditors of the Debtor to file a proof of claim for pre-petition claims (the "Bar Date"). In accordance with the Bar Order, the Debtor's bankruptcy counsel served a copy of the notice of the Bar Date upon all known creditors and other parties-in-interest. The Debtor and his professionals have reviewed the Claims filed by the creditors. As of April 12, 2018, a total of twelve (12) claims have been filed in the Debtor's Chapter 11 Case. The claims are as follows:

| Claim No. | Claimant | Amount |
|-----------|----------|--------|
| 1 | Department of the Treasury- Internal Revenue Service | $144,274.40 |
| 2 | Harlem Mann LLC | $1,618,650.00 |
| 3 | RWNIH-DL 122nd Street 1 LLC | $10,729,240.00 |
| 4 | American Express  Centurion Bank | $16,074.63 |
| 5 | Philips Nizer LLP | $712,797.20 |
| 6 | Peoples United Bank, N.A. | $586,916.20 |
| 7 | Robinson Brog Leinwand Greene Genovese & Gluck P.C. | $100,000.00 |
| 8 | U.S. Bank National Association | $837,604.92 |
| 9 | Schulman Lobel | $21,668.75 |
| 10 | TD Bank, N.A. | $1,019,013.69 |
| 11 | 2280 FDB LLC | Unliquidated |
| 12 | Jacque Guillet | $33,000.00 |

For the most part, the Claims are consistent with the Debtor's books and records.  However, as set forth above the Debtor vigorously disputes the validity of the RWN Claim and intends to continue to prosecute the RWN Claim Objection.  The Debtor also intends to object to Claim No. 11 and Claim No. 12.  In addition to the filed Claims referenced above, the Debtor's Schedules reflect an additional approximately $2,000,000 of Unsecured Claims to various individuals most of which are either related to the Debtor or are acquaintances of the Debtor.

To the extent the Debtor deems it prudent and/or cost effective to object to Claims, the Plan provides that the Debtor has sixty (60) days from the Effective Date to file objections to filed claims.  If the Debtor fails to object to a properly filed claim on or before sixty (60) days from

the Effective Date, then such Claim will be deemed allowed and will be entitled to the Distribution under the Plan applicable to the particular class such claim is a member of.

8.      **April 4, 2018 Scheduling Order**

After conducting a status conference on April 3, 2018, the Bankruptcy Court entered a scheduling order on April 4, 2018 (the "April 4th Scheduling Order") which provides, *inter alia*, the Bankruptcy Court will conduct a hearing on RWN's conversion motion on April 20, 2018 and will hear arguments with respect to the Removed Adversary Proceedings related to the arbitration decision with respect to 2280 FDB. The April 4th Scheduling Order further requires RWN to produce a copy of the contract of sale which it entered into with the backup bidder Happy Living Group at the auction in the Ladera case and to respond to certain other discovery requests the Debtor served in connection with the RWN Claim Objection.

9.      **Post-Petition Operations**

Since the Debtor is a real estate developer and is not otherwise employed, the Debtor has no regular source of income. The Debtor relies upon Ellen for his support until he can sell certain assets. As such, the Debtor's operating reports for the most part reflect no income and no disbursements.  The Debtor has not been able to remain current on all of his debt service obligations on the mortgages encumbering the real estate owned with Ellen.

## V.

## SUMMARY OF THE PLAN

The Debtor submits that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Chapter 11 Case was converted to Chapter 7.  Therefore, the Debtor submits that the Plan is in the best interests of the Creditors and the Debtor and recommends acceptance of the Plan by holders of Claims in Classes 3, 4 and 5.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

A.      <u>General</u>

      1.      <u>Brief Explanation of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business (United States Supreme Court has held that an individual can file a chapter 11) for the benefit of itself and its Creditors. Upon the filing of a petition for reorganization under Chapter 11 and during the pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect Claims or enforce Liens against the Debtor.

Confirmation and consummation of a plan of reorganization is the principal objective of a Chapter 11 case. In general, a plan divides the Claims against, and Equity Interests in (here the Debtor is an individual so there are no Equity Interests), a debtor into separate Classes and allocates plan distributions among those Classes. If the legal, equitable and contractual rights of a Class are unaffected by the Plan, such Class is considered "unimpaired." All unimpaired Classes are deemed to have <u>accepted</u> the Plan and therefore are not entitled to vote thereon. Bankruptcy Code §1126(g), on the other hand, provides that all Classes of Claims and Equity Interests that do not receive or retain any property under the Plan on account of such Claims and Equity Interests are deemed to have <u>rejected</u> the Plan. All other Classes of Claims and Equity Interests are considered "impaired" and are entitled to vote on the Plan.

Under the Bankruptcy Code, acceptance of the Plan is determined by Class; therefore, it is not required that each holder of a Claim or Equity Interest in an impaired Class

vote in favor of the Plan in order for the bankruptcy court to confirm the Plan. Generally, each impaired Class must vote to accept the Plan; however, the Bankruptcy Court may confirm the Plan in certain circumstances without the acceptance of all impaired Classes if at least one (1) impaired Class votes to accept the Plan and certain other statutory tests are satisfied. Many of these tests are designed to protect the interests of creditors who either do not vote or vote to reject the Plan but who will nonetheless be bound by the Plan if it is confirmed by the Bankruptcy Court.

**2.      Acceptance of the Plan**

As a condition to confirmation, Bankruptcy Code §1129(a) requires that: (a) each impaired Class of Claims or Equity Interests votes to accept the Plan; and (b) the Plan meets the other requirements of §1129(a). As explained above, Classes that are unimpaired are deemed to have accepted the Plan and therefore are not entitled to vote thereon, and Classes that do not receive or retain any property under the Plan are deemed to have rejected the Plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims classified in impaired Classes that are to receive Distributions under the Plan.

An impaired Class of Claims will be deemed to have accepted the Plan if holders of at least two-thirds in dollar amount and a majority in number of Claims in such Class who cast timely ballots vote to accept the Plan.

**3.      Classification of Claims Generally**

Bankruptcy Code Section 101(5) defines a Claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to

an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code Section 1123 provides that a plan of reorganization shall designate Classes of Claims against a debtor.  Bankruptcy Code Section 1122 further requires that each Class of Claims contain only Claims that are "substantially similar" to each other.  The Debtor believes that it has classified all Claims in compliance with the requirements of Sections 1122 and 1123.  However, it is possible that a holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtor would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of Claims could necessitate a re-solicitation.

**B.**     **Classification and Treatment of Claims Under the Plan**

The following describes the classification of Claims under the Plan and the treatment that holders of Allowed Claims are to receive if the Plan is confirmed and becomes effective.  A Claim is classified in a particular Class only to the extent that the Claim fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim fits within the description of such different Class.

1.      **Unclassified Claims**

The Plan does not classify Administrative Claims, statutory fees due to the United States Trustee, or Priority Tax Claims but does provide for the following treatment of such Claims.

(a)      **United States Trustee Fees**

All fees payable by the Debtor under Section 1930 of Title 28 of the United States Code that have not been paid prior to the Effective Date shall be paid by the Debtor on the Effective Date.  In addition, the Debtor, on or after the Effective Date, shall be liable for and the Disbursing Agent shall pay such fees until the entry of a final decree in this case or until the case is converted or dismissed.  The Disbursing Agent shall file post-confirmation operating reports with the Bankruptcy Court and the United States Trustee until its final decree is entered.

(b)      **Administrative Claims.**

An "Administrative Claim" is a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's business after the commencement of a Chapter 11 case, loans and advances made to the Debtor after the Petition Date, compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331 or 503, certain retiree benefits, certain reclamation Claims, and all fees and charges against the estate pursuant to Chapter 123 of Title 28 of the United States Code.

The Plan provides that each holder of an Allowed Administrative Claim (including, without limitation, the professionals' fees and expenses incurred by the Professional Persons and allowed in a Final Order of the Bankruptcy Court) shall be paid in full, in Cash, by

the Disbursing Agent (i) on the later to occur of the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order, or (ii) upon such other terms as may exist in the ordinary course of business of the Debtor; or (iii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Claim and the Debtor.

The Debtor estimates that the aggregate amounts due to professionals shall total approximately $350,000.00.  This includes the professional fees of Tarter Krinsky & Drogin LLP ("TKD"), bankruptcy counsel for the Debtor.  Other than Shafferman & Feldman LLP, TKD is the only professional retained by court order.  This is exclusive of the $35,000.00 retainer paid to TKD prior to the entry of TKD's retention order and $50,000 paid in February 6, 2018.

With respect to the trade Claims arising after the Petition Date representing obligations incurred by the Debtor in the ordinary course of its business consistent with past practice, such trade Claims shall be paid in the ordinary course of business.  The Debtor estimates that post-petition ordinary course payables as of the Effective Date will be approximately $15,000.  As to other Allowed Administrative Claims, except as otherwise provided in the Plan, the Plan provides that each holder of an Allowed Administrative Claim: (i) shall be paid by the Disbursing Agent on the later to occur of the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

The Plan further provides that holders of Administrative Claims, including Claims of Professional Persons for services rendered during the Chapter 11 case, must file requests for payment within thirty (30) days after the Confirmation Order.

Administrative Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order (including, without limitation, Claims for professionals' fees and expenses) shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval.  After the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of the Professional Persons employed by the Debtor in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.  The Plan provides that the fees and expenses of such Professionals shall be submitted monthly to the Reorganized Debtor by such Professionals in the form of a detailed invoice therefor, and shall be paid by the Reorganized Debtor upon such submission.  If the Reorganized Debtor disputes the reasonableness of any such invoice and, after attempting to resolve the dispute, all unresolved disputes shall be submitted to the Bankruptcy Court on notice to the Reorganized Debtor for a determination of the reasonableness of such invoice.

(c)      **Priority Tax Claims**

A "Priority Tax Claim" is an Unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of the Bankruptcy Code §507(a)(8).  The Internal Revenue Service filed a claim in the sum of $144,274.40 on account of income taxes, penalties, and interest.  However, based upon the date of assessment and the filed proof of claim, it appears the Internal Revenue Service does not assert the claim is entitled to priority under section 507(a)(8). As such, the Debtor intends to treat the IRS's claim as a general unsecured claim in accordance with the treatment of Class 5 Unsecured Creditor detailed below.  In the event it is

determined there are any Allowed Priority Tax Claims, the Debtor shall pay same in equal quarterly installments over a four year period from the Effective Date.

    2.        **Class 1 – TD Bank's Secured Claim**

        Class 1 consists of TD Bank's Secured Claim which is secured by a first mortgage on the property known as 265 West 122nd Street, New York, NY Unit D ("Unit D"). Class 1 is unimpaired under the Plan and not entitled to vote for or against the Plan. The holder of the Class 1 Claim shall retain the legal, equitable, and contractual rights to which such claim entitles the holder (TD Bank). Notwithstanding any contractual provisions that entitles TD Bank to demand or receive accelerated payments of such claim after the occurrence of a default, TD Bank's Allowed Claim may be satisfied by (i) the curing of any payment or performance defaults that occurred before or after the commencement of the Debtor's chapter 11 filing, (ii) the reinstatement of the original maturity of such claim, (iii) compensation for any damages incurred as result of any reasonable reliance by the TD Bank on such contractual provisions, and (iv) does not "otherwise alter the legal, equitable or contractual rights" of TD Bank. TD Bank shall retain its lien on Unit D to the same extent and priority as existed on the Petition Date.  The Debtor estimates the amount necessary to reinstate TD Bank is approximately $50,000.

    3.        **Class 2 – U.S. Bank National Association as Trustee's Secured Claim**

        Class 2 consists of U.S. Bank National Association as Trustee's Secured Claim which is secured by a first mortgage on the property known as 254 West 123rd Street, Garden New York, NY 10027 ("123rd Street Property"). Class 2 is unimpaired under the Plan and not entitled to vote for or against the Plan. The holder of the Class 2 Claim shall retain the legal, equitable, and contractual rights to which such claim entitles the holder (U.S. Bank National Association). Notwithstanding any contractual provisions that entitles U.S. Bank National

Association to demand or receive accelerated payments of such claim after the occurrence of a default, U.S. Bank National Association's Allowed Claim may be satisfied by (i) the curing of any payment or performance defaults that occurred before or after the commencement of the Debtor's chapter 11 filing, (ii) the reinstatement of the original maturity of such claim, (iii) compensation for any damages incurred as result of any reasonable reliance by the U.S. Bank National Association on such contractual provisions, and (iv) does not "otherwise alter the legal, equitable or contractual rights" of U.S. National Association as Trustee. U.S. Bank National Association shall retain its lien on 123rd Street Property to the same extent and priority as existed on the Petition Date.  The Debtor estimates the amount necessary to reinstate U.S. Bank National Association is approximately $38,000.

> 4.     **<u>Class 3 – People's United Bank, N.A.'s Secured Claim</u>**

Class 3 consists of the Secured Claim of People's United Bank, N.A. ("People's United") which is secured by a first mortgage on the property known as 1 Burlingham Road, Pine Bush, NY 12566 (the "Pine Bush Property").  According to the proof of claim filed by People's United, the amount of the claim is $586,916.20 and the contractual interest rate is 5.5%. People's United's loan matured by its terms prior to the Petition Date. As such the Debtor is unable to reinstate the loan.

The Debtor estimates the value of the Pine Bush Property to be at least $1,700,000. As such, People's United Class 3 Claim is fully secured. Class 3 Claim is impaired as the Plan proposes to alter the terms, conditions and payment schedule for People's United's claim over a three year period. Under the Plan, People's United is to be paid the full amount of its claim plus interest at 5.5% as follows. Beginning on the first day of the third month following the Effective Date the Reorganized Debtor will make payments of $3,000 per month to People's United for 36

months from the first payment as set forth above and on or before the first day of the 40th month from the Effective Date, the Reorganized Debtor shall pay the balance of People's United's Secured Claim by either a sale and/or refinance the Pine Bush Property.  Class 3 Claim is entitled to vote for or against the Plan.

        **5.**        **Class 4 – Harlem Mann LLC's Secured Claim**

        Class 4 consists of the Secured Claim of Harlem Mann LLC (the "Mann Claim"). According to the Mann Claim, Harlem Mann LLC ("Mann") holds a secured claim against the Debtor based upon a security agreement and filed UCC financing statement. According to the proof of claim, the Mann Claim is secured by all the Debtor's assets. The Debtor does not necessarily agree the Mann Claim is a secured Claim but for the purposes of the Plan, the Debtor is treating the Mann Claim as a Secured Claim.

        The Plan provides the Mann Claim shall be deemed an Allowed Secured Claim, secured only to the extent of any interest which Mann has in the Debtor's property pursuant to the promissory note and any related agreements and the UCC financing statement attached to the Mann Claim. The Mann Claim shall be paid as follows. On the Effective Date, the Debtor shall pay $100,000 to Mann. The remaining $900,000 shall be paid to Mann from the distributions received from RGS on account of the proceeds of the liquidation of the remaining assets of 2280 FDB. Payments to Mann shall be made at the time the Debtor receives such distributions and shall consist of at least twenty five percent (25%) of each such distribution until the $900,000 has been fully paid. No interest shall accrue on the Mann Claim.  Class 4 Claim is impaired and entitled to vote for or against the Plan.

6. **Class 5 - All General Unsecured Claims**

Class 5 consists of the holders of all Unsecured Claims against the Debtor, including, but not limited to the RWN Claim. The Debtor estimates the total amount of Class 5 Unsecured Claims will be approximately $3 million assuming the Court sustains the Debtor's objection the RWN Claim. If the Court overrules the Debtor's objection to the RWN Claim, the total amount of the Allowed Class 5 Claims could be as high as $14 million.

The Plan provides that holders of Allowed Class 5 Claims shall be paid in full with post-petition interest from the Petition Date at 3% per year over a period of three years from the Effective Date assuming the RWN Claim is expunged. The Debtor will obtain the funds to pay Allowed Class 5 Claims from distributions received through RGS from the liquidation of the remaining assets of 2280 FDB. In the event the RWN Claim is determined to be an Allowed Claim by Final Order at an amount of $5 million or more, the Plan will be deemed modified to provide that holders of Allowed Class 5 Claims shall be paid in full plus post-petition interest from the Petition Date at 3% per annum over a period of five years. These payments shall be made from the distributions received through RGS from the liquidation of the remaining assets of 2280 FDB. Holders of Allowed Class 5 Claims and the Reorganized Debtor may agree to less favorable payment terms and such agreement is only binding if in writing. Class 5 is impaired as that term is defined in section 1124 of the Bankruptcy Code and entitled to vote for or against the Plan.

C. **Conditions to and Means for Consummation of the Plan**

1. **Condition to Occurrence of the Effective Date**

The Effective Date will occur only if the Bankruptcy Court issues a Confirmation Order confirming the Plan or a modified Plan, which the Debtor consents to.

The Effective Date shall be the fifteenth (15) day after entry of the Confirmation Order.

### 2.    Funding of the Plan

This Plan will be funded primarily from the monies the Debtor receives through the liquidation of 2280 FDB's remaining assets which consist of five residential condominiums and one retail condominium unit totaling approximately 15,000 sq. ft. The Debtor estimates the value of these assets to be approximately $20 million of which the Debtor indirectly owns 80%. The Debtor expects a process will soon be put in place for 2280 FDB with respect to a procedure for liquidating 2280 FDB's remaining assets. Ellen is also in the process of selling Unit C at the building located 265 West 122nd Street, New York, New York. Based upon the sale price and the mortgages on this unit, Ellen should receive net proceeds of approximately $500,000 a portion of which she will allow the Debtor to utilize to fund the Plan and pay professional fees as well as cure cost to the holders of the purchase money mortgages on the various pieces of real estate owned by Ellen and the Debtor as set forth above.

### D.    Objections to Claims

The Plan provides that all objections to Claims shall be filed by the Debtor and served on the holders of such Claims within sixty (60) days of the Confirmation Date. If the objection to a proof of Claim that relates to a Disputed Claim has not been filed by the applicable date, the Claim to which the proof of Claim relates shall be treated as an Allowed Claim for purposes of distributions under the Plan.

### E.    Resolution of Disputed Claims

The Plan provides that Disputed Claims shall be divided into two (2) portions: the "non-disputed portion" and the "disputed portion". The Disbursing Agent shall pay the non-disputed

portion of a Disputed Claim in accordance with Plan provisions for payment of a Claim in its Class.

**F.      Estimation**

The Plan provides that the Debtor may, at any time, request that the Court estimate any Disputed Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim.

**G.      Allowance of Disputed Claims**

The Plan provides that if, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall, within thirty (30) days after the date on which the Claim becomes an Allowed Claim, or as soon thereafter as is practicable pay to the holder of such Allowed Claim the amount of Cash that such holder would have been entitled to receive under this Plan if such disputed portion of such Claim had been an Allowed Claim on the Effective Date.  Notwithstanding anything to the contrary contained in this Plan, the Disbursing Agent shall make a Distribution on the non-disputed portion of an Unsecured Claim in accordance with the provisions of the Plan.

**H.      Certain Other Provisions of The Plan**

The Plan contains other provisions consistent with the requirements of Chapter 11 of the Code, including provisions for the Distribution of Cash and the collection and disposition of assets of the Debtor's Estate.

**1.      Causes of Action/Avoidance Actions**

Except as otherwise provided herein or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Reorganized Debtor shall retain, and may,

in his determination of the best interest of the estate, enforce any claims, rights and causes of action that have been or may be commenced by the Debtor. These Claims may include seeking to modify the Sale Order in the Ladera chapter 11 case and/or to seek section 363(n) relief in the Ladera case. The Debtor is unaware of any transfers which may be avoidable as constructively fraudulent transfers. Effective upon the Confirmation Date, the Debtor waives, releases and relinquishes any and all of its claims and rights, if any, relating to any transfers of the Debtor's property to or for the benefit of any creditor which could be avoided, recovered or subordinated pursuant to the provisions in §§547 and 548 of the Bankruptcy Code.

### 2.    **Disbursing Agent**

The Reorganized Debtor shall act as Disbursing Agent for the purpose of making the Distributions required on the Effective Date under the Plan. Hans Futterman shall be in charge of all matters relating to Disbursements required by the Plan on the Effective Date. In the event that the Disbursing Agent changes prior to the entry of an order of final decree closing the Debtor's Chapter 11 case, the Bankruptcy Court and the United States Trustee shall be notified in writing of the identity and address of the new Disbursing Agent.

### 3.    **Payments by Cash**

Payments to be made by the Disbursing Agent pursuant to the Plan shall be made by check drawn on a domestic bank.

### 4.    **Unclaimed Distributions**

The Plan provides that Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Proofs of Claim filed by such holders unless no Proof of Claim has been filed, in which case then to the address set forth on the Schedules

filed with the Court, unless superseded by a written notice to the Disbursing Agent providing actual knowledge to the Disbursing Agent of a change of address.

The Plan further provides that if any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing of such holder's then current address, at which time all Distributions shall be made to such holder, without interest.

### 5.    Executory Contracts and Unexpired Leases

#### (a)    Assumption and Rejection Generally

Subject to approval of the Bankruptcy Court, the Bankruptcy Code empowers a debtor-in-possession to assume or reject executory contracts and unexpired leases.  As a general matter, an "executory contract" is a contract under which material performance (other than the payment of money) remains due by each party thereto.  If an executory contract is rejected, the non-debtor party to that contract may file a Claim for any damages incurred by reason of the rejection.  In the case of rejection of leases for non-residential real property, resulting damage Claims are subject to certain limitations imposed by the Bankruptcy Code.  If an executory contract or unexpired lease is assumed, the debtor-in-possession is bound to perform its obligations arising thereunder in accordance with the terms of such agreement.

#### (b)    Assumption of Executory Contracts and Unexpired Leases

The Plan provides that, as of the date the Plan is confirmed, any executory contract or unexpired lease that has not yet been (a) assumed and assigned, or (b) rejected shall be deemed to be assumed by the Debtor as of the Confirmation Date. The Debtor's Schedule G reflects no executory contracts.

6.    **Professional Fees and Expenses**

The Plan provides that each of the Professionals requesting compensation in the Chapter 11 Case shall file an application for an allowance of final compensation and reimbursement of expenses in the Chapter 11 Case incurred through the Confirmation Date within thirty (30) days after the entry of the Confirmation Order.

7.    **Retention of Jurisdiction**

The Plan provides that, from and after the Confirmation Date and until such time as all payments and Distributions required to be made by the Debtor have been made, the Bankruptcy Court shall retain jurisdiction over the Debtor's Chapter 11 Case for all purposes permitted under the Code, including, without limitation, the following:

(a)    To hear and determine any dispute relating to the Plan or any property described in the Plan and to enforce its provisions.

(b)    To hear and determine all issues arising out of any motions, applications, adversary proceedings or contested or litigated matters in the Chapter 11 Case pending at the Confirmation Date or commenced thereafter.

(c)    To order recovery of any assets of the Debtor, whether title is presently held in the name of the Debtor or a third party.

(d)    To hear and determine motions to approve the sale of assets of the Debtor under Section 363 of the Bankruptcy Code and/or the rejection or assumption of executory contracts under Section 365 of the Bankruptcy Code.

(e)    To hear and determine all issues relating to any purchases, sales or contracts made or undertaken by the Debtor during the pendency of the Chapter 11 Case.

(f)    To hear and determine all Claims arising from the rejection of executory contracts or unexpired leases.

(g)    To hear and determine all objections to Claims and all controversies concerning classification, allowance, valuation, liquidation, estimation, or satisfaction of Claims.

(h)    To make orders allowing amendment of the schedules filed in the Chapter 11 Case for any purpose including, without limitation, to prosecute objections to Claims not previously listed as disputed, contingent or unliquidated.

(i)    To hear and determine all applications for compensation of professional and similar fees and reimbursement of expenses arising out of or relating to the case or any Claims.

(j)    To hear and determine any and all motions to abandon property of the Debtor's Estate.

(k)    To make such other orders or give such directions as permitted by Section 1142 of the Bankruptcy Code.

(l)    To consider and order any modifications or amendments requested to the Plan.

(m)    To remedy any defect or omission or reconcile any inconsistency in the Plan or the Confirmation Order in such manner as may be necessary or desirable to carry out the purposes and intent of the Plan.

(n)    To make all orders necessary or appropriate to carry out the provisions of the Plan.

(o)    To enforce all orders previously entered by the Bankruptcy Court.

(p)    To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the Bankruptcy Code.

## VI.

## <u>CONFIRMATION PROCEDURES</u>

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code §1129 must be met.  These include, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of holders of Claims in each impaired Class.

**A.**    **<u>Solicitation of Votes; Acceptance</u>**

The Debtor is soliciting the acceptance of the Plan from all holders of Claims in Classes that are impaired under the Plan and receiving Distributions thereunder.  Using these criteria, holders of only Claims in Classes 3, 4 and 5 are entitled to vote on the Plan.  In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Class 5 will be deemed to have accepted the Plan if the Plan is accepted by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that have cast ballots on the Plan and that are eligible to vote for or against the Plan.

**B.**    **<u>Confirmation Hearing</u>**

Bankruptcy Code §1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing") after the period for submission of Ballots has expired.  The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court

without further notice except for an announcement of the postponement made at the Confirmation

Hearing.  Bankruptcy Code § 1128(b) provides that any party in interest may object to confirmation

of the Plan.  Objections must be made in writing, specifying in detail the name and address of the

person or entity objecting, the grounds for the objection and the nature and amount of the Claim

held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and

the Local Bankruptcy Rules.  Objections must be filed with the Clerk of the Bankruptcy Court, with

a courtesy copy delivered to the chambers of the Honorable Michael E. Wiles, and served upon the

parties so designated in the Order and Notice accompanying this Disclosure Statement on or before

the time and date designated in such Order and Notice.  **FAILURE TO TIMELY FILE AND
SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE
BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,

whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have

been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtor has complied with the applicable provisions of the Bankruptcy
Code.

3.      The Plan has been proposed in good faith and not by any means proscribed
by law.

4.      Any payment made or promised by the Debtor for services or for costs and
expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident
to the Chapter 11 Case, has been approved by, or is subject to approval of, the Bankruptcy Court as
reasonable.

5.      The Debtor has disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and Equity Interest holders and with public policy; and (b) the Debtor have disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtor and the nature of any proposed compensation for such insider(s).

6.      Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See "Best Interests Test" below.

7.      Unless the Debtor is required to seek nonconsensual confirmation of the Plan, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over five (5) years.

9.      At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtor or the Reorganized Debtor.

11.    The Debtor believes that the Plan has been submitted in good faith and upon acceptance of the Plan by the voting Class, the Plan will satisfy all of the foregoing statutory requirements.

## C.    Best Interests Test

As mentioned above, confirmation of the Plan requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor believes that a liquidation of the Debtor would provide the holders of Class 5 Allowed Claims with a potential lesser recovery than under the Plan (which provides for full payment plus interest over time) due to the Debtor's belief that with the appointment of a trustee, the liquidation of 2280 FDB's assets may result in a lesser recovery than if overseen by the Reorganized Debtor who is intimately familiar with the assets and the developer of the condominium development.    In short, since the Plan provides for full payment over time plus interest to holders of Allowed Unsecured Claims, the Debtor believes the Plan meets the "Best Interests Test" contained in section 1129(a)(7) of the Bankruptcy Code.

## D.    Cram Down

The Bankruptcy Code provides a mechanism by which a plan may be confirmed even if it has been rejected by an impaired class of claims.    Under the "cram down" provisions of the Bankruptcy Code (§1129(b)), the proponent of the Plan (in this case the Debtor) may request that it be confirmed despite its rejection by an impaired class, and the court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired class and (ii) is fair and equitable with respect to such class.

The Bankruptcy Code sets forth specific guidelines for determining whether a plan is fair and equitable with respect to a particular class of claims.  For Unsecured Claims, as are those in Class 5, a plan must either provide that equity interest holders do not receive or retain any property on account of their interest or that the plan provides that each holder of a claim be paid in full over time of an Allowed Claim.  Here, the Debtor is an individual so there are no equity interests. However, the Plan provides for full payment over time plus interest to all holders of Allowed Unsecured Claims thereby satisfying 1129(b)(2)(i). For Secured Claims, as are in Classes 1, 2, 3 and 4, a plan must provide that the holders of such secured claim retain the lien securing such claim to the extent of the allowed amount of such claim and that the holder of such claim receive on account of such claim of a value, as of the Effective Date of the Plan, of at least the value of such holders interest in the estate's interest in the property securing the lien.  In other words, the secured creditor must receive the present value of the Allowed Amount of its Secured Claim which Allowed Amount is dependent upon the value of the property securing the Claim.

Under the Plan, all secured creditors in Classes 1, 2, 3 and 4 will retain their liens to secure the full amount of their Allowed Secured Claim and receive payments over time equal to the present value of the Allowed Amount of their Secured Claim as of the Effective Date of the Plan.  In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting class unless certain modifications are made to the terms and conditions of such non-consenting class' treatment under the Plan, the Debtor reserves the right, without re-solicitation, to propose such modification to such non-consenting class' treatment and to confirm the Plan, provided such modification does not result in total extinguishment of the non-consenting class' claim.

E.      **Risk Factors**

The Debtor has no way of being certain that 2280 FDB will be able to dispose of all its remaining assets in time frame contemplated under the Plan.  It is possible the NYC real estate market can suffer a dramatic down turn as it has in the past.  However, based upon years of experience and past sales of 2280 FDB's condominium units and the presence state of the real estate market in upper Manhattan, the Debtor does believe that the Plan is feasible.

Certain substantial risk factors are inherent in most Chapter 11 plans which provide for installment payments.  If such plans are accepted, it is usually because it represents a greater hope for return than a dividend in a liquidating Chapter 7 case.

## VII.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The tax consequences of the Plan may impact the decision of the holder of a Claim in determining whether to accept or reject the Plan. Moreover, the tax consequences will vary depending upon the individual circumstances of holder of a Claim.

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan to the holders of Class 5 Unsecured Claims. The summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. This summary does not address all aspects of federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code and also does

not discuss any aspects of state, local, or foreign taxation. Additionally, a substantial amount of time may elapse between the Effective Date and the receipt of the final Distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the Internal Revenue Service with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtor as proponent of the Plan with respect thereto. Accordingly, each holder of a Claim should consult his, her or its own tax advisor to determine what effect, if any, the treatment afforded its respective Claim under the Plan may have under federal, state and/or local tax laws, and the laws of any applicable foreign jurisdictions.

On the exchange of its Claim for cash and/or property, each holder of a Claim in Class 5 will recognize gain or loss measured by the difference between: (a) the aggregate fair market value of the cash and/or property received; and (b) such holder's tax basis in the Claim. To the extent that the cash and/or property received by a holder of a Claim is attributable to accrued interest on such Claim, the cash and/or property received will be deemed made in payment of such interest. Conversely, a holder of a Claim will recognize a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full. The allocation for federal income tax purposes between principal and interest of amounts received in exchange for the discharge of a Claim at a discount is not clear. However, the Debtor intends to treat any amount received by holders of Claims as first allocated to principal.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including but not limited to: (a) the nature or origin of the Claim; (b) the tax status of the holder; (c) whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held; (d) whether the Claim was acquired at a market discount; and (e) whether and to what extent the holder had previously claimed a bad debt deduction with respect to the Claim. Any cash and/or property received by a holder of a Claim after the Effective Date may be subject to the imputed interest provisions of the Tax Code.

No statement in this Disclosure Statement should be construed as legal or tax advice. The Debtor and her professionals do not assume any responsibility or liability for the tax consequences the holder of a Claim may incur as a result of the treatment afforded its Claim under the Plan. Again, all holders of Claim are urged to consult with their own tax advisor regarding the potential tax consequences of the Plan.

**CIRCULAR 230 DISCLOSURE: This tax discussion was written to support the promotion or marketing of the Plan. To ensure compliance with requirements imposed by the Internal Revenue Service, we are informing you that this discussion was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax-related penalties that may be imposed on the taxpayer under the Tax Code. Taxpayers should seek advice based on their particular circumstances from an independent tax advisor.**

## VIII.

## <u>VOTING INSTRUCTIONS</u>

Creditors should complete and sign the enclosed Ballot and return it to Tarter Krinsky & Drogin LLP, 1350 Broadway, 11th Floor, New York, New York 10018, Attn: Scott S. Markowitz, Esq., attorneys for the Debtor.

A ballot is enclosed with each copy of this Disclosure Statement being sent to all holders of Impaired Claims that filed proof of Claims or were scheduled by the Debtor. Ballots must be received on or before 5:00 p.m. Eastern Daylight Time on June ___, 2018.

If a ballot is damaged or lost, or if you have any questions concerning any voting procedures, you may contact Tarter Krinsky & Drogin LLP, attorneys for the Debtor, 1350 Broadway, 11th Floor, New York, New York 10018 (212) 216-8000, Attention: Scott S. Markowitz, Esq.

IX.

**CONCLUSION**

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative.  Accordingly, the Debtor urges holders of Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in the Order and Notice accompanying this Disclosure Statement.

Dated: New York, New York
        April 16, 2018

By:/s/ Hans Futterman
   Hans Futterman


**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Hans Futterman*
*Debtor and Debtor-in-Possession*

By:/s/ Scott S. Markowitz
   Scott S. Markowitz, Esq.
   1350 Broadway, 11th Floor
   New York, New York 10018
   (212) 216-8000