**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HANS FUTTERMAN, | : | Case No. 17-12899 (MEW) |
| | : | |
| Debtor. | : | |

----------------------------------------------------------- x

**DECISION REGARDING CERTAIN ASSERTED**
**OBJECTIONS TO CLAIM 3-2 OF RWNIH-DL 122ND ST 1, LLC**

The issues before the Court arise out of a deficiency claim filed by RWNIH-DL 122nd

Street 1, LLC ("**RWN**") in the Chapter 11 case of Hans Futterman.  The deficiency claim arises

out of the bankruptcy cases of Ladera Parent LLC and Ladera LLC (the "**Ladera Debtors**") and

is based on a personal guaranty of the Ladera Debtors' obligations that Mr. Futterman signed

(the "**Guaranty**").  The parties disagree as to whether Mr. Futterman is entitled to assert certain

objections to the deficiency claim as a matter of New York law and as to whether any or all of

such objections are foreclosed either by the terms of the Guaranty or by the confirmation of the

Ladera Debtors' plan of reorganization.  The parties jointly asked the Court to rule on certain

disputed legal issues in order to assist the parties in streamlining issues and preparing their cases

for trial.  The Court has broad authority to issue such rulings pursuant to Rule 16 of the Federal

Rules of Civil Procedure, made applicable here by Rules 7016 and 9024 of the Federal Rules of

Bankruptcy Procedure, and this Decision sets forth the Court's rulings as to the relevant legal

standards.

**<u>Background</u>**

Mr. Futterman is a real estate developer who has engaged in various development

projects through entities he either controlled or owned.  One such project was known as the

"Ladera project," which involved the Ladera Debtors.  Mr. Futterman was the ultimate sole

1

equity owner of Ladera Parent LLC, and Ladera Parent LLC was the sole owner of the limited

liability company membership interests in Ladera, LLC.

Ladera LLC owned real property at 300 West 122nd Street in New York that it intended

to develop.  In about August 2015, RWN loaned Ladera the principal amount of approximately

$36,640,000 under two loan agreements (the "**Ladera Loans**").  The Ladera Loans were secured

by, among other things, first priority mortgage liens and security interests on the property located

at 300 West 122nd Street, together with, among other things, certain related plans and

development rights and interests that Mr. Futterman had in certain entities he controlled.  Mr.

Futterman also signed the Guaranty to provide additional credit support.

A number of the provisions of the Guaranty waived defenses that might otherwise be

available.  *See* Second Amended and Restated Guaranty Agreement, Ex. A. to RWN's Proof of

Claim, Ex. 1 to Futterman's Objection to the RWN's Proof of Claim, Case No. 17-1899 (the

"**Futterman Docket**"), Docket No. 68-1.  More particularly:

- Paragraph 2(b) of the Guaranty states that all sums payable to RWN under the
  Guaranty "shall be payable on demand and without reduction for any offset, claim,
  counterclaim or defense."

- Paragraph 5 confirms that the obligations of Mr. Futterman are "irrevocable, absolute
  and unconditional, irrespective of . . . any setoff, counterclaim, and irrespective of
  any other circumstances which might otherwise limit recourse against Guarantor by
  Lender or constitute a legal or equitable discharge or defense of a guarantor or
  surety."

- Paragraph 5 further states that the obligations of Mr. Futterman under the Guaranty
  "shall not be in any way affected" by various matters, including "the sale, transfer or

2

conveyance of the Property or the Collateral or any interest therein to any Person,
whether now or hereafter having or acquiring an interest in the Property or the
Collateral or any interest therein and whether or not pursuant to any foreclosure,
trustee sale or similar proceeding against Borrower or the Property or the Collateral
or any interest therein."

- Finally, paragraph 5(c) states, in relevant part, that "to the extent allowed by
  applicable law" Mr. Futterman "expressly and irrevocably waives all defenses in an
  action brought by [RWN] to enforce this Guaranty based on claims of waiver, release,
  surrender, alteration or compromise and all setoffs, reductions, or impairments,
  whether arising hereunder or otherwise."

On December 4, 2016, the Ladera Debtors filed for bankruptcy under Chapter 11. The
Ladera Debtors attempted without success to arrange a refinancing of their debts, and on March
29, 2017 they proposed a plan of reorganization under which the properties would be sold. The
Ladera Debtors also sought approval of bidding procedures that would govern an auction of the
properties. The Court approved bidding procedures in an Order dated May 17, 2017, and
approved a short postponement of a scheduled auction in an Order dated June 21, 2017. Shortly
thereafter, however, the Ladera Debtors withdrew their request for approval of a sale and
withdrew their request that an auction be conducted.

The cancellation of the proposed sale met with howls of protest from RWN, and the
Ladera Debtors and RWN promptly filed competing proposed plans of reorganization. The
Ladera Debtors' proposed plan contemplated additional efforts to refinance the properties, and
the RWN Plan contemplated a prompt sale. The parties resolved their differences by agreeing
that the Ladera Debtors' proposed plan could be confirmed, but only on the condition that the

3

plan could not become effective unless new financing was arranged by a specified date, failing which the confirmation of the Ladera plan would automatically be rescinded and the RWN plan would automatically be confirmed. The Court confirmed the Ladera Debtors' proposed plan on these terms by Order dated August 10, 2107. Ladera failed to arrange the desired financing, and so the Court entered an Order on August 31, 2017 that rescinded the confirmation of the Ladera Debtors' plan and that confirmed the RWN plan of reorganization.

RWN filed proposed bidding procedures in connection with its proposed plan, and no party in interest objected to those procedures. The procedures largely followed the procedures that the Ladera Debtors had earlier proposed. The RWN plan provided that there would be an auction of the Ladera properties and that the auction would be overseen by a Wind Down Officer who was appointed under the confirmed plan. The Wind Down Officer (who is Esther DuVal of CBIZ) was authorized to determine whether interested parties were eligible to participate in bidding and otherwise to supervise the conduct of the auction. There were no objections to the appointment of the Wind Down Officer.

The Wind-Down Officer ultimately qualified two bidders: a group comprised of Happy Living Development, LLC, Titan Capital ID LLC and Ira Saperstein ("**Happy Living**"), and a designee of RWN named West 122 Associates LLC ("**West 122**"). The auction took place on September 14, 2017. After 11 rounds of bidding, the Wind-Down Officer selected West 122 as the winning bidder, with a credit bid of $48,600,000 (the "**Credit Bid**"). The parties then asked the Court to approve the sale to West 122.

Mr. Futterman informally submitted a request for more time to determine whether he wished to object to the confirmation of the sale. The Court considered that request in a telephone conference on September 21, 2017. After considering the arguments of the parties the Court

declined to grant additional time.  No objections were filed, and on September 22, 2017, the

Court entered an order approving the sale, which was later amended on October 19, 2017 (as

amended, the "**Sale Order**").  The Sale Order included a finding that "the consideration to be

paid by [RWN] constitutes adequate and fair value for the Assets."  Am. Order Authorizing and

Approving the Sale, Case No.16-13382 (the "**Ladera Docket**"), Docket No. 180 ¶¶ G, H.  The

Sale Order further provided that the "consideration provided by the Successful Purchaser and

any Purchaser Transferee for the Assets shall be deemed for all purposes to constitute reasonably

equivalent value and fair consideration under the Bankruptcy Code and any other applicable law

. . ." *Id.* ¶ 4.  No appeals from the Sale Order were filed.

### The Claim and the Objections

Mr. Futterman filed a personal bankruptcy petition in late 2017.  RWN subsequently filed

the Claim in Mr. Futterman's bankruptcy case, asserting a right to recover approximately $10

million pursuant to the Guaranty.  RWN explained that the claim reflected (i) the principal

balance of RWN's loan to the Ladera Debtors (approximately $39.3 million), plus (ii) interest

payments owed to RWN (approximately $16.3 million), plus (iii) RWN's costs and expenses,

including attorneys' fees (approximately $2.4 million), minus (iv) the amount of the $48.6

million Credit Bid.

Mr.  Futterman has objected to the Claim.  The crux of his argument is that RWN

improperly colluded with the Wind-Down Officer and otherwise engaged in scare tactics and

other dilatory conduct to discourage other bidders from participating in the auction, for the

purpose of chilling competition and artificially lowering the price at which RWN could prevail in

the auction.  Mr. Futterman has noted that within a few weeks after the auction RWN entered

into an agreement to sell the Ladera properties to an affiliate of Happy Living—the only other

qualified bidder in the auction—for a price that far exceeds the amount of the RWN Credit Bid and that also far exceeds the amounts that were owed to RWN.  He has also asserted that there was an improper agreement between RWN and Happy Living to defer Happy Living's bid so that RWN (not the Ladera Debtors and their creditors and owners) could reap the benefit of the higher price that Happy Living was willing to pay.  Mr. Futterman further contends that his appraiser has determined that the "true" fair market value of the Ladera Debtors' assets is closer to $80 million than to the Credit Bid amount of $48.6 million. *See* Debtor's Obj. to Am. Claim of RWN, Futterman Docket, Docket. No. 66.  Finally, Mr. Futterman has criticized various aspects of the process that was followed during the auction.  *Id.* at ¶ 4.

Based on these allegations, Mr. Futterman contends that the Court should look past the auction price at which the Ladera Debtors' assets were sold and should instead apply a "fair market value" credit in determining whether RWN may assert a deficiency claim.  Mr. Futterman contends that the Court has the obligation (or at least the authority) to apply a fair market value credit pursuant to various provisions of New York law (including section 1371 of the New York Real Property Actions and Proceedings Law ("**RPAPL**"), section 5240 of the New York Civil Practice Law and Rules (the "**CPLR**"), certain provisions of Article 9 of the New York Uniform Commercial Code (the "**U.C.C.**"), or pursuant to a general New York public policy), or alternatively pursuant to section 105(a) of the Bankruptcy Code.

RWN argues that Mr. Futterman's arguments are foreclosed by the Sale Order, by the order confirming the Ladera Debtors' plan of reorganization and by the terms of the Guaranty that he executed.  RWN also argues that even if New York law applies to the calculation of the deficiency claim, the alleged circumstances here do not call for a re-calculation of that claim.

No party has sought summary judgment as to the claims of collusion and fraud, and

discovery has proceeded with respect to those claims. However, the parties agreed that as a case

management matter and in preparation for trial it would be useful to obtain legal rulings as to Mr.

Futterman's contentions that he is entitled to a "fair value" credit in calculating the deficiency

claim, and as to RWN's contentions that Mr. Futterman has waived various defenses pursuant to

the Guaranty.

## Further Proceedings in the Ladera Cases

After the parties submitted briefs on the foregoing points, an adversary proceeding

complaint was filed against RWN and West 122 in the Ladera cases, purportedly on behalf of the

Ladera Debtors and Mr. Futterman. In that complaint the plaintiffs alleged that RWN had

engaged in fraud and that RWN had allegedly entered into a secret agreement with Bespoke (an

affiliate of Happy Living), during or shortly following the auction, in which Bespoke agreed not

to bid the full amount at which it was prepared to bid and instead to purchase the Ladera

properties from RWN. *See* Compl. at 16, Adv. Pro. No. 18-01628, Docket No. 1. Mr. Futterman

and the Ladera Debtors also sought to amend the Sale Order to replace the auction price paid by

RWN to the Ladera Debtors with the amount that West 122 sold the Ladera properties to

Bespoke.

RWN moved to dismiss the action because its filing had been authorized only by Mr.

Futterman himself. RWN argued that Mr. Futterman had no right to do so because (1) his

ownership interests in the Ladera Debtors were cancelled when the RWN plan of reorganization

was confirmed, (2) the Wind-Down Officer (who has sole authority to act for the Ladera Debtors

and to pursue claims on their behalf) had not authorized the filing of the complaint, and (3) the

chapter 11 trustee who has been appointed in Mr. Futterman's bankruptcy case (who has sole

authority over all property of Mr. Futterman's bankruptcy estate, including any rights that Mr. Futterman claims to own by virtue of his former ownership of the Ladera Debtors) had not authorized the filing of the complaint. The chapter 11 trustee and the Wind-Down Officer each confirmed that they had not authorized the filing of the adversary proceeding, and represented that they did not wish to pursue the asserted claims. The Court noted the seriousness of the charges that had been made but agreed with RWN that Mr. Futterman did not have the right to authorize the filing of the adversary proceeding, and dismissed the complaint for lack of standing. Mr. Futterman has appealed from that dismissal and his appeal is still pending.

## **Analysis**

The adversary proceeding that Mr. Futterman filed in the Ladera cases was dismissed because any affirmative claims that the Ladera Debtors could have against RWN arising out of the conduct of the auction belong to the Wind Down Officer, and also because any claims or rights that Mr. Futterman might personally have (including rights to act on behalf of entities he formerly owned) belong to the chapter 11 trustee in Mr. Futterman's case. While Mr. Futterman did not have standing to pursue those affirmative claims either in his own name or in the name of the Ladera Debtors, he nevertheless does have standing to object to RWN's deficiency claim in Mr. Futterman's own bankruptcy case. Section 502 of the Bankruptcy Code provides that any "party in interest" in a bankruptcy case (a category that includes Mr. Futterman) has the right to object to a proof of claim. *See* 11 U.S.C. § 502. Mr. Futterman therefore has the right to assert that the deficiency claim should be disallowed or reduced based on any defense to such a claim that is available to him as guarantor.[1]

---

[1]    Recently the chapter 11 trustee in Mr. Futterman's case has filed a motion seeking approval of a settlement with RWN. Issues relating to the trustee's rights to settle such claims notwithstanding Mr. Futterman's objections, and as to the wisdom of the proposed

## I.    Defenses Available Under New York Law

Mr. Futterman argues that various New York statutes, or equitable principles, require that a "fair value" credit be applied in calculating the amount of any deficiency claim that may be asserted against him.  Mr. Futterman relies primarily on section 1371 of the Real Property Actions and Proceedings Law.  The main purpose of section 1371 is to force the holder of a secured mortgage debt to choose between an equitable action to foreclose on collateral and an action at law to enforce the note, so that an obligor is not forced to defend two separate actions to collect the same debt.  *See VNB N.Y. Corp. v. Paskesz*, 131 A.D.3d 1235, 18 N.Y.S.3d 68 (2d Dep't 2015).  Section 1371 prohibits a party from pursuing an action on the note at the same time as the party pursues a foreclosure action.  It also provides that if a foreclosure sale is pursued under New York law, then the sale is deemed to satisfy the underlying debt, unless a deficiency judgment is sought within the time permitted by the statute.

Section 1371 provides that in a New York foreclosure action the amount of a deficiency judgment is to be calculated in the following way:

> Upon such motion the court, whether or not the respondent appears, shall determine, upon affidavit or otherwise as it shall direct, the fair and reasonable market value of the mortgaged premises as of the date such premises were bid in at auction or at such nearest earlier date as there shall have been any market value thereof and shall make an order directing the entry of a deficiency judgment.  Such deficiency judgment shall be for an amount equal to the sum of the amount owing by the party liable as determined by the judgment with interest, plus the amount owing on all prior liens and encumbrances with interest, plus costs and disbursements of the action including the referee's fee and disbursements, less the market value as determined by the court or the sale price of the property whichever shall be the higher.

---

settlement, will be considered in connection with that motion and are not addressed or decided here.

*See* N.Y.R.P.A.P.L. § 1371. Mr. Futterman contends that under section 1371 he is entitled to a hearing, in his current chapter 11 case, to determine the market value of the Ladera properties that should be offset against RWN's secured debt claims.

However, section 1371 only applies if a foreclosure judgment is issued and if a foreclosure sale occurs. *See Berkshire Bank v. Tedeschi,* 2013 U.S. Dist. LEXIS 43214 at *21 (N.D.N.Y. March 27, 2013) (where defendant sold property and no foreclosure sale occurred the terms of section 1371 were not applicable); *Hometown Bank of Hudson Val. v. Colucci*, 127 A.D.3d 702, 704, 7 N.Y.S.3d 291, 293 (2d Dep't 2015) (section 1371 did not apply where no foreclosure sale occurred); *Fed. Deposit Ins. Corp. v. 1873 W. Ave. Corp.*, 225 A.D.2d 893, 895, 639 N.Y.S.2d 163, 165 (3d Dep't 1996) (where foreclosure action was terminated to allow a private sale to be consummated, the provisions of the RPAPL regarding deficiency judgments did not apply). Here, RWN did not foreclose on a mortgage, and there was no foreclosure sale. Instead, the Ladera properties were sold pursuant to a plan of reorganization and pursuant to a bidding and auction process approved by this Court. Section 363 of the Bankruptcy Code permits sales of a debtor's assets, and section 1123(a)(5) of the Bankruptcy Code permits a sale to be made on the terms set forth in a plan of reorganization. *See* 11 U.S.C. §§ 363, 1123(a)(5).

Since the Ladera Debtors' properties were sold pursuant to federal statutory authorities – and not pursuant to a New York foreclosure action – the terms of the RPAPL do not apply. *See, e.g.*, *Litchfield Fin. Corp. v. Northern Hotels Corp.*, No. 139-03, 2016 N.Y. Misc. LEXIS 1136 at*1 (Sup. Ct., Essex Cty. Jan. 13, 2016) (noting that the Court had denied a motion for entry of a deficiency judgment based on RPAPL § 1371 because the property at issue had been sold at auction at the direction of a bankruptcy court and not pursuant to a foreclosure under the RPAPL).

Mr. Futterman has cited to various bankruptcy court decisions that have recognized prior deficiency judgments that were entered in foreclosure cases, but those decisions have no bearing on the issues he has raised in this proceeding.  In each of the cited cases, a bankruptcy court had to deal with a deficiency judgment that had been entered following an actual state court foreclosure.  *See, e.g.*, *In re Covelli*, 550 B.R. 256 (Bankr. S.D.N.Y. 2016) (determining effect of Chapter 7 discharge on deficiency judgment obtained in state court foreclosure action); *In re Shea*, 533 B.R. 358 (Bankr. E.D.N.Y. 2015) (determining whether section 522(f) of the Bankruptcy Code applies with respect to a judgment arising out of a state court foreclosure action); *In re Smith*, 270 B.R. 557 (Bankr. W.D.N.Y. 2001) (deficiency judgment received in state court foreclosure action impaired the homestead exemption of the debtors).  None of those decisions held, or could be reasonably be interpreted as holding, that the provisions of the RPAPL govern a sale that occurs pursuant to a bankruptcy plan.

Furthermore, even if section 1371 of the RPAPL were applicable here that would not be helpful to Mr. Futterman.  The relevant "foreclosure" action (for purposes of the RPAPL) would have been the proceedings that occurred in the Ladera Debtors' cases, and it would have been in those cases (not Mr. Futterman's current chapter 11 case) that the amount of a deficiency judgment against the Ladera Debtors would have been determined.  The Court did make a determination, in the Ladera Debtors' cases, of the amount of the deficiency claim for which the Ladera Debtors themselves were liable.  The RWN plan of reorganization provided that RWN would have an "RWN Deficiency Claim" against the Ladera Debtors that would be equal to the amount of RWN's allowed secured claim minus (i) the amount of the RWN Credit Bid (in the event RWN bought the properties pursuant to a credit bid), or (ii) the amount of the sales proceeds that were actually received.  No party in interest, including Mr. Futterman, objected to

11

this provision.  Later, RWN sought confirmation of the results of the auction, and it asked for a determination that the Credit Bid was the highest price at a fairly-conducted auction and represented fair value for the assets.  Again, no objections were filed.  Mr. Futterman asked for time to consider whether to make an objection, but he did not do so.  This Court then entered an Order that determined that the Credit Bid constituted "adequate and fair value" and constituted reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  No party appealed from that Order, and no party who has standing to move for relief from the terms of that Order has done so.

Under the plain terms of the confirmed plan of reorganization, the approved court-approved credit bid is to be used in calculating the RWN Deficiency Claim in the Ladera Debtors' cases.  Even if RPAPL 1371 were applicable, that would not mean that Mr. Futterman would have any right in his own chapter 11 case to reopen the question of how the deficiency claim against the Ladera Debtors was measured.  As described further below, Mr. Futterman (as guarantor) may have rights to challenge the deficiency claim if the price was so grossly deficient as to shock the conscience, or if he can prove that the sale process was tainted by fraud or other deliberately wrongful conduct.  But the rights provided by section 1371 of the RPAPL, even if they applied, would have been for the benefit of the Ladera Debtors in their own cases.  There is nothing about section 1371 that gives a guarantor a right to a new "fair value" hearing in a separate proceeding to enforce a deficiency claim against the guarantor.

Mr. Futterman has also cited to section 5240 of the New York Civil Practice Law and Rules, which permits a New York state court to "make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure" in connection with the use of enforcement procedures.  *See* NY Civ. Prac. L. & Rules § 5240.  New York courts have

12

held that the broad authority over enforcement procedures that is set forth in section 5240

permits a New York court to provide a credit against a judgment based on the fair value of

property, particularly if the nominal sale price is "grossly disproportionate" to the actual value.

*See* 54 N.Y. Jur. 2d Enforcement and Execution of Judgments § 342 (May 2018).  Here,

however, the sale occurred pursuant to the Bankruptcy Code, in a proceeding to which the CPLR

does not apply.  Furthermore, the relevant "enforcement procedure" – namely, the sale that

occurred in the Ladera Debtors' cases – has long since been completed.  The New York courts

have confirmed that section 5240 of the CPLR may not be invoked after a sale has been

completed and after property has been delivered to a buyer.  *Guardian Loan Co. v. Early*, 47

N.Y.2d 515, 520, 392 N.E.2d 1240, 1243 (1979).  Accordingly, even if section 5240 had been

applicable Mr. Futterman could not rely upon in as authority to revisit, in his current chapter 11

case, the values that were used in calculating a deficiency in a different proceeding.

Mr. Futterman further argues that the provisions of Article IX of the New York Uniform

Commercial Code should apply in calculating the deficiency claim for which he is liable.  There

are several provisions of Article IX that he contends are relevant:

- Section 9-610 provides that a disposition of collateral may be made "following

  any commercially reasonable" procedure.  It also makes clear that a secured party

  may purchase collateral at a public disposition of that collateral.

- Section 9-615(f) of the N.Y.U.C.C. provides a special method for calculating a

  deficiency when a secured party acquires collateral at a foreclosure disposition.  If

  the price at such a disposition is "significantly below the range of proceeds that a

  complying disposition to a person other than the secured party . . . would have

  brought," then the amount of a deficiency is not calculated by reference to the

actual disposition price, but instead is calculated by reference to the price that
would have been realized in a complying disposition to another party.
N.Y.U.C.C. § 9-615(f).

- Section 9-626 provides that if a disposition of collateral was not conducted in
  accordance with the provisions of Article IX, then "the liability of the debtor or a
  secondary obligor for a deficiency" is limited to the amount by which the secured
  debt exceeds "the greater of" the actual proceeds or "the amount of proceeds that
  would have been realized had the non-complying secured party proceeding in
  accordance with the provisions of this part . . ."

*See* N.Y.U.C.C. §§ 9-610, 9-615(f), 9-626. Again, however, there are many problems with
RWN's contentions that Article IX is applicable here.

First, Article IX only applies to dispositions of collateral that occur pursuant to the terms
of Article IX. Here, as stated several times above, the sales occurred pursuant to provisions of
the Bankruptcy Code. The provisions of the Uniform Commercial Code do not govern those
transactions. Instead, they are governed by the terms of federal law. Article IX clearly states
that its terms do not apply when a disposition of collateral occurs pursuant to another statute,
which is what happened here. *See* N.Y.U.C.C. § 9-109.

Second, it is not clear that the protections of Article IX would have been available even if
the disposition here had not occurred pursuant to federal bankruptcy law. Mr. Futterman argues
that some of the assets that were sold represented personal property of the Ladera Debtors to
which Article IX disposition standards could have been applicable. However, Article IX does
not apply to real property transactions, because those transactions are governed by the RPAPL.
In addition, section 9-604 makes clear that a creditor has the option to proceed under the RPAPL

if both real and personal property are involved, in which case the provisions of Article IX do not apply at all. *See* N.Y.U.C.C. § 9-604. Mr. Futterman's primary contention throughout this proceeding has been that section 1371 of the RPAPL governs the dispositions of collateral that occurred in these cases; that position is inconsistent with his more recent attempts to rely, at the same time, on the provisions of Article IX.

Third, Mr. Futterman's primary argument with regard to Article IX is that the underlying auction was not conducted in a commercially reasonable manner. But Article IX provides that a sale is deemed to be commercially reasonable if it has been approved in a judicial proceeding. *See* N.Y. U.C.C. § 9-627(c)(1) ("A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved . . . in a judicial proceeding."). That is exactly what happened here. The disposition of the Ladera Debtors' properties occurred pursuant to procedures that this Court approved, and the outcome of the auction was confirmed by this Court without objection by any party. Perhaps that approval would not preclude a defense to the deficiency claim based on a contention that the results of the auction were tainted by actual fraud and deliberate wrongdoing that were unknown at the time (a point discussed further below), but it certainly would foreclose Mr. Futterman's effort to make collateral attacks on the "commercial reasonableness" of the procedures that the Court approved in the Ladera Debtors' cases.

Similarly, Mr. Futterman's attempt to rely on section 615(f) of Article IX governing the sale of collateral to a secured party is likewise flawed. New York courts appear to interpret that provision to be inapposite where the sale procedure was deemed commercially reasonable and where there was no objection to the sale price at the time of the sale. *See Citibank, N.A. v. Solow*, 92 A.D.3d 569, 570, 939 N.Y.S.2d 361, 362–63 (1st Dep't 2012) (finding that where a sale of collateral to a secured party was commercially reasonable, a debtor cannot rely on UCC §

9–615[f], because "while the statute refers to 'calculation,' it addresses the commercial reasonableness of the sale price").

The foregoing provisions of New York law therefore did not govern the sales that occurred during the Ladera Debtors' cases. That leaves the open question, however, of whether any similar principles nevertheless are applicable under New York law in deciding the extent to which RWN may assert a deficiency claim against Mr. Futterman as a guarantor.

RWN's pursuit of a claim on the Guaranty is governed by New York law, and is subject to any defenses that New York law would allow Mr. Futterman to assert. Even if the provisions of the RPAPL, the CPLR and Article IX that are cited above do not technically govern the sales that occurred here, New York's highest court has recognized that a court still has inherent equitable authority in certain circumstances to insist that a "real" property value (rather than a nominal sale value) be used in calculating the amount of a deficiency claim. *See Guardian Loan Co. v. Early*, 47 N.Y.2d 515, 521, 392 N.E.2d 1240, 1244 (1979); *see also Mikulec v. United States*, 705 F.2d 599, 602 (2d Cir. 1983). That power is to be used "sparingly and with great caution," and it is not a remedy that is available based on a "mere inadequacy of price." *Guardian Loan Co. v. Early*, 47 N.Y.2d at 520. Instead, there must be proof that "fraud, mistake or exploitive overreaching" occurred during the course of the sale. *Id.*

"Fraud" and "exploitative overreaching" may be demonstrated where collusive behavior has occurred that restricts the bidding for property or that seeks to divert value to a mortgagee that otherwise would have gone to a mortgagor. *See, e.g., Polish Natl. Alliance v. White Eagle Hall Co.*, 98 A.D.2d 400, 408, 470 N.Y.S.2d 642, 650 (2d Dep't 1983) (holding that "[t]he essence of a judicial sale is a full and free opportunity for bidders to compete, and any agreement that unfairly restricts that opportunity is contrary to public policy" and further holding that "a

16

mortgagee . . . cannot enter into an agreement to benefit itself in excess of the judgment due at

the expense of the mortgagor"); *Westbury Federal Sav. & Loan Asso. v. Quinton Enterprises,*

*Inc.*, 88 A.D.2d 950, 951, 451 N.Y.S.2d 188, 188 (2d Dep't 1982) (submission of appraisal as

evidence of value, without disclosure of the existence of a higher offer, was a misrepresentation

to the court that infected the calculation of the deficiency and that warranted a new determination

of the deficiency).  Here, Mr. Futterman has alleged that RWN engaged in deliberately

manipulative or collusive behavior during the auction process that was designed to discourage

bidders, or to limit the amounts they would bid, or to defer bids entirely so that RWN (and not

the Ladera Debtors and their creditors and owners) could reap the benefit of a sale at a higher

price.  The Court expresses no view at this point as to whether the evidence supports any of these

accusations.  However, proof of such deliberately wrongful conduct would constitute grounds to

invoke the court's inherent equitable authority under New York law to re-examine the deficiency

claim insofar as it relates to Mr. Futterman's obligations under the Guaranty.

Another form of "exploitive overreaching" that the New York courts have recognized is a

situation in which a nominal sale price is so low in relation to the real value as to be

"unconscionable."  *See, e.g.*, *Mercury Factoring, LLC v. Partners Trust Bank*, 75 A.D.3d 1101,

1102, 904 N.Y.S.2d 851, 852 (4th Dep't 2010) (finding that the disparity between a sale price of

$10,000 and an "uncontested" fair value of $95,000 demonstrated "exploitive overreaching");

*Hitech Homes LLC v. Burke*, No. 160469/15, 2019 WL 1442084, at *1 (N.Y. App. Div. 2d Dep't

Apr. 2, 2019) (recognizing an "unconscionably low" price as a factor in determining whether

"exploitative overreaching" has occurred); *U.S. Bank N.A. v. Martinez*, 162 A.D.3d 528, 529, 79

N.Y.S.3d 144, 145 (1st Dep't 2018) (noting that the court could have exercise its "equitable

powers to set aside a foreclosure sale" had the "price [been] so inadequate as to shock the court's

conscience"). A price is not "unconscionable" just because it is less than full market value. *See Chase Manhattan Bank v. Nath*, 162 A.D.3d 978, 980, 80 N.Y.S.3d 377, 379 (2d Dep't 2018) (declining to set aside a foreclosure sale where "the sale price was not so inadequate as to shock the court's conscience"). New York courts generally have held that a sale of collateral for a price that is less than 10% of its real value is unconscionable, while sales at or above 50% of fair market value have consistently been upheld. *See Polish Natl. Alliance v. White Eagle Hall Co.*, 98 A.D.2d 400, 408, 470 N.Y.S.2d 642, 649 (2d Dep't 1983); *In re 824 S. E. Blvd. Realty, Inc.*, No. 11-15728 ALG, 2012 WL 3561981, at *8 (Bankr. S.D.N.Y. Aug. 17, 2012).

Finally, bankruptcy courts also have inherent authority to disregard the terms of prior sales, and even to reopen those sales, where the prior results were infected by fraud or other deliberate manipulation. *See* 11 U.S.C. § 365(n); *see also In re General Insecticide Co., Inc.*, 403 F.2d 629, 630–31 (2d Cir.1968) (sales should be treated as final unless they are "tinged with fraud, error or similar defects which would in equity affect the validity of any private transactions") (citing 4A Collier Bankruptcy, ¶ 70.98[16]), 1183, 1184–94 (14th ed. 1967); *In re Ward*, 423 B.R. 22, 30–31 (Bankr. E.D.N.Y. 2010) ("[A] court of equity may set aside its own judicial sale upon grounds otherwise insufficient to confer an absolute legal right to a resale in order to relieve of oppressive or unfair conduct."); *Fleet Fin., Inc. v. Gillerson*, 277 A.D.2d 279, 280, 716 N.Y.S.2d 66 (2d Dep't 2000) ("A court, in the exercise of its equitable powers, has the discretion to set aside a judicial sale where fraud, collusion, mistake, or misconduct casts suspicion on the fairness of the sale"); *cf. Exec. Bank of Fort Lauderdale, Fla. v. Tighe*, 75 A.D.2d 574, 574, 426 N.Y.S.2d 585, 586 (2d Dep't 1980) (observing that "because the approval of the sale by the bankruptcy court was not binding on the defendants, since they were not given a full and fair opportunity to contest the propriety of the sale"). Just as this Court has equitable

authority to set aside a sale that has been infected by fraud, so too it has the equitable power to

recalculate a deficiency claim against Mr. Futterman if the evidence were to show that the prior

auction was infected by deliberate misconduct.

## II.    Effect of the Guaranty on Mr. Futterman's Objections

Under New York law, waivers of claims or defenses contained in guarantees—

particularly where, as here, they are described as "unconditional" or "irrevocable"—are valid,

enforceable and generally are held to preclude defenses in actions to enforce a guaranty.  *See,*

*e.g.*, *First N. Y. Bank for Bus. v. DeMarco*, 130 B.R. 650, 654 (S.D.N.Y. 1991) (finding that

under New York law an irrevocable and unconditional guaranty is deemed to "foreclose, as a

matter of law, guarantors from asserting any defenses or counterclaims"); *Red Tulip, LLC v.*

*Neiva*, 44 A.D.3d 204, 209, 842 N.Y.S.2d 1, 5 (1st Dep't 2007) (noting that absolute and

unconditional language has consistently been held "to preclude the assertion of defenses to a

guaranty.").

An exception exists, however, where fraud or similar deliberately wrongful and

oppressive conduct has occurred.  New York State has a public policy against permitting a party

to use a pre-existing waiver to shield itself from the consequences of its own subsequent fraud.

*See, e.g.*, *Overseas Private Inv. Corp.*, No. 10 Civ. 7096, 2012 WL 967458 at *7 (S.D.N.Y.

March 14, 2012) (ruling that a waiver did not foreclose a fraud claim under New York even

through it was both "unconditional[]" and "irrevocabl[e]"); *North Fork Bank v. Computerized*

*Quality Separation Corp.*, 62 A.D.3d 973, 974, 879 N.Y.S.2d 575, 576–77 (2d Dep't 2009)

(holding that a waiver will be enforced "in the absence of fraud or negligence in the disposition

of collateral");  *European Am. Bank v. Mr. Wemmick, Ltd.*, 160 A.D.2d 905, 906, 554 N.Y.S.2d

628, 630 (2d Dep't 1990) ("Although the agreement contains a provision in which the appellants

waived the right to a jury trial, and to interpose set-offs and counterclaims, such a waiver will not be enforced to bar counterclaims sounding in fraud."); *Sterling Nat'l Bank & Trust Co. v. Giannetti*, 53 A.D.2d 533, 533, 384 N.Y.S.2d 176, 176 (1976) (ruling that "defenses based upon allegations of fraud may not be waived").

The scope of the fraud exception may be subject to debate if an alleged fraud preceded the execution of a guaranty.  In *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974 (N.Y. 1985), the New York Court of Appeals considered whether a waiver of defenses in a guaranty should be interpreted as a waiver of defenses of fraudulent inducement.  The guaranty in that case stated that all defenses were waived irrespective of the validity or enforceability of the guaranty.  In light of this language, the Court held that the guaranty specifically identified and thus put an end to the particular fraudulent inducement defense that the defendant raised.  *Id.* at 93.  Other courts have drawn attention to this critical limiting factor in the *Plapinger* decision.  *See, e.g.*, *MCC Funding LLC v. Diamond Point Enterprises, LLC*, 36 Misc. 3d 1206(A), 954 N.Y.S.2d 760 (Sup. Ct. 2012) (distinguishing *Plapinger* on the grounds that that decision involved only fraudulent inducement claims and not general allegations that the counterparty engaged in a broader scheme to defraud the defendant).  As a result, "the mere general recitation that a guaranty is 'absolute and unconditional' is insufficient under *Plapinger* to bar a defense of fraudulent inducement . . ." *Manufacturers Hanover Trust Company v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993).  Rather, "the touchstone is specificity"—a "clear indication that the disclaiming party has knowingly disclaimed reliance on the *specific* representations that form the basis of the fraud claim." *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24, 27 (S.D.N.Y. 2002) (citing *Plapinger*, 7 F.3d at 316).

*Plapinger* and its progeny hold that a party may waive an existing claim based on fraud that preceded the date of the waiver, so long as the waiver is explicit. But the conduct that is at issue in this case occurred long after the Guaranty was executed. As a matter of public policy New York law will not enforce a waiver of defenses as to future fraudulent conduct. *See, e.g.*, *Archer Capital Fund, L.P. v. GEL, LLC*, 95 A.D.3d 800, 802, 944 N.Y.S.2d 179, 181 (2d Dep't 2012) (ruling that the mortgagor's counterclaim alleging fraud was not foreclosed by its waiver of its right to assert defenses or counterclaims in the mortgage and loan documents as a matter of law); *MCC Funding LLC v. Diamond Point Enterprises, LLC*, 36 Misc. 3d 1206(A), 954 N.Y.S.2d 760, 2012 WL 2537893 (Sup. Ct. 2012) (no waiver in connection with loan and guaranty documents executed in 2008 where the individual who controlled the mortgagee faced SEC securities fraud charges in 2009); *see also Fed. Deposit Ins. Corp. v. Frank L. Marino Corp.*, 74 A.D.2d 620, 621, 425 N.Y.S.2d 34, 36 (2d Dep't 1980) (no waiver of counterclaims arising from misconduct related to disposition of collateral). This is because, as noted above, "to enforce a waiver provision to bar a defendant from interposing a counterclaim against a plaintiff based upon fraud would allow the plaintiff to shield itself from its own tortious conduct." *MCC Funding* LLC, 2012 WL 2537893 at *6 (citations omitted).

Of course, conduct does not amount to "fraud" just because a guarantor does not like the conductor or thinks that the conduct was unreasonable. There must be proof of deliberate wrongdoing – manipulation, collusion and/or deliberate misrepresentations – before public policy allows Mr. Futterman to escape the waivers to which he agreed when he executed the Guaranty. The whole point of including waivers of defenses in guarantees is to permit the quick and certain enforcement of guarantees without expensive and drawn-out litigations over the reasonableness of everything that preceded the enforcement of the guaranty. Public policy may

insist that there be an exception for fraudulent behavior or misconduct, but public policy permits a waiver of other defenses, including general complaints about the alleged reasonableness or cooperativeness of a lender who enforces remedies. *Palm Beach Mortg. Mgmt., LLC v. Red Tulip, LLC*, 18 A.D.3d 379, 380, 795 N.Y.S.2d 559, 560 (1st Dep't 2005).

Mr. Futterman has raised issues as to whether RWN committed fraud in connection with the sale of the Ladera properties. He has alleged that RWN engaged in deliberately manipulative or collusive behavior during the auction process that was designed to discourage bidders, or to limit the amounts they would bid, or to defer bids entirely so that RWN (and not the Ladera Debtors and their creditors and owners) could reap the benefit of a sale at a higher price. The Court expresses no view at this point as to whether the evidence supports any of these accusations. However, any such deliberately manipulative conduct would have been contrary to affirmative representations that were made to the Court about the good faith conduct of the participants in the auction, would be contrary to the standards imposed by the Bankruptcy Code, and would constitute fraud if proved at trial. The Court agrees that proof of such deliberately wrongful conduct would establish a defense to RWN's deficiency claim. In addition, that defense would not be foreclosed by the waiver of defenses set forth in the Guaranty, because the wrongful conduct occurred subsequent to the execution of the Guaranty, and because claims sounding in fraud are not waivable in advance as a matter of New York law.

RWN argues that "collusion" is a defense that was waived by the guaranty, citing *Coop. Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 113 A.D.3d 457, 461, 978 N.Y.S.2d 186, 190 (1st Dep't 2014). In *Navarro*, a bank purchased receivables from a company, and an individual director guaranteed the payment of the amounts due on the receivables that the company sold to the bank. It was later discovered that the company was running a Ponzi scheme

and that the receivables it had sold were fake. The bank sued and obtained a default judgment against the company, and then moved to enforce that judgment against the director who had provided the guaranty. The director contended that the bank had indirectly exercised control of the judgment debtor and that the default judgment therefore was the product of "collusion." The court rejected this defense, noting that it involved only the procedures by which the default judgment was entered and not the question of the underlying indebtedness itself. *Id.* at 461.

In *Navarro,* the word "collusion" was just a pejorative word that was applied to a party's conduct, without any indication of actual fraud or manipulation. Where conduct truly is collusive, fraudulent and manipulative, however, a waiver of defenses in a guaranty will not be applied as a matter of public policy.

Similarly, in *Fortress Credit Corp v. Hudson Yards*, 78 A.D.3d 577, 912 N.Y.S.2d 41 (1st Dep't 2010), the Court rejected contentions of "tortious interference" with a potential sale to another party. There is no further description in the reported decision of the conduct in which the lender allegedly engaged, or of whether the alleged "tortious interference" constituted anything other than a failure to go along with what the obligor wanted. In any event, the appellate court affirmed a dismissal on the ground that the asserted defense (whatever it was) was foreclosed by the guaranty, and also because the defense lacked any evidentiary support. *Id.* at 578. Here, by contrast, the alleged wrongful behavior involves allegations that RWN violated auction rules, discouraged bidders, and/or colluded with bidders, and then falsely reported to the Court that the auction had been conducted at arm's-length and in good faith. The vague and unsupported allegations of tortious interference in *Fortress Credit* may not have been enough to escape a waiver, but the allegations in this case (if proved) would constitute a fraud and therefore a defense that cannot be waived as a matter of public policy.

Mr. Futterman contends that his right to insist on a "commercially reasonable" disposition of property under Article IX of the Uniform Commercial Code is also a right that cannot be waived.  *See* N.Y. U.C.C. Law § 9-602.  As noted above, however, the provisions of Article IX are not applicable to the dispositions of collateral that occurred here.  "Waiver" issues are not relevant, because the terms of Article IX do not apply in the first place.

As noted above, New York's state courts have also held that courts have the general equitable power (independent of the UCC or other statutes) to intervene if a sale price is unconscionably low.  It is not clear, as a matter of New York law, whether this is a defense that is foreclosed by the waivers in the Guaranty.  Mr. Futterman has not pointed to a decision by a New York court that has addressed this issue.  Given the public policies that underly the decisions that have refused to recognize an "unconscionably low" disposition price, and the fact that the New York courts have regarded such an unconscionable disparity as a form of "exploitative overreaching," the Court concludes that this particular defense is not foreclosed by the waivers in the Guaranty.  However, that does not mean that Mr. Futterman may automatically obtain a "fair market value credit" in calculating the RWN deficiency claim, which is the relief that he primarily has sought.  Under the New York authorities cited above, a defense based on an unconscionably low sale price would not be available to Mr. Futterman unless he is able to show that the disposition price was so low in relation to "real" value as to shock the conscience.  It is not clear whether Mr. Futterman contends that the "real" value of the Ladera Debtors' properties were so out of line with the amount of the Credit Bid as to bring the "unconscionability" cases into play, but that is an issue the Court will resolve at trial to the extent that Mr. Futterman asserts this particular argument.

### III.    Effect of the Confirmed Ladera Plan on Futterman's Objection

In addition to contending that the Guaranty forecloses Mr. Futterman's objection to the Claim, RWN also contends that Mr. Futterman should be estopped from challenging the deficiency claim calculation based on events that occurred during the course of the Ladera Debtors' cases.

First, RWN argues that the confirmed plan of reorganization in the Ladera Debtors' cases stated that if RWN acquired the property by a credit bid then the RWN Deficiency Claim against the Ladera Debtors would be calculated by subtracting the RWN Credit Bid from the amount of the RWN debt.  It is true that the terms of the confirmed plan (to which no party objected) did not provide for an automatic "fair value" credit of the kind that Mr. Futterman now seeks.  The real issue that remains in these cases, however, is whether the auction was infected by fraud or deliberate misconduct, or (possibly) whether the amount of the credit bid was so unconscionably low as to warrant an intervention as a matter of equity.  RWN does not go so far as to suggest that the general approval of a method of calculating the RWN Deficiency Claim in the Ladera Debtors' cases should foreclose an inquiry, in Mr. Futterman's separate case, into the issue of whether fraud or exploitative overreaching occurred during the subsequent auction, and whether such fraud or exploitative overreaching are equitable grounds to alter the deficiency claim that might otherwise be pursued in Mr. Futterman's case.  New York law recognizes that Mr. Futterman may assert such defenses (notwithstanding the waivers of defenses in the Guaranty), and there is nothing in the terms of the confirmed plan of reorganization in the Ladera Debtors' cases that properly would have limited Mr. Futterman's rights to raise such issues as a guarantor, or that purported to do so.

Second, RWN suggests that Mr. Futterman (as the former owner of the Ladera Debtors) should be bound by the calculation of the RWN Deficiency Claim in those cases.  The test in the Second Circuit for *res judicata* in the bankruptcy context and in the plan confirmation context requires that "1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *Corbett v. MacDonald Moving Servs., Inc*., 124 F.3d 82, 87-88 (2d Cir.1997).  In the bankruptcy context, we ask as well whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan.  *Id.* (citing *Sure–Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 875–76 (2d Cir.1991)).

Here, there is nothing about Mr. Futterman's challenges to the deficiency claim that would challenge, impair, destroy or invalidate anything that happened in the Ladera Debtors' cases.  More importantly, it may be true that Mr. Futterman controlled the Ladera Debtors at earlier stages in the proceedings, but at the time of the auction his ownership interests had been extinguished, as RWN itself pointed out when it argued that Mr. Futterman had no standing to file an adversary proceeding on behalf of the Ladera Debtors.  The Ladera Debtors (under the control of Ms. DuVal) elected not to challenge the results of the auction, but there is no reason why Mr. Futterman could or should be estopped based on the conduct of entities he no longer controlled.

Third, suggests that Mr. Futterman participated in the Ladera Debtors' cases and that he could have raised issues about the auction at the hearing to confirm the Ladera Debtors' sale.  It is true that Mr. Futterman participated (as an owner) in the Ladera Debtors' cases, but he no longer had that capacity at the time of the auction.  As a practical matter there was very little

time for him to file objections (as a guarantor) after the auction occurred, and Mr. Futterman did

not actually litigate such objections, in part because he did not have personal counsel who could

pursue them.

It is also not clear from the record before the Court at what point in time Mr. Futterman

became aware of the facts he believes gives rise to his theory that RWN colluded with the Wind

Down Officer and/or Happy Living.  While it is true that generally speaking newly-discovered

evidence alone does not defeat the application of *res judicata*, an exception exists where the

"evidence was either fraudulently concealed or when it could not have been discovered with due

diligence."  *See In re Layo*, 460 F.3d 289, 292-93 (2d Cir. 2006) (citing *Saud v. Bank of New

York*, 929 F.2d 916, 920 (2d Cir. 1991).

Based on the foregoing, I decline to rule that as a matter of law Mr. Futterman is

precluded from asserting his "fraud" or "exploitative overreaching" defenses to the deficiency

claim based on the terms of the confirmed plan of reorganization in the Ladera Debtors' cases, or

based on the Ladera Debtors' lack of opposition to the calculation of the deficiency claim in their

cases, or based on Mr. Futterman's lack of objection to the conduct of the auction at the hearing

to consider the approval of the sale in the Ladera Debtors' cases.  Any contentions that Mr.

Futterman should be barred from raising issues about the auction should be raised at trial where

they can be decided in light of a full factual record as to what Mr. Futterman knew, when he

knew it, and why he did or did not make objections in the Ladera Debtors' cases.

Dated: New York, New York
           April 24, 2019


                                                              s/Michael E. Wiles
                                                              Honorable Michael E. Wiles
                                                              United States Bankruptcy Judge