**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
In re:                                     :        Chapter 11
                                           :
HANS FUTTERMAN,                            :        Case No. 17-12899 (MEW)
                                           :
                        Debtor.            :
-------------------------------------------------------------x

### DECISION (1) VACATING AND MODIFYING A DECEMBER 1, 2023 PARTIAL FINAL ARBITRATION AWARD AND A FEBRUARY 29, 2024 FINAL ARBITRATION AWARD INSOFAR AS THEY AWARD DAMAGES AGAINST RGS HOLDINGS, LLC, (2) CONFIRMING THE REST OF THE DECEMBER 1, 2023 PARTIAL FINAL AWARD AND THE FEBRUARY 29, 2024 FINAL AWARD, (3) CONFIRMING A JULY 12, 2017 ARBITRATION AWARD (AS CLARIFIED ON NOVEMBER 6, 2019), AND (4) DISMISSING PENDING ADVERSARY PROCEEDINGS

A P P E A R A N C E S :

TARTER KRINSKY & DROGIN LLP
New York, New York
*Attorneys for Hans Futterman and RGS Holding, LLC*
   By:   Scott S. Markowitz, Esq.
         Debra Bodian Bernstein, Esq.

BRENDAN C. KOMBOL, ESQ.
New York, New York
*Attorney for USHA SOHA Terrace, LLC*

BENAUR LAW LLC
New York, New York
*Attorneys for Ventures SOHA LLC*
   By:   George Benaur, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE:**

        Before the Court are (1) the motion [ECF No. 432] by Debtor Hans Futterman to vacate a

portion of an arbitration award by arbitrator Lisa S. Aldoroty dated December 1, 2023 [ECF No.

432-1] (the "**Partial Final Award**") that was later incorporated into a Final Award dated February

29, 2024 [ECF No. 435-2] (the "**Final Award**"), and (2) cross-motions by Ventures SOHA LLC

[ECF No. 435] and USHA SOHA Terrace LLC [ECF No. 438] to confirm the Final Award in its entirety. The parties also remain in dispute as to whether a prior decision by arbitrator Michael Oscar Renda dated July 12, 2017 [ECF No. 59-2] (as clarified by the arbitrator on November 6, 2019 [ECF No. 348]) (collectively, the "**2017 Arbitration Award**") still requires confirmation by this Court. The confirmed plan of reorganization "incorporated" the 2017 Arbitration Award [ECF No. 364-2, Article V(d)(4)], but no separate Order has been entered with respect to the prior timely-filed motions to confirm the award. (In 2023, when disputes over the status of the prior award arose, the parties asked the Court to defer the entry of a further Order regarding the prior arbitration until after the completion of the subsequent arbitration before Ms. Aldoroty.)

Ms. Aldoroty issued the Partial Final Award on December 1, 2023. As explained more fully below, the parties agreed that it was appropriate to seek a clarification of certain aspects of her rulings, and so in a Decision [ECF No. 444] and Order [ECF No. 445] entered on April 19, 2024, I directed that the arbitrator be asked to respond to three clarifying questions. The arbitrator's response was submitted to the Court as an attachment to a letter that Mr. Futterman's counsel filed with the Court on May 20, 2024. ECF No. 447-1. The parties have since repeated their respective requests for confirmation or for partial vacatur or modification of her awards.

For the reasons set forth below, the Court has determined that the portions of the Partial Final Award and the Final Award that award damages against RGS Holdings, LLC should be vacated and/or modified but that the remainder of the various arbitration awards should be confirmed. Three adversary proceedings that remain pending in this Court should also be dismissed. A proposed Order to this effect is being issued for comment by the parties.

## Background

This matter has a tortured history. I have repeated below much of the factual and procedural background that was set forth in my April 19, 2024 decision, though I have supplemented that discussion with some additional material that is relevant.

### A.    The Relevant Projects

The debtor, Mr. Futterman, is a real estate developer. There are two projects in which Mr. Futterman has been involved that are relevant to this decision. I will refer to them as the 2280 FDB Project and the Ladera Project.

#### 1.    The 2280 FDB Project.

Mr. Futterman and certain entities he owns had roles in the development of real property located at 2280 Frederick Douglass Boulevard in Manhattan. The building is a mixed-use development that includes residential condominium units (some of which remain unsold), retail space, a community facility and a parking garage. The parking garage was sold in 2016 for a purchase price of $1.275 million. There are a number of entities involved in the 2280 FDB project, some of which are owned by Mr. Futterman and some of which are not.

The main operating entity (the actual owner of the 2280 FDB property) is a New York limited liability company named 2280 FDB, LLC ("**2280 FDB**"). There are two entities that have ownership interests in 2280 FDB:

- SOHA Terrace Manager Corporation owns all of the Class B membership interests in 2280 FDB, which represent a 0.5 percent ownership interest. SOHA Terrace Manager Corporation is named in the 2280 FDB Operating Agreement as the managing member of 2280 FDB. SOHA Terrace Manager Corporation is owned by SOHA Manager Owner LLC, which in turn is owned by Mr. Futterman.

- A New York limited liability company named SOHA Terrace, LLC ("**SOHA**") owns all of the Class A membership interests in 2280 FDB. The Class A membership interests represent a 99.5 percent ownership interest in 2280 FDB.

SOHA (the majority owner of 2280 FDB) has three owners. An entity named RGS Holdings, LLC ("**RGS**"), which is owned by Mr. Futterman, owns eighty percent of the membership interests in SOHA. RGS was designated as the managing member of SOHA in SOHA's operating agreement. Another entity named USHA SOHA Terrace, LLC ("**USHA**") is a fourteen-percent owner of SOHA, and a third entity named Ventures SOHA LLC ("**Ventures**") is a six-percent owner. USHA and Ventures are owned by third party investors.

    **2.**    **The Ladera Project**.

Mr. Futterman was involved in another project that was not completed and that related to the development of property located at 300 West 122nd Street in New York. Mr. Futterman owned all of the membership interests in a New York limited liability company named Ladera Parent LLC ("**Ladera Parent**"), which in turn owed all of the membership interests in a New York Limited Liability Company named Ladera, LLC ("**Ladera**"). Ladera borrowed money from a lender named RWNIH-DL 122nd Street 1 LLC ("**RWN**") to attempt to complete the development of the Ladera project.

As described below, the two Ladera entities filed bankruptcy proceedings before the projects were completed, and their assets were transferred to a secured creditor.

**B.**    **The 2017 Arbitration Decision**

The various entities involved in the 2280 project have been engaged in a number of litigations that have consumed much expense and time. Some of their disputes were addressed in a prior arbitration proceeding that resulted in the issuance of an arbitration award on August 22,

4

2017.  ECF No. 59, Ex. A.  The arbitration addressed a host of claims against Mr. Futterman and RGS based on allegations of fraud, deceit, breach of fiduciary duty, mismanagement, and/or failure to keep accurate books and records regarding the 2280 project.  The arbitrator rejected many of the parties' contentions that Mr. Futterman and RGS had engaged in wrongdoing, or that they had allegedly kept inaccurate records, or that they had allegedly converted business opportunities that should have belonged to 2280 FDB.  However, the arbitrator ruled in favor of the claimants in three respects.

First, the arbitrator found that Mr. Futterman and RGS had deliberately postponed the sale of some condominium units with the goal of buying out the other investors at a discount.  The arbitrator further found that this constituted self-dealing by RGS and Mr. Futterman.

Second, the arbitrator found that Mr. Futterman, through RGS, had used the assets of SOHA "for his own personal benefit with no benefit to SOHA and its other members, including USHA," because Mr. Futterman and RGS had caused SOHA to guarantee a loan that was made to RGS.  The arbitrator held that using SOHA to guarantee the obligations of RGS was a violation of RGS's duties as the managing member, and that this of itself was "substantial cause to remove RGS, including Futterman, as the managing member of SOHA."

Third, the arbitrator found that Mr. Futterman had caused SOHA to pay expenses from a 2280 FDB account in connection with a personal loan that Mr. Futterman had incurred.

The arbitrator decided that as the result of the foregoing conduct Mr. Futterman and RGS should be removed as managing member of SOHA.  In addition, in light of the "intentional misconduct" described above, the arbitrator held that SOHA Terrace Manager Corp. needed to be removed as the managing member of 2280 FDB.  The arbitrator stated as a result that USHA should be entitled to appoint a new manager.

C.    **The Ladera Bankruptcy Cases**

The development of the Ladera project did not go as hoped.  On December 4, 2016, the two Ladera entities filed Chapter 11 bankruptcy cases in this Court.  The Ladera cases were filed while the above-described arbitration proceeding was still pending.

USHA and Ventures raised issues during the Ladera case that were based on the terms of a Parking Declaration dated October 15, 2015, pursuant to which 2280 FDB had agreed that thirty (30) spaces in the 2280 FDB parking garage would be available as accessory parking spaces to the Ladera project.  To be clear: the issues relating to the Parking Declaration were *not* among the issues that were the subject of the then-pending arbitration.

USHA and Ventures filed proofs of claim against the Ladera entities in their chapter 11 cases.  *See* Case No. 16-13382, ECF No. 110, Exhibits A and C.  USHA's claim was filed on March 29, 2017 and was asserted individually and purportedly on behalf of 2280 FDB and SOHA as well.  The claim alleged that "parking rights, permitting rights, and converted funds" allegedly owned by "SOHA, 2280 FDB and affiliates" had been converted "to or for the benefit of" the Ladera debtors.  The claim asserted that such conversions had caused damages in an amount to be proved at trial but estimated at no less than $10,000,000.  The Ventures proof of claim was also filed on March 29, 2017.  It also referred to an alleged "conversion and/or fraudulent transfer or commingling of assets including but not limited to parking rights, permitting rights, and converted funds" and contended that Ventures had been damaged "in an amount to be proved at trial but estimated at no less than $1,406,300."

During the summer of 2017 the Ladera debtors and RWN proposed competing plans of reorganization.  Ventures and SOHA filed objections to the proposed plans.  In their objections, Ventures and SOHA contended that the parking rights that had purportedly been granted to Ladera

under the 2016 Parking Declaration should be nullified and should not be treated as property of

the Ladera entities' estates. *See* Case No. 16-13382, ECF No. 118. Ventures and USHA also filed

an adversary proceeding against the Ladera entities, in which Ventures and USHA purported to

assert derivative claims on behalf of 2280 FDB and SOHA Terrace. *See* Adv. Pro. No. 17-01102

(MEW). The Complaint challenged Mr. Futterman's authority to agree to the parking declaration

on behalf of 2280 FDB, and sought an order invalidating the declaration on a variety of theories.

*See* Complaint, Adv. Pro. No 17-01102, ECF No. 1.

The Ladera debtors, and RWN, strongly opposed the claims filed by USHA and Ventures,

but the claims and the plan objections were settled at the time that RWN's proposed plan of

reorganization was confirmed. *See* Case No. 16-13382, ECF No. 149. Separate terms were set

forth regarding the settlements that USHA, Ventures, SOHA and 2280 FDB had reached with

RWN and with the Ladera Debtors. *Id*. at Exhibit 1. More particularly, RWN agreed as part of its

settlement to incorporate, in its proposed reorganization plan, the following terms:

- RWN would increase its plan funding by $275,000;

- $275,000 would be segregated for the benefit of USHA, Ventures and a trustee
  representing a predecessor of Ventures, and would be paid to those parties following
  confirmation of the plan;

- If RWN was the winning bidder at a subsequent sale, then (a) an unsecured claim
  against Ladera would be allowed "in the name of either (i) 2280 or (ii) USHA, Trustee
  and Ventures" in the amount of $4 million; and (b) an unsecured claim of $10 million
  would be allowed in favor of 2280 FDB and against the Ladera Parent entity.
  Otherwise, however, there would be no agreement as to allowed claims, and any buyer
  reserved the right to object to the USHA and Ventures claims.

- The parties agreed that the potential claims allowances to which RWN had agreed "shall have no collateral estoppel or otherwise legally binding effect, [and] the allowance shall not be deemed an admission by the Debtors or anyone else as to the validity of the Allowed 2280 Parties' Claims." *Id*.

It should be noted that, at the time these agreements were reached, it was questionable whether any funds would actually be available for distribution with respect to any unsecured claims in the Ladera cases. That was especially likely to be the case if RWN was the winning bidder, as that was likely to mean that RWN had acquired the property by bidding some part of its secured debt.

The separate settlement terms between the Ladera debtors and the 2280 Parties provided that USHA, Ventures and SOHA agreed to withdraw all of their proofs of claim against the Ladera debtors and all of their objections to confirmation of the proposed plan of reorganization. The parties agreed that the provisions of the settlement would have no collateral estoppel or res judicata effect in any pending or future litigation. The Ladera debtors also reserved the right to object to the USHA, Ventures and 2280 FDB proofs of claim in the event that the RWN plan did not become effective. *Id*.

Pursuant to the RWN plan, an auction sale was held in September 2017, at which time RWN made a credit bid in the amount of $48,600,000 plus the assumption of certain other obligations. This Court approved the sale of the property to RWN or its designee by order dated September 22, 2017. *See* Case No. 16-13382, ECF No. 167. Under the confirmed plan of reorganization, unsecured creditors were only entitled to receive payments if funds were still available after the satisfaction of secured, administrative and priority claims. The Court understands that no such funds were available and therefore that there were no distributions with respect to the unsecured claims that were allowed against the Ladera entities and in favor of 2280

FDB, SOHA, USHA and/or Ventures, though one or more of those entities did receive the $275,000 payment that was part of the RWN settlement.

**D.    The Futterman Bankruptcy**

Mr. Futterman filed his own bankruptcy petition on October 17, 2017. He filed a motion seeking a "partial" confirmation of the August 2017 arbitration award. ECF No. 59. RWN (which held a pledge of RGS's membership interests in SOHA Terrace) objected to that request and also filed a motion for the appointment of a chapter 11 trustee. ECF Nos. 57, 71. After a hearing, I issued a bench decision [ECF No. 143] in which I ruled that a chapter 11 trustee should be appointed. I also ruled that the arbitrator should be asked to clarify three issues regarding the management of 2280 FDB and the manner in which a new manager should be selected:

> 1. Did the arbitrator intend that USHA would have the permanent right to elect a managing member of SOHA Terrace, and that the provisions of section 402(a) of the New York Limited Liability Company Law would not apply?
>
> 2. If the relevant provisions of the New York Limited Liability Company Law do apply to the election of a new manager, did the arbitrator intend to rule that RGS would not be entitled to vote for the selection of a new manager, even if RGS is under the control of a trustee and not under the control of Mr. Futterman?
>
> 3. Did the arbitrator intend to rule that USHA itself would have the right to name a managing member of 2280 FDB, or does that right continue to belong to SOHA Terrace, as the holder of 99.5 percent of the membership interests in 2280 FDB, LLC?

ECF No. 144.

For reasons that are no longer clear the parties asked for eight separate extensions of the deadline for the submission of these questions to the arbitrator. Ultimately, though, the questions were submitted to the arbitrator, and the arbitrator filed the following responses on November 6, 2019:

> 1. The Arbitrator did not intend to conflict with any of the provisions of any of the laws of the State of New York. The Arbitrator did not intend that USHA

9

would have the permanent right to elect a managing member of SOHA Terrace. Rather, the intent was to immediately protect the assets of SOHA Terrace from the control of Hans Futterman.

    2.  RGS would be entitled to vote for the selection of a new manager, if RGS is under the control of a trustee and not under the control of Hans Futterman.

    3.  The right to name a managing member of 2280 FDB continues to belong to SOHA Terrace as the holder of 99.5 percent of the membership interests in 2280 FDB, LLC.

ECF No. 348.

Meanwhile, three lawsuits that had been filed by USHA and Ventures against Mr. Futterman and RGS in the New York state court were removed to this Court. *See* Adv. Pro. Nos. 17-01220 (MEW), 17-01221 (MEW), and 17-01222 (MEW). In addition, USHA and Ventures made clear during the bankruptcy case that they wished to continue to press their contentions that Mr. Futterman had breached fiduciary duties in connection with the issuance of the Parking Declaration.  Mr. Futterman reached agreement with USHA and Ventures that the parties' remaining disputes (including claims relating to the Parking Declaration) would be resolved in arbitration.  More particularly, Article V(D) of the Plan of reorganization in Mr. Futterman's case provided that:

- The parties would select a neutral accounting firm to audit the books and records of 2280 FDB for periods on and after January 1, 2014.

- The parties would "each hire an expert to provide a valuation related to the parking declaration that was granted to the Ladera entity in such manner and method as the expert deems appropriate, to include, as determined by the respective expert, the value gained by the granting of the parking declaration."  If the two experts' reports were more than $500,000 apart, and if the parties were unable to reconcile their differences,

a third expert was to be selected to perform a valuation, and all of the experts' reports

would be provided to an arbitrator.

- The proofs of claim filed by USHA and others would be valued at zero for purposes of

  voting on the Plan.

- "All other rights and claims" of the parties were reserved and not waived.

- "All remaining disputes" between the parties would be resolved by binding arbitration

  conducted through the AAA.

- Nothing in the Plan vitiated the 2017 Arbitration Award, as clarified.

ECF No. 364, Ex. A.

In addition, under the confirmed plan of reorganization in Mr. Futterman's case the parties

agreed that the former chapter 11 trustee would act as the interim manager of 2280 FDB.  That

arrangement continued until the trustee resigned from that position in 2023.  At that point the

parties once again could not agree on how to proceed.  Nor could they agree as to whether the

selection of a new manager should await the outcome of the new arbitration as to the parties' other

disputes.

**E.    The December 2023 Partial Final Award**

On December 1, 2023, the arbitrator in the second arbitration proceeding issued a

"Reasoned Partial Final Award of Arbitrator."  ECF No. 432-1.  The arbitrator reviewed and

discussed a host of different accusations and defenses, and for the most part rejected the additional

claims that were asserted against RGS and Mr. Futterman.  A subsequent Final Award dated

February 29, 2024, ECF No. 435-2, incorporated the provisions of the Partial Final Award.  The

parties do not contest any of the arbitrator's findings with the exception of an award of damages

against RGS that she made with respect to the Parking Declaration.

At pages 13-18 of her Partial Final Award the arbitrator discussed the evidence that the parties had offered regarding the terms of the Parking Declaration, its alleged value to the Ladera project, whether Mr. Futterman had authority to execute the Parking Declaration on behalf of 2280 FDB, whether the consent of USHA and Ventures had been required, and whether Mr. Futterman breached any fiduciary duty in executing the Parking Declaration. The arbitrator rejected the contention that the consent of USHA or Ventures was required, holding that it was the 2280 FDB Operating Agreement (and not the SOHA Operating Agreement) that governed the manager's powers and responsibilities with respect to the issuance of the Parking Declaration by 2280 FDB. *Id.* at 14. She also held that Mr. Futterman had authority to issue the Parking Declaration on behalf of 2280 FDB without the consent of USHA and Ventures. The arbitrator further noted that the Parking Declaration had been issued in favor of Ladera without compensation to 2280 FDB. *Id.* After reviewing other evidence as to the alleged value of the Parking Declaration, the arbitrator stated the following:

> The undersigned Arbitrator finds that, Futterman should have received consideration for the Restrictive Parking Declaration as there was significant value created for the Ladera Project. However, Futterman's actions fall short of a breach of fiduciary duty as Futterman performed his duties as manager in a manner he reasonably believed to be in the best interest of the Project as he genuinely thought he would be improving the operations at the Project's garage. However, on behalf of USHA and Ventures, there were two qualified experts who testified and prepared expert reports with respect to the value gained by the Ladera Project in connection with the Restrictive Parking Declaration. Futterman chose not to engage an expert but instead he testified regarding the Restrictive Parking Declaration. Futterman's testimony attempts to undermine the methodology utilized in both the [experts' reports], but Futterman is neither an expert nor a New York State Certified General Real Estate Appraiser.

*Id.* at 18.

The arbitrator also rejected arguments that Mr. Futterman had violated fiduciary duties when he later caused 2280 FDB to sell the parking garage in 2016 for a price of $1.275 million.

She held that Mr. Futterman had the authority to approve that sale and that he "acted in a commercially reasonable manner as he engaged an experienced broker and took the higher and better offer." *Id*. at 19.

At the conclusion of her report, the arbitrator held that Mr. Futterman was not liable to any of the parties for any of his actions. However, without further explanation the arbitrator ordered as follows:

> Respondent, RGS, shall pay USHA the sum of $1,120,000 in connection with the Restrictive Parking Declaration.

> Respondent, RGS, shall pay Ventures the sum of $480,000 in connection with the Restrictive Parking Declaration.

*Id*. at 30.

## F.    The Parties' Motions and Cross-Motions and the Request for Clarification

Mr. Futterman asked that I confirm all portions of the Partial Final Award (and additional rulings made by the arbitrator in the Final Award) with the exception of the portions of the awards that directed RGS to make payments to USHA and to Ventures. He acknowledged that arbitration awards should not be overturned in the absence of a manifest disregard of law, but contended that such a manifest disregard occurs when an arbitrator "knew of a governing legal principle yet refused to apply it or ignored it altogether," and where "the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 481 (2006). He also argued that an arbitrator violates applicable standards if the arbitrator's decision is irrational and arbitrary. Mr. Futterman contended that the award against RGS violated these principles in three ways.

First, Mr. Futterman contended that it is a "cornerstone of New York law that damages can only be awarded if there is an adverse finding" of liability, citing *City of New York v. State*, 95 Misc. 2d 810, 815 (Ct. Cl. 1978) ("[A]n award of damages necessarily entails a finding of

liability."). In this case, the arbitrator explicitly found that Mr. Futterman did not breach fiduciary duties by entering into the Parking Declaration. She identified no other theory upon which Mr. Futterman or RGS owed any liability to any person.

Second, the arbitrator did not explain why RGS in particular bore any liability in connection with the Parking Declaration. Ladera (not RGS) was the recipient of rights under the Parking Declaration. There is no indication that RGS had any ownership interest in the Ladera entities or that RGS derived any value from the rights that were granted to the Ladera entities. Nor did the arbitrator explain why RGS owed any liability directly to USHA and to Ventures, given that the Parking Declaration was issued by 2280 FDB (not by SOHA, USHA or Ventures) and given that the declaration was issued in favor of Ladera (not RGS).[1]

Third, Mr. Futterman contended that the damages awarded by the arbitrator were irrational. He notes that the award is equivalent to a determination that the Parking Declaration was worth $8 million to 2280 FDB. However, the arbitrator found that the sale of the entire parking garage for a price of $1.275 million was a commercially reasonable event. Mr. Futterman contended that it is irrational to conclude that the Parking Declaration (which gave Ladera's residents the right to rent 30 of the 70 parking spaces at full price and did not alter the economics of the garage itself) somehow was worth many times more than the garage was worth.

USHA and Ventures responded by asking me to confirm the arbitrator's award in full. Their attorneys acknowledged during oral argument on April 17, 2024 that it is difficult to discern a basis for the arbitrator's awards against RGS in light of her finding that no breach of fiduciary

---

[1]     Mr. Futterman also contended that the arbitrator ignored section 13.1 of the 2280 FDB Operating Agreement, which provides that a managing member shall not be liable for any act or omission except upon the commission of fraud or willful misconduct. However, RGS was not a managing member of 2280 FDB, and the arbitrator did not suggest otherwise.

duty occurred. USHA and Ventures suggested that I should nevertheless uphold the award if I could identify alternative theories in support of the award. However, USHA and Ventures were unable at that time to suggest any alternative theories of liability that appeared to be plausible or that had any support in what the arbitrator actually said.

Ventures filed papers that suggested that the confirmed plan of reorganization in Mr. Futterman's case might have somehow already determined the question of whether 2280 FDB, SOHA, USHA and/or Ventures were entitled to compensation in connection with the execution of the Parking Declaration, and as though the only issue for determination by the arbitrator was as to the appropriate value to be paid. When I raised this issue at oral argument, however, Ventures readily acknowledged that the plan of reorganization had done no such thing. The relevant portion of the Transcript from April 17, 2024 is as follows:

> THE COURT: Mr. Benaur [Ventures counsel], it seemed in your papers that you seemed to be arguing that under the plan there was an agreement that there was liability and that their only issue was how much benefit Ladera got. Is that what your position was in the arbitration? Because I have to tell you, that has never been my understanding of the plan.

> MR. BENAUR: Well, we just cited the plan and the arbitration. We cited the specific provision of the plan.

> THE COURT: Did you take the position in the arbitration, that Mr. Futterman - -

> MR. BENAUR: I don't think so. I don't think we presented it that this was a done matter. I think we just presented it from a perspective of there was a reorganization plan. It referred the issue of the parking declaration to arbitration. It required the hiring of experts. Mr. Futterman did not hire an expert. But we didn't ever dictate to the arbitrator what the ruling was with respect to the parking declaration.

> MR. KOMBOL [SOHA counsel]: Your Honor, the arbitrator, as far as I understand it, was provided copies of those orders, but I don't think it was addressed at the hearing at all. She actually, I believe, said several times on the record she didn't want to get into it. Just provide me the bankruptcy orders. I'll read them myself.

4/17/24 Tr., ECF No. 446 at 15:23–16:21. As I noted in the Decision that I issued on April 19, 2024, the provisions of the plan regarding the designations of expert testimony were timing provisions only. The parties reserved all of their rights to contest liability, and damages were to be awarded only to the extent that the arbitrator found that damages were owed under an appropriate legal theory. ECF No. 444 at 14.

During argument, Ventures also suggested that an "accounting" had been sought, but there was nothing in the arbitrator's decision that supports a conclusion that RGS owed anything to 2280 or to SOHA by virtue of an "accounting" of any kind. Ventures further suggested that the arbitrator had the right to "balance the equities" among the owners of SOHA. However, the arbitrator did not purport to act on that ground, and I know of no theory of liability under which the respective rights of shareholders may be modified by a "balance of equities" that is independent of the owners' legal obligations to each other.

USHA also suggested, during oral argument, that the SOHA Operating Agreement requires an adjustment of the members' respective entitlements in the event that one of the members receives a distribution in kind from SOHA. However, there was no suggestion by the parties (and no finding by the arbitrator) that RGS received any distribution "in kind" from SOHA, or that SOHA distributed anything to RGS at all. The Parking Declaration was between 2280 FDB and Ladera. The "recipient" of rights was Ladera (not RGS), and the party transferring rights was 2280 FDB (not SOHA). The arbitrator also decided explicitly that, in assessing the parties' rights and obligations with respect to the Parking Declaration, the relevant operating agreement was the 2280 FDB agreement, rather than the SOHA Operating Agreement. Furthermore, the arbitrator decided that Mr. Futterman had the authority to execute the Parking Declaration on behalf of 2280 FDB and that the grant of the Parking Declaration, without compensation, was not a breach of fiduciary

duty.  Unless there was some other legal theory under which 2280 FDB was entitled to compensation, I found it difficult to understand how SOHA was adversely affected or how the owners of SOHA could be entitled to damages.

The arbitrator directed that USHA and Ventures return, to 2280 FDB, the payments that were made to them by RWN in connection with the confirmation of the plan of reorganization in the Ladera entities' chapter 11 cases.  She appeared to have recognized that this amount was due and owing to 2280 FDB in connection with the settlement of the claims that had been made against the Ladera entities with respect to the Parking Declaration.  The values of the Ladera entities' assets were too small to permit distributions to unsecured creditors, and so there were no distributions on the other claims that had been allowed in favor of 2280 FDB and its owners.  But there was no suggestion, in any of the parties' claims or in the arbitrator's decision, that RGS was a guarantor of any of Ladera's obligations.  Nor was there any explanation of why RGS should owe damages based on gains that allegedly were received by the Ladera entities.

I stated, under the circumstances, that I was not inclined to indulge any of Ventures' or USHA's proposed alternative theories of liability.  They found no support in anything that the arbitrator actually said, and in some cases invoked theories that are not even real theories of liability.  However, I also was not inclined simply to reject the arbitrator's award insofar as it relates to the Parking Declaration, as Mr. Futterman urged me to do.  I believed that the arbitrator might have had something else in mind, and if she did have another theory in mind she was entitled to clarify her reasoning.  The parties agreed that I had the power to ask the arbitrator to clarify her ruling, *see Hardy v. Walsh Manning Sec., L.L.C.*, 341 F.3d 126, 130, 134 (2d Cir. 2003), and counsel to USHA and Ventures stated on the record that they supported a request for clarification. *See* 4/17/24 Tr., ECF No. 446 at 13 (acknowledgment by USHA counsel that "I see no problem

17

with that, your Honor"); *id.* at 14–15 (statements by Ventures' counsel that "it makes sense to ask

the arbitrator for clarification" and that "I would support asking for clarification").

On April 19, 2024, I issued an order remanding the matter to the arbitrator for clarification

as to the following three points:

> 1.  Given the finding that Mr. Futterman did not breach fiduciary duties in
> issuing the Parking Declaration, what is the legal theory on which damages
> were awarded?
>
> 2.  What is the basis upon which damages were awarded against RGS and
> in favor of USHA and Ventures?
>
> 3.  How were the damages payable by RGS calculated?

ECF No. 445. I also issued a Decision that explained the reasons why clarification was being

sought. ECF No. 444. My order directed that the Decision, as well as the Order, be delivered to

the arbitrator on or before April 26, 2024. ECF No. 445.

## G.      The Arbitrator's Clarification

The Arbitrator provided a clarification to her ruling that is dated May 17, 2024. ECF No.

447-1. As to the legal theory on which damages were awarded, the arbitrator stated the following:

> The evidence and testimony indicated that the only issue to be determined was
> the value of the recorded Restrictive Parking Declaration gained by the Ladera
> entity and the amount of the consideration to be paid to USHA and Ventures
> in exchange for the benefits and rights received by the Ladera entity pursuant
> to the recorded Restrictive Parking Declaration.

In other words, the arbitrator understood that the parties had agreed that USHA and Ventures were

entitled to compensation from RGS for the issuance of the Parking Declaration, and that under the

terms of the confirmed Plan the only issue left for the arbitrator to determine was the value that

Ladera had received from the issuance of that declaration. As noted above, this understanding was

entirely wrong, and the parties acknowledged before me on April 17, 2024 that it was wrong. In

fact, I stated in my prior Decision that it was wrong, and my Decision was provided to the

arbitrator.  Notwithstanding these clear statements, the arbitrator's clarification adhered to her own

prior interpretation of the Plan as the sole support for the damages award.

As to the grounds on which damages were awarded against RGS, the arbitrator stated the

following:

> Futterman has a 100% interest in RGS (a party to this Arbitration and which is
> the managing member of SOHA Terrace LLC), RGS has an 80% interest in
> SOHA Terrace LLC, and SOHA Terrace LLC has a 99.5% interest in 2280
> FDB.  Futterman through RGS, as managing member of SOHA Terrace LLC,
> controlled 2280 FDB.

This particular statement did not clarify anything.  It seemed to say that damages were awarded

against RGS because it is the entity that owned interests (directly or indirectly) in SOHA and 2280

FDB, regardless of whether the actual benefits were conferred on a different entity (Ladera) and

regardless of whether any underlying violation of duty occurred.  In short, it did not explain any

legal rationale for an award of damages against RGS, other than the erroneous presumption that

the parties had somehow already agreed that RGS was liable for whatever benefits Ladera had

received, and that the only issue for determination was as to the amount of value that Ladera

derived from the parking declaration.

## H.    <u>Subsequent Submissions by the Parties</u>

I was puzzled by the arbitrator's statement that under the confirmed bankruptcy plan the

"only issue to be determined" was the value of the Parking Declaration.  That had never been my

understanding, and the parties on April 17 had confirmed that it was not their understanding and

had not been their contention during the arbitration.  The confirmed plan set forth a mechanism

for the submission of expert reports on valuation issues, but it explicitly stated that all other rights

of the parties were reserved.

I had suspicions, given the statements Ventures had initially made in support of its motion for confirmation of the arbitration award, about the positions that Ventures and USHA might have taken in front of the arbitrator. I therefore asked the parties to submit the entirety of the arbitration record to me, and to identify therein all instances in which there was any discussion of whether the bankruptcy plan had already resolved the issue of liability and left only the issue of valuation to be decided. The parties have submitted the record, and I have reviewed the relevant portions.

Although the claimants' attorneys told me on April 17 that they had not argued, during the arbitration, that liability had already been decided and that valuation was the only issue that remained, the record plainly shows the contrary. The transcripts of the arbitration proceedings include some arguments to that effect by the attorneys for USHA and Ventures, although Mr. Futterman's counsel repeatedly argued that liability issues had to be decided before the valuation testimony was even relevant. 3/24/23 Tr. at 624–42; 5/3/23 Tr. at 1813–17, 1827–31. USHA's post-hearing reply submission was explicit in this regard: it argued that the liability issues were irrelevant, and that the arbitrator should only decide the value of the rights that Ladera obtained from the issuance of the Parking Declaration. *See* USHA Reply, at 11–12 (arguing that the Plan did not allow the defendants "to contest whether or not the Parking Declaration acted as a transfer benefitting the Futterman Parties," that the defenses asserted by the Futterman Parties were not permitted under the Plan, and that the only issue to be resolved was the value that Ladera obtained from the Parking Declaration).

The arbitrator's clarification stated that the "evidence and testimony" before her suggested that the only issue to be decided was the valuation of the benefits that Ladera had obtained. However, in response to my direction the parties identified only the legal arguments discussed above, and no testimony or evidence on this issue.

### Discussion

The arbitrator decided that Mr. Futterman did not breach fiduciary duties when he approved the issuance of the Parking Declaration; that the issuance of the Parking Declaration was governed by the 2280 FDB Operating Agreement and not by the SOHA Operating Agreement; and that the issuance of the Parking Declaration did not violate the 2280 FDB Operating Agreement. She identified no other legal theory of liability upon which Mr. Futterman, Ladera, or RGS would owe damages to any other party by reason of the issuance of the Parking Declaration. Her clarification makes clear that she understood that the only issue for decision by her was as to the value (to Ladera) of the rights that Ladera received. She adhered to that interpretation of the Plan even after having been informed that it was wrong. She had been urged to adopt this view by USHA and Ventures. However, USHA and Ventures have acknowledged before me – and the arbitrator was so informed – that this interpretation of the plan was *not* correct, and in fact that liability had never been conceded by Mr. Futterman, RGS or any other party. In short, it is quite clear that "value" was not the only issue submitted to the arbitrator. Instead, she was supposed to determine whether any party had any legal liability to any other party.

Arbitrators have wide latitude and discretion in making their rulings. It is well-settled that if an arbitrator decides an issue that is within the parties' agreement to arbitrate then the arbitrator's ruling can only be overturned or modified based on the statutory grounds set forth in sections 10 and 11 of the Federal Arbitration Act, 9 U.S.C. §§ 10, 11, or based on a demonstration that the decision reflects a manifest disregard of applicable law as defined in various decisions by the Second Circuit Court of Appeals. *See Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444 (2d Cir. 2011); *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139–140 (2d Cir. 2007). I therefore approach any motion for vacatur or modification of an arbitration award with extreme

hesitancy and skepticism.  In this particular and highly unusual case, however, I believe that for a number of independent reasons the arbitrator's decision awarding damages against RGS must be vacated and/or corrected or modified.

First, the arbitrator's acceptance of the argument made by USHA and Ventures cannot be upheld on the theory that she was deciding an issue that the parties had committed to her for resolution, because there was nothing in the party's agreement to arbitrate that said that she could resolve disputes as to whether an "admission" of liability had been made as part of the bankruptcy Plan.  The parties agreed that their underlying claims and defenses as to liability would be addressed in the arbitration.  However, they also explicitly agreed that all of their respective rights and defenses were reserved.  They never agreed to arbitrate the question of whether RGS had already admitted liability through the Plan, or to arbitrate any other issue regarding the interpretation of the Plan itself.  The Plan stated that this Court reserved jurisdiction to address "any" issues relating to the interpretation of the Plan.  Plan, ECF No. 364-2, Art. XI.

Arbitration "is a matter of consent, not coercion."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986) (". . . arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. . . ."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (". . . arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration. . ."); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (holding that the arbitrability of an issue is a matter for a court to decide unless there is "clear and unmistakable" evidence that the party agreed that an arbitrator would make that determination).

Whether the Plan included an "admission" of liability (leaving only valuation to be decided) was not one of the issues referred to arbitration. Section 11 of the Federal Arbitration Act states that the court may modify or correct an arbitrator's award if the arbitrator has made an award based on "a matter not submitted to" the arbitrator, unless the matter does not affect the merits of the decision. 9 U.S.C. § 11. Since the arbitrator's decision that Mr. Futterman had allegedly admitted to RGS's liability in the Plan (and that the only remaining issue was the assessment of damages) was based on an issue (the interpretation of the Plan) that was not submitted to her, and since her decision on that matter so plainly affected the merits of her decision, I have the statutory power under section 11 of the Federal Arbitration Act to modify and correct the award "so as to effect the intent thereof and promote justice between the parties." 9 U.S.C. § 11(b). The parties before me have agreed that the alleged "admission" of liability never occurred, and the arbitrator found that no underlying breach of fiduciary duty or breach of contract occurred, so the "correction" that is needed is obvious.

Second, the relevant parts of the arbitration award may and should be vacated under section 10 of the Arbitration act if "the arbitrators exceeded their powers . . ." 9 U.S.C. § 10(a)(4). As explained above, the arbitrator's decision that the Plan included an admission of liability constituted a resolution of an issue that the parties did not agree to submit to arbitration. In that regard it represented an act that exceeded her powers under section 10(a)(4), in addition to being a decision that is subject to modification under section 11. *See Porzig,* 497 F.3d at 140 (stating that if an arbitrator goes beyond the agreement of the parties as to the issues to be resolved "it acts inherently without power" and an award must be vacated).

Third, the relevant parts of the arbitration award may be vacated under section 10(a)(4) of the Arbitration Act to the extent that the arbitrator "so imperfectly executed" the assigned task that

"a mutual, final and definite award upon the subject matter submitted was not made." 9 U.S.C. §
10(a)(4).  In this case, the arbitrator's task was to determine *whether* any underlying violations of
legal duties had occurred and, if so, what damages might be appropriate and against what entity.
She "imperfectly executed" that task by treating "valuation" as the only issue to be decided.  She
may have been induced to follow that path by the misrepresentations made to her by USHA and
Ventures, but regardless of the cause her decision that valuation was the only issue to be decided
was an "imperfect execution" of the task that the parties had agreed to submit to her.

Fourth, my April 19, 2024 Decision requesting clarification of the award made clear that
valuation was not the only issue to be decided, that liability had not be conceded, and that any
contrary view was an incorrect interpretation of the Plan.  My Decision also made clear that the
parties had admitted, before me, that valuation was not the only issue to be decided and that
liability had not been conceded.  When asked to clarify her ruling on these issues, the arbitrator
should either have identified a proper basis for an award of damages, or should have modified her
decision to take this agreed-upon point into consideration.  However, she did not do so.  Instead,
she explained that her damage award was based on her conclusion that, pursuant to the Plan,
valuation was the only issue to be decided, and on that bases she stated that her Final Award "is
reaffirmed and remains in full force and effect."  ECF No. 447-1.

Proof that an arbitrator has made a "manifest disregard of the law" cannot be based on a
mere error.  *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967).
Instead, it requires conduct that amounts to a "disregard" of the law – *i.e.*, evidence that an
arbitrator has neglected to follow an applicable legal ruling despite knowledge of it.  *Local 771,
I.A.T.S.E. v. RKO General, Inc., WOR Div.*, 546 F.2d 1107, 1113 (2d Cir. 1977).  Here, the
arbitrator was informed (through my prior Decision) not only that the Plan had included no

admission of liability, but also that the parties had conceded, before me, that "valuation" was not the sole issue that had to be decided.  Even if the interpretation of the Plan (and whether it included an admission of liability) had been committed to the arbitrator (which it was not for the reasons stated above), the arbitrator's adherence to her erroneous view under these circumstances constituted a manifest disregard of the agreed plain meaning of the Plan.

Fifth, an arbitrator's award may be vacated to the extent it has been obtained by "undue means."  9 U.S.C. § 10(a)(1).  Parties have wide latitude to make factual and legal arguments in good faith.  However, in this case USHA and Ventures misrepresented what I had done when I confirmed the Plan, and they persuaded the arbitrator to adopt an interpretation of the Plan that they knew was at odds with the parties' actual agreement.  While we have found no precedent involving similar situations, I believe that USHA's and Ventures' deliberate misrepresentation of what the parties had previously agreed, and of what I had approved, means that they procured the arbitrator's decision through "undue means."  Cf. Porzig, 497 F.3d at 142–43 (a party's legal argument before an arbitrator that was at odds with controlling Supreme Court authority was a misstatement of law that apparently influenced the arbitrators and was a factor in finding that an award was based on a manifest legal error and had to be vacated).

Neither Ventures nor USHA has attempted to justify or excuse, before me, their prior arguments that valuation was the only issue to be decided, or to justify or excuse the arbitrator's adherence to that theory when she issued her clarifying order.  Ventures has instead urged me to confirm the arbitration award notwithstanding all of these problems, pointing out that the arbitrator stated in her original award that Mr. Futterman "should have" obtained compensation for the Parking Declaration, and suggesting as a result that the arbitrator made an award based on her own general sense of equity or fairness.  The arbitrator's clarification makes clear that she did not do

25

so; she assumed, instead, that liability had already been conceded.  But even if the arbitrator had

intended to do what Ventures suggests, and to make an award against RGS based on vague notions

of the "fairness" of Mr. Futterman's conduct – *without* an admission of liability and *without* an

underlying legal wrong – that would just have meant that the award was in excess of the arbitrator's

authority, for the parties never agreed that damages would or could be owed in such circumstances.

*See 187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005) (holding that an arbitrator

is not free to dispense her own theory of industrial justice, and that once an arbitrator found that

the termination of employee was for just cause, the arbitrator had no authority to order

reinstatement of the employee, and the reinstatement order exceeded the arbitrator's authority);

*see also City of New York*, 95 Misc. 2d at 815 (holding that under New York law "damages can

only be awarded if there is an adverse finding" of liability).

To be clear, I fault USHA and Ventures (not the arbitrator) for this outcome.  USHA and

Ventures not only should have known better, in fact they did know better, as evidenced by their

admissions on April 17.  I am appalled that USHA and Ventures took the position that they took

before the arbitrator.  I am also appalled that at the April 17, 2024 hearing USHA and Ventures

failed to acknowledge the arguments that they had previously made, and that they instead feigned

ignorance as to how or whether the arbitrator might have had the impression that liability issues

had already been conceded.  It is now quite clear from the arbitrator's clarification that the damages

award is based solely on the legal theory that liability had already been admitted, and it is clear

from the arbitration record that it was USHA and Ventures who urged the arbitrator to adopt this

false premise.

For the reasons stated above, I cannot and will not confirm an arbitration award that is

based on a legal premise (an alleged admission) that is plainly wrong and that the parties have

conceded is wrong, and that is the outcome of a bad faith effort by USHA and Ventures to induce the arbitrator to skip over one of the issues (the parties' underlying liability) that was supposed to be a prerequisite to any award of damages. The Partial Final Award and the Final Arbitration Award by Ms. Aldoroty will be vacated and/or modified and corrected to the extent that they award damages against RGS and in favor of USHA and Ventures, but will be confirmed in all other respects.

To the extent that confirmation is required, I will also confirm the 2017 Arbitration Award, as clarified. Accordingly, the right to elect a managing member of 2280 FDB belongs to SOHA as the holder of 99.5% of the membership interests in 2280 FDB, LLC. The right to elect a managing member of SOHA Terrace belongs to the members of SOHA. However, RGS is not eligible to vote for the election of a manager of SOHA to the extent that RGS is under the control of Mr. Futterman. The parties plainly would be best served by the selection of an independent manager to complete the liquidation of 2280 FDB and SOHA Terrace, and I hope that common sense prevails and that such an approach is taken. However, I have no power to impose that solution upon them.

The arbitrations have resolved all other issues among the parties and so the three adversary proceedings that remain pending in this Court will be dismissed. A proposed Order will be submitted to the parties for their comments so as to ensure that all of the relevant rulings have been fully and accurately captured.

Dated:  New York, New York
        June 24, 2024


                                    /s/ Michael E. Wiles
                                    THE HONORABLE MICHAEL E. WILES
                                    UNITED STATES BANKRUPTCY JUDGE